## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FILIP TECHNOLOGIES, INC., *et al.*,[1] | Case No. 16-12192 (KG) |
| Debtors. | (Joint Administration Requested) |

### DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

Filip Technologies, Inc., on behalf of itself and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "**Debtors**"), hereby submits this motion (this "**DIP Motion**") for entry of an interim order (the "**Interim Order**") and a final order (the "**Final Order**" and together with the Interim Order, the "**Financing Orders**"), (I) authorizing the Debtors to enter into senior secured and superpriority post-petition financing (the "**DIP Facility**") with AT&T Capital Services, Inc. as lender under the DIP Facility (in such capacity, the "**DIP Lender**") (ii) authorizing the Debtors to use "cash collateral," (the "**Cash Collateral**") as such term is defined in section 363 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"); granting liens and superpriority administrative claims pursuant to section 364 of the Bankruptcy Code; (iv) scheduling a final hearing with respect to the relief requested herein pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"); and (v) granting related relief.  In support of this DIP Motion, the Debtors respectfully represent as follows.

---

[1] The Debtors in these jointly administered cases are Filip Technologies, Inc. (Tax ID: 0660); Filip Technologies UK Ltd. (ID: 8339); Evado Filip AS (ID: 6131); Evado Filip Limited (ID: 7233); and Evado Filip US Ltd. (Tax Id: 3412).

## Jurisdiction and Venue

1.        This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334 and the *Amended Standing Order of Reference* from the United States District Court for the

District of Delaware, dated February 29, 2012.  Venue is proper pursuant to 28 U.S.C. §§ 1408

and 1409.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b), and the

Debtors confirm their consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy

Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the

"**Local Rules**") to the entry of a final order by the Court in connection with this Motion to the

extent that it is later determined that the Court, absent consent of the parties, cannot enter final

orders or judgments in connection herewith consistent with Article III of the United States

Constitution.  The statutory predicates for the relief requested herein are sections 105, 361, 362,

363, 364, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014,

and Local Rule 4001-2.

## Relief Requested

2.        By this Motion, the Debtors request entry of the Interim Order, substantially in

the form attached hereto as **Exhibit I**, and the Final Order (together with the Interim Order, the

"**DIP Orders**") that, among other things:[2]

> a.        authorizes Filip Technologies, Inc. (the "**Borrower**") to obtain, and each
> of the other Debtors (collectively, the "**Guarantors**", and the Borrower
> and Guarantors being referred to herein collectively as the "**Obligors**") to
> unconditionally guaranty, jointly and severally, the Borrower's and each
> other's obligations in respect of the DIP Facility, which if approved on a
> final basis would consist of post-petition financing in a total amount of
> $1,240,000, inclusive of the Roll-Up Loans (defined below) provided
> pursuant to the terms of (w) the Interim Order and, on a final basis, the

---

[2]    The terms of the DIP Facility as described in this Motion are for illustrative purposes only.  This Motion is not
intended to modify or supersede any of the terms of the DIP Facility or the proposed Interim Order.  In the
event of any conflict or inconsistency between this Motion and either the DIP Loan Documents or the proposed
Interim Order, then the DIP Loan Documents or the Interim Order, as applicable, shall be controlling.

Final Order, (x) that certain Summary of Proposed Terms and Conditions for Debtor-In-Possession Financing, dated as of October 5, 2016 (the "**Term Sheet**" and together with any definitive documentation in form and substance acceptable to the DIP Lender, and each as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with their respective terms, the "**DIP Credit Agreement**"), a true and correct copy of which is attached to the Interim Order as Exhibit A, by and among the Borrower, the Guarantors, and the DIP Lender, (y) with respect to the Roll-Up Loans (defined below), that certain Secured Promissory Note, dated September 28, 2016, by and among the Borrower and AT&T Capital Services, Inc. as pre-petition lender (in such capacity, "**AT&T**") (collectively with any other agreements and documents executed or delivered in connection therewith (each as may be amended, restated, supplemented, or otherwise modified from time to time), the "**AT&T Prepetition Promissory Note**") and (z) any and all other credit documents (as contemplated by the DIP Credit Agreement, and together with the DIP Credit Agreement and the AT&T Prepetition Promissory Note, collectively, the "**DIP Loan Documents**");

b.    authorizes the use of the proceeds of the DIP Facility to, among other things, make payments as permitted by the initial 12-week budget (the "**Initial Budget**"), a copy of which is attached to the Interim Order as Exhibit B, and each subsequent Authorized Budget (defined below) for operating expenses, general and ordinary purposes of the Debtors, the satisfaction of interest, fees, and costs due under the DIP Credit Agreement, and for other administrative expenses, including budgeted professional fees, all subject to the conditions set forth in the final DIP Loan Documents and in the Interim Order;

c.    approves borrowings between the entry of the Interim Order and the entry of the Final Order in an aggregate principal amount not more than $150,000 (the "**Interim Advance**"), and authorizes the Guarantors to unconditionally guaranty obligations under the DIP Loan Documents jointly and severally;

d.    approves the conversion, concurrently with the entry of the Interim Order, of the outstanding senior prepetition indebtedness (the "**Senior Prepetition Indebtedness**") in an amount equal to $480,000, borrowed pursuant to the AT&T Prepetition Promissory Note, including, without limitation, outstanding principal and accrued interest and fees thereon into the DIP Facility (the "**Roll-Up Loans**"), such that automatically upon the entry of the Interim Order, (a) the Senior Prepetition Indebtedness shall be deemed to have been incurred under the DIP Facility, (b) the Prepetition AT&T Collateral (defined below) shall be deemed to be DIP Collateral (defined below), and (c) the Prepetition AT&T Liens (defined below) shall be deemed to be DIP Liens (defined below);

e.      approves the terms of, and authorizes the Debtors to execute and deliver and perform under, the DIP Credit Agreement and authorizes and directs the Debtors to perform such other and further acts as may be required in connection with the DIP Loan Documents (including, without limitation, the negotiation thereof) and the Interim Order;

f.      grants to the DIP Lender, (x) the DIP Liens on all of the DIP Collateral pursuant to sections 364(c)(1), 364(c)(2), and 364(d)(1) of the Bankruptcy Code, which DIP Liens are senior to all other liens and (y) pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority administrative claims having recourse to all pre-petition and post-petition property of the Debtors' estates, now owned or hereafter acquired and the proceeds of each of the foregoing, including,[3] upon entry of the Interim Order, any Debtor's rights under section 549 of the Bankruptcy Code and the proceeds thereof, and upon entry of the Final Order, the proceeds of Avoidance Actions (as defined below);

g.      authorizes the Debtors to use Cash Collateral, including Cash Collateral in which the DIP Lender has a lien or other interest, in each case whether existing on the Petition Date, arising pursuant to the Interim Order, or otherwise;

h.      vacates the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Interim Order;

i.      schedules a final hearing on the DIP Motion (the "**Final Hearing**") to be held no later than 21 calendar days after the entry of the Interim Order to consider entry of the Final Order that grants all of the relief requested in this DIP Motion on a final basis and which Final Order shall be in form and substance (including with respect to any subsequent modifications to the form or substance made in response to objections of other creditors or this Court) acceptable to the DIP Lender;

j.      waives, upon entry of the Interim Order, certain rights of the Debtors to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code; and

k.      provides for the immediate effectiveness of the Interim Order and waives any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

---

[3]     As used herein, the words "including" or "include" and variations thereof shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation."

**Background**

A.      **Introduction and Case Background**

3.      On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition with the Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these chapter 11 cases.  As of the date hereof, no creditors' committee has been appointed.

4.      Factual background relating to the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in detail in the *Declaration of Roy Messing in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* (the "**First Day Declaration**") and is incorporated herein by reference.

5.      As described in the First Day Declaration, the Debtors, with the assistance of a retained investment banking firm, pursued a marketing and sale process for substantially all of their assets over a period of approximately five months prior to the Petition Date.  As of late August 2016, these efforts, although exhaustive, had not secured a prospective buyer.  At that time, the Debtors informed AT&T (also the Debtors' largest customer) that the Debtors lacked sufficient liquidity to continue to maintain the Filip Service and that, absent additional liquidity, the Debtors would have no alternative but to initiate proceedings under Chapter 7 of the Bankruptcy Code.  To avoid this outcome and enable the Debtors to continue strategic discussions with potential acquirers while maintaining the operation of the Filip Service for the benefit of the Debtors' direct customers and end users, AT&T advanced $160,000 to the Debtors pursuant to that certain Maintenance Agreement dated as of August 24, 2016, by and among the Borrower and AT&T Services, Inc. (the "**Maintenance Agreement**")  Subsequently, AT&T advanced a further $80,000 to the Debtors pursuant to that certain Supplemental Maintenance

Agreement, dated as of September 16, 2016, by and among the Borrower and AT&T Services, Inc. (the "**Supplemental Maintenance Agreement**," and together with the Maintenance Agreement, and each as amended, restated, supplemented, or otherwise modified from time to time, collectively, the "**Prepetition Maintenance Agreements**" and the loans extended thereunder, the "**Maintenance Amounts**").  The $240,000 of total Maintenance Amounts advanced by AT&T Services, Inc. to the Debtors on an unsecured basis pursuant to the Prepetition Maintenance Agreements afforded the Debtors with further runway to continue strategic discussions regarding a potential sale, while maintaining the continued operation of the Filip Service.

6.      During the course of these discussions with interested parties, it became clear to the Debtors that no party was willing to pursue an acquisition of the Debtors' business outside of a Chapter 11 process.  The Debtors inquired of the potential purchasers whether they would agree to advance debtor-in-possession ("**DIP**") financing in order to facilitate such a process, but none of the potential purchasers expressed willingness to do so.  Additionally, the Debtors explored whether their existing lead investors would provide additional capital to fund the Debtors' Chapter 11 process.  Despite these efforts, the Debtors were unable to obtain any alternative proposals for DIP financing.

7.      By late September 2016, the Debtors had nearly exhausted the funding provided under the Prepetition Maintenance Agreements and faced the prospect of having to shut down the Filip Service due to the Debtors' dire cash position.  The Debtors requested that AT&T advance (a) immediate financing to allow the Debtors to prepare for the filing of these cases and (b) postpetition financing to support an expeditious sale process within the context of a chapter 11 proceeding in an effort to create a competitive auction process for the Debtors' business and

assets.  On September 26, 2016, the Debtors entered into the AT&T Prepetition Promissory

Note, which provided $240,000 in new secured borrowings and rolled up the Maintenance

Amounts (which Maintenance Amounts were assigned by AT&T Services, Inc. to AT&T) under

the Prepetition Maintenance Agreement into a single secured loan (the Prepetition Maintenance

Agreements and the AT&T Prepetition Promissory Note, collectively the "**AT&T Prepetition**

**Loan**" and the agreements and documents executed or delivered in connection therewith (each as

may be amended, restated, supplemented, or otherwise modified from time to time), the "**AT&T**

**Prepetition Loan Documents**").

8.     With initial funding in place to permit the Debtors to prepare for their chapter 11

cases, the Debtors then engaged in good-faith, arm's length negotiations regarding the DIP

Credit Agreement with AT&T.  During this time, the Debtors continued to explore whether

additional financing might be available, other than from AT&T, and those efforts were

unavailing.

9.     During the course of the Debtors' negotiations with AT&T, the Debtors, among

other things, explored AT&T's willingness to provide financing without the requested milestones

and other lender protections that are included in the DIP Facility.  The Debtors' efforts

culminated in the proposed DIP Facility, which is described below.  After the Debtors' good-

faith and arm's length efforts, the Debtors believe that, under the circumstances of these cases

and the Debtors' financial condition, the Debtors have obtained terms that are fair and reasonable

and are the best available to the Debtors.  Equally important, the Debtors believe that the DIP

Facility will provide the Debtors with the funds that are immediately needed in order to avoid

irreparable harm, maintain and preserve the value of the Debtors' assets, continue the operation

of the Filip Service uninterrupted for the benefit of direct customers and end users, and provide

the Debtors' the necessary liquidity to conduct a public and competitive process to sell their assets and obtain maximum value for all stakeholders through Chapter 11.

## The Proposed DIP Facility

10.     The salient terms of the DIP Credit Agreement and the other DIP Loan Documents to be executed in connection therewith and to which the DIP Facility refers are set forth in the Term Sheet attached hereto as <u>Exhibit A</u>, which is incorporated herein by reference.

11.     Under the proposed DIP Credit Agreement, the DIP Lender will make cash advances and other extensions of credit in a maximum principal amount not to exceed $1.24 million, inclusive of the Roll-Up Loans, subject to the terms and conditions of the DIP Loan Documents.  The DIP Lender requires, and the Debtors have agreed, that the DIP Facility, proceeds of the DIP Facility, and Cash Collateral shall be used in a manner consistent with the terms and conditions of the DIP Loan Documents, including any covenant contained therein pertaining to compliance with the Authorized Budget, solely for, *inter alia*: (i) the working capital needs of the Debtors, (ii) the satisfaction of interest, fees and costs due under the DIP Facility, and (iii) permitted payment of costs of administration of the chapter 11 cases, all solely in accordance with the DIP Loan Documents, Authorized Budget and the Financing Orders.

12.     The DIP Lender's commitment to fund the DIP Facility is subject to, *inter alia*, entry of the Financing Orders satisfactory to the DIP Lender.  Further, pursuant to the DIP Loan Documents, the Debtors have agreed to close a sale of their assets by no later than the earlier of November 10, 2016 or the date that is five (5) days after the Sale Hearing (as defined in the Sale Motion) (the "**Sale Closing Date**").[4]

---

[4]     *See Debtors' Motion For Orders (I)(A) Approving Bidding Procedures and Auction and (B) Scheduling Sale Hearing and Approving Notice Thereof; (II) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (III) Authorizing the Assumption*

## Local Rule 4001-2 Disclosures

13.     The Debtors believe that the following financing terms are required to be identified pursuant to Bankruptcy Rules 4001(b) and (c) and Local Rule 4001-2 and, as discussed herein, are necessary and justified in the context of, and the circumstances relating to, the chapter 11 cases.

a.     <u>Stipulations to Validity, Perfection, and Amount of Prepetition Liens; Waiver of Prepetition Claims</u>.  Local Rule 4001-2(a)(i)(B) requires the disclosure of provisions or findings of fact that bind the estate with respect to validity, amount, or perfection of liens or a waiver of claims, without first giving certain parties in interest an opportunity to conduct an investigation.  Although the DIP Loan Documents include certain stipulations by the Debtors related to the validity, amount, and perfection of the Senior Prepetition Indebtedness, the Interim Order provides for the earlier to occur of (a) the date that is seventy-five (75) days after entry of the Interim Order, and (b) the date that is sixty (60) days after the appointment of the official committee of unsecured creditors, if any, as the challenge period for such stipulations.  *See* Interim Order ¶¶ D & 6.

b.     <u>Waiver of Section 506(c) Surcharge</u>.  Local Rule 4001-2(a)(i)(C) requires disclosure of provisions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code.  The DIP Loan Documents also provide for a waiver of rights under section 506(c) with respect to the DIP Lender upon entry of the Interim Order.  *See* Interim Order ¶ 8.

c.     <u>Liens on Avoidance Actions</u>.  Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant the prepetition secured creditor liens on avoidance actions.  Pursuant to the DIP Loan Documents, the DIP Lender are granted liens on claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state or municipal law and the proceeds of each of the foregoing (which for avoidance of doubt, excludes Debtors' claims and causes of action under section 549 of the Bankruptcy Code or similar state or municipal law and the proceeds of each of the foregoing), and the proceeds thereof, whether received by judgment, settlement, or otherwise upon the entry of the Interim Order, provided however, the DIP Lender shall only receive a lien on the claims and causes of action after entry of a Final Order.  *See* Interim Order ¶ 2(h)(I).

d. <u>Roll-Up of Senior Prepetition Indebtedness</u>. Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that use post-petition loans to repay prepetition debt. The DIP Loan Documents provide for the "roll-up" of the outstanding obligations arising under or in connection with the AT&T Prepetition Promissory Note, including, without limitation, outstanding principal and accrued interest and fees, immediately upon entry of the Interim Order. The Roll-Up Loans shall be subject to the Challenge Period established under Paragraph 6 of the Interim Order. *See* Interim Order ¶¶ 2(c), 6; DIP Credit Agreement at 2.

e. <u>Treatment of Professionals</u>. Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment to professionals retained by the creditors' committee from professionals retained by the Debtors. The Carve-Out provided for in the Interim Order is applicable to solely to the Debtors' professionals. *See* Interim Order ¶ 7(a).

14.    The provisions of the DIP Loan Documents as to which disclosure was required pursuant to Local Rule 4001-2 are all justified under the circumstances of the chapter 11 cases because (i) the Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral and borrowing under the DIP Facility is vital to a successful sale and/or to otherwise preserve the value of the Debtors' estates and (ii) the Debtors will suffer immediate and irreparable harm if financing is not obtained and permission to use Cash Collateral is not granted immediately, in each case in accordance with the terms of the Interim Order and the DIP Loan Documents, as well as for all of the other reasons discussed below.

**Basis for Relief Requested**

15.    As set forth above and in the First Day Declaration, the Debtors believe that the DIP Facility is the best, and only, financing available to the Debtors under the circumstances and will enable the Debtors, among other things, to continue to operate their assets as a going concern during an orderly marketing and competitive sale process and to otherwise preserve and maximize the value of the Debtors' estates. If immediate financing is not obtained in accordance with the terms of the Interim Order and the DIP Loan Documents, the Debtors and their estates will suffer immediate and irreparable harm.

16.     For the reasons stated herein, the Debtors submit that they have satisfied the requirements to access post-petition financing on a superpriority, secured basis pursuant to section 364 of the Bankruptcy Code.  Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security.  If a debtor in possession cannot obtain sufficient post-petition credit on an unsecured basis, section 364(c) of the Bankruptcy Code permits a bankruptcy court to authorize a debtor to obtain credit or incur debt, repayment of which is (x) entitled to super-priority, administrative-expense status or (y) is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or both.  Furthermore, section 364(d) of the Bankruptcy Code permits a bankruptcy court to authorize a debtor to obtain post-petition credit secured by a senior or equal lien on encumbered property (*i.e.*, a priming lien) when a debtor is unable to obtain credit elsewhere and the interests of existing lienholders are adequately protected.  11 U.S.C. §§ 364(c), (d).

17.     As further discussed herein, the DIP Facility is secured by substantially all of the assets of the Debtors' estates through super-priority claims, security interests, and secured liens pursuant to section 364.  The circumstances of the chapter 11 cases necessitate post-petition financing under section 364(c) and (d) of the Bankruptcy Code, and the DIP Facility reflects the sound exercise of the Debtors' business judgment.

## I.     THE DEBTORS SHOULD BE AUTHORIZED TO OBTAIN POST-PETITION FINANCING UNDER SECTION 364(C) OF THE BANKRUPTCY CODE

18.     Section 364(c) of the Bankruptcy Code provides that if a debtor is unable to obtain unsecured credit allowable as an administrative expense, the court may authorize the debtor to obtain credit or incur debt (a) on a super-priority administrative basis, (b) secured by a

lien on the debtor's unencumbered assets, or (c) secured by a junior lien on the debtor's already

encumbered assets.  11 U.S.C. § 364(c).  Section 364(c) financing is appropriate when the debtor

in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.

*See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-29 (Bankr. S.D.N.Y. 1990) (debtor must show

that it has made a reasonable effort to seek other sources of financing under sections 364(a) and

(b) of the Bankruptcy Code); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987)

(secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and

hearing, upon showing that unsecured credit cannot be obtained).

19.     Courts have articulated a three-part test to determine whether a debtor is entitled

to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

> a.     The debtor is unable to obtain unsecured credit under section 364(b), i.e.,
>        by allowing a lender only an administrative claim;
>
> b.     The credit transaction is necessary to preserve the assets of the estate; and
>
> c.     The terms of the transaction are fair, reasonable, and adequate, given the
>        circumstances of the debtor-borrower and the proposed lender.

*In re Ames Dep't Stores*, 115 B.R. at 37-39.

20.     The Debtors propose to obtain the financing set forth in the DIP Credit

Agreement by providing, among other things, super-priority claims, security interests, and liens

pursuant to sections 364(c)(1)—(3) and section 364(d) of the Bankruptcy Code.  For the reasons

set forth below, the Debtors submit that entry into the DIP Facility satisfies each of these factors.

**A.     The Debtors Could Not Obtain Unsecured Financing**

21.     To show that the credit required is not obtainable on an unsecured basis, a debtor

need only demonstrate "by a good faith effort that credit was not available without" the

protections of sections 364(c) of the Bankruptcy Code.  *Bray v. Shenandoah Fed. Sav. And Loan

Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  Thus, "[t]he statute imposes

no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*, *see also In re Ames Dep't Stores*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also *In re Snowshoe Co.*, 789 F.2d 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

22.     As set forth above and in the First Day Declaration, unsecured financing is not available to the Debtors.  As evidenced by the fact that potential buyers, aware of the Debtors' liquidity situation, expressed no interest in funding the Debtors (on any terms) demonstrates that the Debtors have no viable alternative to the proposed DIP Facility.  Obtaining the financing needed by the Debtors as unsecured debt is simply not a viable option.

23.     Accordingly, the Debtors have satisfied the requirement of sections 364(c) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors.

**B.      Entry Into the DIP Facility Is Necessary to Preserve Assets of the Estates and Is In the Best Interests of Creditors.**

24.      A debtor's decision to enter into a post-petition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  *See In re Barbara K. Enters., Inc.*, 2008 WL 2439649 at *14 (Bankr. S.D.N.Y. Mar. 5, 2009) (explaining that courts defer to a debtor's business judgment); *Ames Dep't Stores*, 115 B.R. at 38 (noting that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment). Courts grant a debtor considerable deference in acting in accordance with its sound business judgment.  *See, e.g., Barbara K. Enters.*, 2008 WL 2439649 at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to any party in interest."). Further, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).

25.      The Debtors' decision to enter into the proposed DIP Facility is an exercise of their sound judgment that warrants approval by the Court.  The Debtors' management, Board of Directors, and professionals have reviewed their restructuring alternatives in detail.  These chapter 11 cases follow several exhaustive yet unfortunately unavailing efforts by the Debtors to consummate strategic transactions over the past year.  Faced with the depletion of remaining liquidity and the inability to obtain further funding outside of Chapter 11, the Debtors' management took the steps they deemed necessary and exercised their best business judgment in negotiating the DIP Facility.  The Debtors management and the Board of Directors ultimately

concluded that the DIP Facility will provide immediate access to capital to pay their limited

ongoing operating expenses while enabling the Debtors to pursue a sale of substantially all of the

Debtors' assets on a competitive basis and under the protection of Chapter 11, all on more

favorable terms than any other reasonably available alternative.

26.     Without this financing (and the AT&T Prepetition Loan) the Debtors would have

liquidated under chapter 7 with no chance for a recovery to their creditors.  The DIP Facility is

the Debtors' best and only means of obtaining the liquidity necessary to avoid a shutdown of

their business, preserve going concern value, and effectuate a value-maximizing sale transaction

for the benefit of all stakeholders.

**C.      The Terms of the DIP Facility Are Fair and Reasonable Under the Circumstances.**

27.     In determining whether the terms of post-petition financing are fair and

reasonable, courts consider the relative circumstances of both the debtor and the potential lender.

*In re Farmland*, 294 B.R. at 886-89; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v.*

*First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 364-65 n.7

(W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds

for its reorganization).  Judged from that perspective, the terms of the DIP Facility are fair and

reasonable.

28.     The DIP Facility provides the Debtors the liquidity they need to maintain their

assets during the chapter 11 cases and allow the Debtors to pursue and effectuate a competitive

process and sale of the Debtors' assets.  The proceeds of the DIP Facility are sized to support the

Debtors through the anticipated pendency of these chapter 11 cases and to preserve and promote

the viability of the Debtors' assets, but nothing more.  Moreover, the financial terms and

covenants of the DIP Facility are standard and more than reasonable for financing of this kind.

29.     Based on the Debtors' negotiations regarding the DIP Facility, the terms of the

DIP Loan Documents constitute, on the whole, the most favorable terms the Debtors could

achieve upon which the DIP Lender will extend the necessary post-petition financing.  Although

the Debtors explored whether the DIP Lender would provide the DIP Facility without certain

provisions, in the course of negotiations, the DIP Lender indicated it would not be willing to

provide the DIP Facility without such terms.  In particular, the DIP Lender would not provide

financing without the provisions requiring, in particular: (i) the achievement of certain sale

milestones, including the filing of a sale motion on or shortly after the Petition Date and (ii) the

conversion of the Senior Prepetition Indebtedness into Roll-Up Loans under the DIP Facility,

and (iii) securing the DIP Facility with first-priority liens and superpriority claims.  These are

key components of consideration for the DIP Lender without which it has indicated it is

unwilling to provide the DIP Facility.

30.     Accordingly, the Debtors, in consultation with their advisors—recognizing the

absence of favorable competing proposals and the benefits to be provided under the DIP

Facility—determined in their sound business judgment that the terms of the DIP Credit

Agreement were superior to any other set of terms reasonably available to the Debtors at this

time.  Therefore, the DIP Facility provides the Debtors with the best, most feasible, and value-

maximizing financing option available at this time.

31.     Moreover, the Debtors have concluded that the economic terms of the DIP

Facility are fair and reasonable and are consistent with what can be expected in a debtor-in-

possession financing facility. In that regard, it is worth noting that the DIP Lender has not

imposed any fees on the Debtors for providing the DIP Facility.  After thorough analysis by the

Debtors and their advisors, they have concluded that the terms of the DIP Facility are reasonable

and appropriate under the circumstances.  The non-economic terms of the DIP Facility, including

the sale milestones, are also within the range of what can be expected for a debtor-in-possession

financing facility, particularly considering the facts and circumstances of these cases, and the

nature of the Debtors' assets.

32.     For these reasons, in the Debtors' prudent business judgment, the terms of the

DIP Facility are fair and reasonable in the circumstances of the chapter 11 cases and the Debtors

could not obtain post-petition financing from any other lending source.

### D.     The Roll-Up Is Warranted

33.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease

property, other than in the ordinary course of business, with court approval.  It is well settled in

the Third Circuit that such transactions should be approved when they are supported by a sound

business purpose.  *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in

the Third Circuit, a debtor's use of assets outside the ordinary course of business under section

363(b) should be approved if the debtor can demonstrate a sound business justification for the

proposed transaction).  The business judgment rule shields a debtor's management from judicial

second-guessing.  *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986)

("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a

presumption of reasonableness attaches to a debtor's management decisions.").

34.     The DIP Lender has made clear to the Debtors that the conversion of the Senior

Prepetition Indebtedness into Roll-Up Loans under the DIP Facility, such that automatically and

immediately upon entry of the Interim Order (a) the Senior Prepetition Indebtedness shall be

deemed to have been incurred under the DIP Facility, (b) the Prepetition AT&T Collateral shall

be deemed to be DIP Collateral, and (c) the Prepetition AT&T Liens shall be deemed to be DIP

Liens, is an integral part of the overall package presented by the DIP Facility.  The DIP Facility,

on the whole, is fair and reasonable under the circumstances, and more importantly, is the only

option available to the Debtors that provides them essential liquidity, without which the Debtors'

assets would be immediately and irreparably harmed.  On these facts, the Debtors' business

judgment in agreeing to including the Roll-Up Loans in the DIP Facility is well supported.

### E.      Use of Cash Collateral

35.     Section 363 of the Bankruptcy Code governs the Debtors' use of property of the

estates.   Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under
> Section . . . 1108 . . . of this title and unless the court orders
> otherwise, the trustee may enter into transactions, including the
> sale or lease of property of the estate, in the ordinary course of
> business, without notice or a hearing, and may use property of the
> estate in the ordinary course of business without notice or a
> hearing.

11 U.S.C. § 363(c)(1).

36.     Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with

respect to "cash collateral" to the general grant of authority to use property of the estate in the

ordinary course set forth in section 363 of the Bankruptcy Code.  Specifically, a trustee or debtor

in possession may not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

a.      Each entity that has an interest in such collateral consents; or

b.      The court, after notice and a hearing, authorizes such use, sale, or lease in
accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

37.     The Debtors need the proposed DIP Facility and the use of Cash Collateral in

order to pursue a strategic sale of their assets and to fund their ordinary course of business

operations and administration in the interim.  Accordingly, to obtain the financing under the DIP

Facility and to avoid immediate and irreparable harm to the Debtors' business operations and their estates, the Debtors have an immediate need for authority to use Cash Collateral.

38.     The Debtors submit that, under the circumstances here, their request to use Cash Collateral should be approved.  The DIP Lender affirmatively consents to the use of Cash Collateral provided that the relief requested herein is granted.  Absent such authority, the Debtors would not have access to any additional liquidity, which would imperil their ability to pursue a sale of their assets.  Any delay in pursuing a sale poses grave risk to the Debtors, and their ability to implement the strategy that will yield highest recovery for their estates and their creditors. Accordingly, the proposed adequate protection is fair, reasonable, and sufficient to justify the requirements of sections 363(c)(2) and (3) of the Bankruptcy Code.

## II.     INTERIM APPROVAL SHOULD BE GRANTED

39.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the borrowers' estates.

40.     The Debtors request that the Court hold and conduct an interim hearing immediately to consider entry of the proposed Interim Order authorizing the Debtors from and after the entry of the Interim Order until the Final Hearing to borrow under the DIP Facility as provided therein.  This relief will enable the Debtors to operate their businesses in a manner that will permit them to preserve and maximize value and therefore avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

**Final Hearing & Notice**

41.     The Debtors further respectfully request that the Court schedule the Final Hearing and authorize it to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, by first-class mail upon: (a) the U.S. Trustee; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the DIP Lender; (d) all known holders of liens upon the Debtors' assets; (e) the Internal Revenue Service; (f) the United States Department of Justice; (g) the Securities and Exchange Commission; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.

**No Prior Request**

42.     No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter (i) the Interim Order

granting the relief requested herein, (ii) schedule a Final Hearing, (iii) enter the Final Order

following a Final Hearing, and (iv) grant such other relief as is just and proper.

Dated: October 5, 2016
      Wilmington, Delaware

**BIELLI & KLAUDER, LLC**

*/s/ David M. Klauder*
David M. Klauder (No. 5769)
Nella M. Bloom (No. 5430)
1204 N. King Street
Wilmington, DE 19801
Phone: (302) 803-4600
Fax: (302) 397-2557
Email: dklauder@bk-legal.com
Email: nbloom@bk-legal.com

and


**MOORE & VAN ALLEN PLLC**

Zachary H. Smith (*pro hac vice* filed)
Hillary B. Crabtree (*pro hac vice* filed)
100 N. Tryon Street, Suite 4700
Charlotte, NC 28202
Telephone: (704) 331-1000
Facsimile: (704) 378-1909
Email:   zacharysmith@mvalaw.com
Email:   hillarycrabtree@mvalaw.com


*Proposed Counsel to the Debtors and Debtors-In-Possession*