## **Exhibit A**

217399535v.12
CHAR2\1836825v3

**SUMMARY OF PROPOSED TERMS AND CONDITIONS FOR
DEBTOR-IN-POSSESSION FINANCING**
(Confidential - For Discussion Purposes Only; Not a Commitment)

Filip Technologies, Inc.
Filip Technologies UK Ltd
Evado Filip AS
Evado Filip Limited
Evado Filip US Ltd.

Debtors and Debtors-in-Possession
October 5, 2016

This summary of proposed terms and conditions is intended as a summary outline of the material terms of a proposed financing, which is conditioned in all respects upon completion of due diligence, negotiation of definitive documentation and final credit approval and does not purport to summarize all of the conditions, covenants, representations, warranties, events of default and other provisions which would be contained in definitive documentation, all of which shall be acceptable to the DIP Lender (as defined below).  Further, the DIP Lender is under no obligation to make a loan or make any commitment to lend and any such commitment would be subject to, among other conditions, such DIP Lender obtaining any necessary final credit authorizations and approvals and the negotiation, execution and delivery of definitive documentation in form and substance satisfactory to such DIP Lender.  Any provision of financial accommodations under such debtor-in-possession credit facility shall be further subject to the terms and conditions and Bankruptcy Court (as defined below) approval as set forth below.

| | |
|---|---|
| **Borrower:** | Filip Technologies, Inc., a Delaware corporation, as debtor and debtor-in-possession ("**Borrower**") under chapter 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in jointly administered cases with Filip Technologies UK Ltd, a private limited company organized under the laws of England and Wales, United Kingdom ("**Filip UK**"), Evado Filip AS, a private limited company organized under the laws of Norway ("**Filip Norway**"), Evado Filip Limited, a private limited company organized under the laws of England and Wales, United Kingdom ("**Evado UK**"), and Evado Filip US Ltd., a Delaware corporation ("**Evado US**," together with Filip UK, Filip Norway, Evado UK and the Borrower, collectively, the "**Debtors**," and the chapter 11 cases, collectively, the "**Cases**")[1] commenced on October 5, 2016 (the "**Petition Date**" or "**Petition Dates**") in the United States Bankruptcy Court for the District of Delaware (along with all other Federal courts of competent jurisdiction, the "**Bankruptcy Court**"). |
| **Guarantors:** | All obligations under the DIP Facility (as below) and the |

---

[1] For the avoidance of doubt, the only Borrower under the DIP Facility will be Filip Technologies, Inc.

|  |  |
|---|---|
|  | other DIP Loan Documents (as defined below) will be unconditionally guaranteed (the "**Guarantee**") by each subsidiary of the Borrower (collectively, the "**Guarantors**"). |
| **DIP Lender:** | AT&T Capital Services, Inc. (the "**DIP Lender**"). |
| **DIP Facility:** | The DIP Lender will provide the Borrower with a senior secured, superpriority multiple draw term loan facility (the "**DIP Facility**") in the aggregate commitment amount of up to $1,240,000 (the "**Maximum Amount**"). Loans under the DIP Facility will be made available pursuant to bi-monthly draw requests and may be used only for the Permitted Purposes (as defined below). Funding mechanics and timing will be set forth in the definitive documentation for the DIP Facility. |
|  | Upon the entry by the Bankruptcy Court of the Interim Order (as defined below), (i) an initial amount of up to $150,000 (the "**Interim Advance**") of the DIP Facility shall be made available during the period from the date of entry of the Interim Order by the Bankruptcy Court through the date of entry of the Final Order (as defined below) by the Bankruptcy Court and (ii) a conversion of outstanding senior prepetition indebtedness (the "**Senior Prepetition Indebtedness**") in an amount equal to $480,000, borrowed pursuant to that certain Secured Promissory Note, dated September 28, 2016, by and among the Borrower and the DIP Lender (the "**Prepetition Senior Secured Promissory Note**"), including, without limitation, outstanding principal and accrued interest and fees thereon (the "**Roll-Up Loans**") shall be deemed to have been incurred under the DIP Facility. The balance of the commitments under the DIP Facility shall be available only upon and after entry of the Final Order. Pending entry of the Final Order, the DIP Lender shall be afforded all of the protections contained in the Interim Order. |
| **Maturity/Termination Date:** | The DIP Facility and the Borrower's right to use proceeds of the DIP Facility and Cash Collateral (defined below) shall automatically terminate without further notice or court proceedings, unless extended with the prior written consent of the DIP Lender, on the earlier of: (i) six (6) months following the Petition Date (the "**Scheduled Termination Date**"); (ii) the date of acceleration of any outstanding borrowings under the DIP Facility pursuant to an Event of Default; (iii) the date a plan of reorganization or plan of liquidation for one or more of the Debtors becomes effective; (iv) the date on which any of the Debtors agree to a sale of all or substantially all of their assets in one or more sales that the DIP Lender does not consent to (including, without limitation, a sale that requires the Debtors to use Cash Collateral or proceeds from, or that would otherwise be available to repay, the DIP Facility to pay Cure Amounts in connection with such sale or otherwise during these |

|  |  |
|---|---|
|  | cases); (v) the Sale Closing Date (as defined below), <u>provided</u>, however, the Debtors and DIP Lender may agree to extend such date for up to (x) 60 days if, on or prior to the Sale Closing Date, the Debtors demonstrate the ability to confirm a plan of liquidation or (y) up to 30 days if, on or prior to the Sale Closing Date, the Debtors demonstrate the ability to seek a structured dismissal or other appropriate disposition of the bankruptcy cases (and the form of such dismissal order is acceptable to the DIP Lender); (vi) the Debtors do not receive a Qualified Bid by the Bid Deadline (each as defined in the Bidding Procedures Order), (vii) the Debtors abandon the Approved Sale (as defined below) or the Approved Sale is otherwise terminated; or (viii) the Approved Sale is modified without the DIP Lender's prior written consent (each a "**Termination Date**").  The Termination Date herein supersedes any termination or maturity date in any documentation governing the Senior Prepetition Indebtedness. |
| **Interest Rate:** | The outstanding DIP Obligations (as defined below) shall bear interest at the rate of 7.50% per annum.  During the continuance of an Event of Default (as defined below) all DIP Obligations shall bear interest at the rate of 9.50% per annum (the "**Default Rate**"). |
|  | Interest will be calculated using the actual number of days elapsed based on a 365-day year and paid monthly.  Until an Event of Default occurs, interest shall not be paid in cash currently, but instead shall accrue, be capitalized and thereafter bear interest.  During the continuance of an Event of Default, interest shall be payable in cash on demand at the Default Rate. |
| **Fees:** | No fees will be charged by the DIP Lender with respect to the provision of DIP Facility. |
| **Priority and Security:** | All obligations of the Debtors under the DIP Facility, including, without limitation, any principal, interest, fees, expenses and indemnification obligations (collectively, the "**DIP Obligations**")**,** shall be: |

 (i) entitled to superpriority administrative claim status under section 364(c)(1) of the Bankruptcy Code with priority over all administrative expense claims and unsecured claims now existing or hereafter arising under the Bankruptcy Code (the "**Superpriority Claim**"), subject only to the Carve-Out (as defined below); and

 (ii) secured pursuant to section 364(c)(2) of the Bankruptcy Code by valid, enforceable, first priority, fully perfected security interests in and liens upon all DIP Collateral.

 "**DIP Collateral**" shall mean all property of the estate of the Debtors as provided for in section 541 of the Bankruptcy Code

whether existing prior to the Petition Date or arising thereafter, including property of each Debtor's estate as of the Petition Date, and all of the Borrower's rights in property acquired post-petition whether now existing or hereafter acquired or arising and all proceeds thereof and recoveries related thereto.  Upon entry of a Final Order, the DIP Collateral shall include the claims, proceeds or related recoveries of any avoidance actions under sections 502(d), 544, 547, 548, 550, and 553 of the Bankruptcy Code.  In addition, DIP Collateral shall include the claims (and the proceeds of such claims) and standing to bring and settle any such claims (including, but not limited to, injunctive relief) that the Debtors may have against any "stalking horse" bidder (or alternate successful bidder) as a result of such bidder's breach of an agreement to purchase the Debtors' assets.

For the avoidance of doubt, and without limitation, DIP Collateral shall include (i) each Debtor's and its estate's rights with respect to all proceeds or recovery or any avoidance actions pursuant to sections 545 and 549 of the Bankruptcy Code; (ii) all inter-company obligations due to each Debtor and all other instruments and securities of each Debtor; (iii) (a) all entitlements, permits, licenses, leases and approvals (collectively, "**Permits**"), including but not limited to any and all Permits issued by any federal, state, county, city or local governmental entity or agency, (b) appurtenances, (c) water rights, (d) accounts of any kind or nature to the extent permitted by applicable law, (e) goods, (f) inventory, (g) equipment, (h) investment property, (i) instruments, (j) chattel paper, (k) rights as a lessee under any leases for real or personal property, (l) capital stock or other equity interests in subsidiaries and joint ventures, (m) Intellectual Property (as defined below) and any related Permits, (n) contract rights and documents, (o) all deposits and letters of credit, (p) indemnities, (q) all chattel paper, commercial tort claims and other causes of action and (r) other general intangibles (including, without limitation, customer lists and customer data); and (iv) any and all rents, issues, products, offspring, proceeds and profits generated by any DIP Collateral, without the necessity of any further action of any kind or nature by the DIP Lender in order to claim or perfect any such liens or interests, including such rents, issues, products, offspring, proceeds and/or profits.

"**Intellectual Property**" means the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, now existing or hereafter adopted, created or acquired, including, without limitation, the copyrights, the patents, the trademarks, domain names, technology, trade secrets, know-how and processes, any applicable goodwill associated with each of the

foregoing and all rights to sue at law or in equity or otherwise recover for any past, present or future infringement, misappropriation or other violation or impairment thereof, including the right to receive all proceeds and damages therefrom.

Notwithstanding anything to the contrary herein, the DIP Lender may, in its sole discretion, enter into and file, as applicable, financing statements, mortgages, security agreements, notices of liens, and other similar documents, and is hereby granted relief from the automatic stay of Section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been entered into, filed or recorded as of the Petition Date. The applicable Debtors shall execute and deliver to the DIP Lender all such financing statements, mortgages, notices, and other documents as such parties may reasonably request to evidence and confirm the contemplated validity, perfection and priority of the DIP Liens granted pursuant hereto (including, for the avoidance of doubt, in respect to any DIP Collateral located outside of the United States). Without limiting the foregoing, the DIP Lender may, in its discretion, file a photocopy of any Financing Order (as defined below) as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized and hereby is directed to file or record such copy of any Financing Order.

**Use of Cash Collateral:** All cash and cash equivalents of the Debtors, whenever or wherever acquired, and the proceeds of all collateral pledged to the DIP Lender, constitute cash collateral, as contemplated by section 363 of the Bankruptcy Code ("**Cash Collateral**"). The Debtors shall exhaust Cash Collateral in excess of $50,000 prior to each borrowing under the DIP Facility. Until the indefeasible repayment of the DIP Obligations in full in cash and the termination of all commitments under the DIP Facility, the Cash Collateral may be used only for Permitted Purposes and in a manner consistent with the Authorized Budget.

**Conditions Precedent to Closing:** The closing of the DIP Facility and the Borrower's right to use proceeds of the DIP Facility and Cash Collateral pursuant to the terms hereof will be subject to the satisfaction of all conditions precedent deemed reasonably necessary or appropriate by the DIP Lender, including but not limited to:

(i) Satisfactory completion of legal and business due diligence and transaction structuring of the DIP Facility, including due diligence concerning the Cases, the assets and liabilities of the Borrower and each of its subsidiaries and the receipt of all

required Bankruptcy Court approvals of the DIP Facility;

(ii) the DIP Lender shall have received and approved the Initial Budget (as defined below) for the initial thirteen (13) week period from the Petition Date to be in form and substance acceptable to the DIP Lender;

(iii) an interim order authorizing the Debtors, as debtors-in-possession, to incur the DIP Obligations and use the proceeds of the DIP Facility (up to $150,000) and Cash Collateral, in accordance with the Initial Budget (under and as defined in the Interim Order (as defined below)) and in form and substance acceptable to the DIP Lender and the Debtors, incorporating the terms hereof and containing such other provisions as the DIP Lender may require, including, without limitation, the drawing of the Initial Amount and the conversion, concurrently with the entry thereof, of the Roll-Up Loans, shall have been entered by the Bankruptcy Court and shall not have been stayed, modified or appealed (the "**Interim Order**");

(iv) the DIP Lender and its affiliates shall have received waivers and releases of any and all claims of the Debtors, their debtor and non-debtor affiliates and their bankruptcy estates arising from or related to any matter whatsoever. The foregoing waivers and releases shall include, without limitation, the waiver of any and all rights to challenge the validity, perfection, priority, extent or enforceability of the claims or liens securing the DIP Obligations, including without limitation seeking to equitably subordinate or avoid the liens securing the DIP Obligations. The foregoing waivers and releases shall be in form and substance satisfactory to the DIP Lender, contained in the DIP Credit Agreement, approved in the Financing Orders and binding upon any chapter 7 trustee or other successor in interest;

(v) confirmation of sufficient insurance coverage for all DIP Collateral, general liability insurance (including director and officer liability insurance) and other forms of insurance in amounts with deductibles satisfactory to the DIP Lender, and that the DIP Lender or its designee is named an additional insured or loss payee; and

(vi) such other deliverables as the DIP Lender may require pursuant to the terms of the DIP Credit Agreement as approved in the Financing Orders.

| | |
|---|---|
| **Conditions Precedent to All Loans:** | The funding of any loan and the Borrower's right to use proceeds of the DIP Facility and Cash Collateral will be subject to satisfaction of the following conditions: |

(i) with respect to any loan made on or after the 21st day after the Petition Date, the execution and delivery, in form and substance acceptable to the DIP Lender and the Debtors, of a definitive credit agreement (the "**DIP Credit Agreement**") and related collateral agreements, if any, required by the DIP Lender (collectively, together with this term sheet and the Prepetition Senior Secured Promissory Note, the "**DIP Loan Documents**") and approved by the Bankruptcy Court pursuant to the Final Order;

(ii) with respect to any loan made on or after the 21st day after the Petition Date, entry of an order authorizing the Debtors as debtors-in-possession to incur the DIP Obligations and use the Cash Collateral on a final basis, in form and substance acceptable to the DIP Lender, incorporating the terms hereof and containing such other provisions as the DIP Lender may require, including, without limitation, approval of the entirety of the amounts borrowed under the DIP Facility Loan Documents, including the concurrent conversion of the Roll-Up Loans, which has not been stayed, modified or appealed and for which the appeal period has expired (the "**Final Order**" and, together with the Interim Order, collectively, the "**Financing Orders**");

(iii) the Interim Order or Final Order, as applicable, is in full force and effect;

(iv) no default or Event of Default has occurred and is continuing;

(v) all representations and warranties shall be true and correct as of the date of the loan request;

(vi) the loans being requested shall be used in accordance with the Permitted Purposes and in a manner consistent with the Authorized Budget (as defined below) approved immediately prior to making of the most recent requested loan;

(vii) the requested loans are anticipated to be utilized within 45 days of receipt of the funds pursuant to the Authorized Budget;

(viii) the Borrower shall have delivered a written request to the DIP Lender certifying to the foregoing and other matters set forth

    in the DIP Loan Agreement;

 (ix) the Borrower's cash management system is acceptable to DIP Lender; and

 (x) all "first day orders" and "second day orders" and any final versions thereof, as applicable sought to be entered by any of the Debtors shall be in form and substance reasonably satisfactory to the DIP Lender.

| | |
|---|---|
| **Representations and Warranties:** | The DIP Loan Documents will contain customary representations and warranties for financings of this type and shall be in form and substance acceptable to the DIP Lender and the Debtors. |
| **Sale Process Covenants:** | (i) On the Petition Date, the Debtors shall file a motion (the "**Sale Motion**"), which motion and all exhibits thereto shall be in form and substance acceptable to the DIP Lender, seeking entry of orders pursuant to sections 363 and 365 of the Bankruptcy Code (I)(a) approving bidding procedures (the "**Bidding Procedures**") and a related auction (the "**Auction**") and (b) scheduling a sale hearing (the "**Sale Hearing**") and approving notice thereof (the "**Bidding Procedures Order**"); (II) authorizing the sale of all or substantially all of their respective assets as a "going concern" to a purchaser acceptable to the DIP Lender under an asset purchase agreement, in form and substance acceptable to the DIP Lender, subject to the receipt of "higher and better" bids (the "**Approved Sale**"), free and clear of all liens, claims, encumbrances, and other interests; (III) authorizing the assumption and assignment of certain executory contracts and establishing procedures to determine cure amounts ("**Cure Amounts**") and establishing deadlines for objections for certain executory contracts to be assumed and assigned by the Debtors; and (IV) granting related relief (the "**Approved Sale Order**"). The Approved Sale may be consummated through a sale pursuant to section 363 of the Bankruptcy Code or through a plan of reorganization or liquidation under section 1129 of the Bankruptcy Code;<br><br>(ii) obtain Bankruptcy Court approval, pursuant to the Bidding Procedures Order, of the Bidding Procedures, in form and substance acceptable to the DIP Lender and the Debtors, no later than sixteen (16) days after filing the Sale Motion;<br><br>(iii) if one or more Qualified Bids (as defined in the Bidding Procedures) are presented in a manner that conforms to the Bidding Procedures, conduct the Auction in accordance with the Bidding Procedures no later than seventeen (17) days after entry of the Bidding Procedures Order;<br><br>(iv) obtain Bankruptcy Court approval, pursuant to the Approved |

|  |  |
|---|---|
|  | Sale Order, of the Approved Sale to the party holding the highest or otherwise best bid for the Assets (the "**Successful Bidder**") pursuant to an asset purchase agreement in form and substance acceptable to the DIP Lender and the Debtors, no later than 5 business days after completion of the Auction; and |
|  | (v) consummate the Approved Sale by no later than the earlier of November 10, 2016 or the date that is five (5) days after the Sale Hearing (the "**Sale Closing Date**"). |
|  | Neither the Bidding Procedures nor the Approved Sale Order nor any of the other deadlines described above shall be amended, extended, or otherwise modified without the consent of the DIP Lender and the Debtors. |
| **Credit Bid:** | The DIP Lender or its designee, shall have the unqualified right to perform due diligence and credit bid up to the full amount of the obligations under the DIP Facility (including for the avoidance of doubt, any Senior Prepetition Indebtedness that has not been converted to Roll-Up Loans) as a bidder (including, for the avoidance of doubt, in connection with any Auction), in any sale of any portion of the DIP Collateral, under or pursuant to (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or a plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a chapter 7 trustee for the Borrower under section 725 of the Bankruptcy Code.  Each Debtor, on behalf of itself and its estate, stipulates and agrees that any sale of all or part of the DIP Collateral that does not include an unqualified right to credit bid up to the full amount of the DIP Obligations by the DIP Lender as provided for in this subparagraph would not result in the DIP Lender receiving the indubitable equivalent of its claims and interests. |
| **Budget; Variance Covenant; Reporting:** | Following the Initial Budget, the Debtors shall prepare for the DIP Lender's review and consent a thirteen (13) week detailed rolling cash projection which shall be updated one (1) business day prior to each requested borrowing hereunder (each a "**Proposed Budget**").  Upon the Debtors' receipt of the DIP Lender's consent to a Proposed Budget, such budget shall become an "**Authorized Budget**" for the applicable thirteen (13) week period and shall replace the then operative Authorized Budget for all purposes.  The Borrower shall (and shall cause its subsidiaries to) operate in accordance with the Authorized Budget and all disbursements shall be consistent with the provisions of the Authorized Budget.  The Borrower may submit additional Proposed Budgets to the DIP Lender, but until any such Proposed Budget is consented to by the DIP Lender, it shall not become an Authorized Budget and the Borrower shall (and shall cause its subsidiaries to) continue to comply with the then operative Authorized Budget.  The Financing |

|  |  |
|---|---|
|  | Orders shall provide that the then current Authorized Budget may be replaced with another Authorized Budget pursuant to the above procedures without the need for further approval from the Bankruptcy Court. |

Compliance with the Authorized Budget shall be measured on a bi-weekly basis as will be measured as follows:

(i)     (a) disbursements (other than in respect of Professional Fees (as defined below)) may exceed the Authorized Budget on a bi-weekly basis by an aggregate amount of no more than 15% and (b) disbursements in respect of Professional Fees may not exceed the Authorized Budget. Any amounts provided for in a line item disbursement that is not disbursed in any given week may be disbursed in subsequent weeks for the same line item disbursement pursuant to the Authorized Budget then in effect;

(ii)    On or before 5:00 p.m. Eastern time on the fifth Business Day of each bi-weekly period, the Borrower shall provide the DIP Lender with a report detailing the actual disbursements and receipts for the preceding period versus the line items contained in the Authorized Budget for such period and an explanation of any such variances; and

(iii)    Such other reporting and information covenants acceptable to the DIP Lender including, without limitation, (a) periodic meetings between representatives of the Borrower and representatives of the DIP Lender and (b) on Wednesday of each week, hold a conference call with the management of the Borrower and the DIP Lender to review the business of the Debtors and the status of the Approved Sale process.

**Permitted Purpose:**    The DIP Facility, proceeds of the DIP Facility, and Cash Collateral may only be utilized for the following categories of expenditures (each a "**Permitted Purpose**"): (i) the working capital needs of the Borrower and its subsidiaries in accordance with the Authorized Budget, (ii) the satisfaction of interest, fees and costs due under the DIP Facility, (iii) the fees, costs and expenses incurred by the Debtors as debtors-in-possession in the Cases, which fees and expenses include but are not limited to, payment of the fees and expenses of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code, approved in accordance with sections 330 and 331 of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Bankruptcy Court's Local Rules, the rules, regulations and requirements of the Office of the United States Trustee and any order, ruling or judgment entered by the Bankruptcy Court in the Cases, in all cases, up to the amounts permitted in the Authorized Budget, and (iv) the other allowed

administrative costs and expenses of the Cases, all solely in accordance with the Authorized Budget and the Financing Orders; provided, that, notwithstanding anything to the contrary herein, neither the DIP Facility, proceeds of the DIP Facility nor Cash Collateral (including any retainer held by any professionals for the below-referenced parties), or any portion of the Carve-Out may be used by (a) any Debtor, Creditors' Committee, or trustee or other estate representative appointed in the Cases or any Successor Cases (as defined in the Interim Order or Final Order, as applicable), or any other person, party, or entity (including any of the Professionals or the members of the Creditors' Committee) to investigate or prosecute any challenge (including any litigation or other action) in connection with the value of the DIP Collateral (or to pay any Professional Fees and disbursements incurred in connection therewith) at any time; (b) any Debtor, any Creditors' Committee, or any trustee or other estate representative appointed in these Chapter 11 Cases or any Successor Cases, or any other person, party, or entity (including any of the Professionals or the members of the Creditors' Committee) to (or to pay any Professional Fees and disbursements incurred in connection therewith): (i) request authorization to obtain post-petition loans or other financial accommodations pursuant to Section 364(c) or (d) of the Bankruptcy Code, or otherwise, other than from the DIP Lender, or to seek any modification to the Interim Order or Final Order, as applicable, not approved by the DIP Lender; (ii) investigate, assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, the DIP Lender, its respective affiliates, assigns or successors and the respective officers, directors, employees, agents, attorneys, representatives and other advisors of the foregoing, with respect to any transaction, occurrence, omission, action, or other matter (including formal or informal discovery proceedings in anticipation thereof), including, but not limited to (A) any challenges raised during the Challenge Period (as defined in the Interim Order or Final Order, as applicable) and any Avoidance Actions (as defined in the Interim Order or Final Order, as applicable) or other actions arising under chapter 5 of the Bankruptcy Code; (B) any action with respect to the validity, enforceability, priority, and extent of the DIP Obligations, the obligations under any loan documents governing the Senior Prepetition Indebtedness or the Roll-Up Loans, or the validity, extent, and priority of the DIP Liens (as defined in the Interim Order or Final Order, as applicable); (C) any action seeking to invalidate, set aside, avoid, or subordinate, in whole or in part, the

|  |  |
|---|---|
|  | DIP Liens or the other DIP Protections (as defined in the Interim Order or Final Order, as applicable); (D) any action seeking, or having the effect of, preventing, hindering, or otherwise delaying any or all of the DIP Lender's assertion, enforcement, or realization on the Cash Collateral or the DIP Collateral in accordance with the DIP Loan Documents or the Financing Orders; and/or (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to any or all of the DIP Lender hereunder or under the DIP Loan Documents, or any payments made thereunder or in respect thereof; (iii) pay any fees or similar amounts to any person (other than the DIP Lender) who has proposed or may propose to purchase interests in any of the Debtors without the prior written consent of the DIP Lender; or (iv) use or seek to use Cash Collateral or sell or otherwise dispose of DIP Collateral unless otherwise permitted hereby, without the prior written consent of the DIP Lender or (c) any Debtor to satisfy Cure Amounts. |
| **Cash Management:** | At no time while the DIP Facility is outstanding shall the Borrower permit Unrestricted Cash (as defined below) of the Borrower and its subsidiaries to be greater than $50,000 after giving effect to any contemplated draw on the DIP Facility and application of the proceeds thereof. In the event such Unrestricted Cash shall exceed $50,000 for three (3) consecutive Business Days, the Borrower shall make a mandatory prepayment of the DIP Facility in the lesser of (i) an amount necessary to reduce the amount of Unrestricted Cash below $50,000, or (ii) an amount necessary to repay the outstanding DIP Obligations in full. Until the indefeasible repayment of the DIP Obligations in full in cash and the termination of all commitments under the DIP Facility, Unrestricted Cash shall be used solely for Permitted Purposes subject to the Authorized Budget.<br><br>"**Unrestricted Cash**" means, cash or cash equivalents that (i) do not appear (or would not be required to appear) as "restricted" on a consolidated balance sheet of the Borrower and its subsidiaries, (ii) are not subject to any liens in favor of, or are under the control of, any person or entity other than the DIP Lender, and/or (iii) are not maintained in a segregated deposit account pursuant to any reserve requirements. |
| **Mandatory Prepayments:** | Mandatory prepayments upon the receipt of proceeds from asset sales (including insurance and condemnation and including pursuant to Section 363 of the Bankruptcy Code). |
| **Affirmative and Negative Covenants:** | In addition to affirmative and negative covenants typical of DIP credit agreements and such other affirmative and negative covenants as the DIP Lender requires, the DIP Credit Agreement |

shall provide that absent the advance consent of the DIP Lender, the Borrower shall not (and shall not permit its subsidiaries to) sell, lease, transfer, assign or otherwise dispose of any of those assets out of the ordinary course of business, and the Debtors acknowledge that any DIP Collateral that is the subject of a sale, lease transfer or assignment that does not receive such consent shall continue to be subject to all liens of the DIP Lender.  Moreover, the Debtors shall covenant that they will operate in the ordinary course of business and will provide the DIP Lender with immediate notice if they are unable or unwilling to do so or, at least ten days in advance, if they foresee the inability to operate in the ordinary course of business prior to a sale of all or substantially all of their assets.

**Events of Default:**    "**Events of Default**" shall include the occurrence of any of the following:

(i) the Interim Order is not entered within three (3) days after the motion seeking authority to enter into the DIP Facility is filed with the Bankruptcy Court, or at any time ceases to be in full force and effect (unless superseded by the Final Order), or is vacated, reversed or stayed, or modified or amended without the prior written consent of the DIP Lender;

(ii) the Final Order is not entered within twenty-one (21) days after the Petition Date or at any time ceases to be in full force and effect, or is vacated, reversed or stayed, or modified or amended without the prior written consent of the DIP Lender;

(iii) breach by any Debtor (or its subsidiaries or affiliates, as applicable) of (a) compliance with the Authorized Budget, (b) any Sale Process Covenant or case milestone, (c) the Variance Covenant, (d) any payment obligations under the DIP Loan Documents or in the Financing Orders or (e) any other covenant or agreement contained in the DIP Loan Documents or in the Financing Orders, subject, in the case of the foregoing clauses (d) and (e) (in respect of affirmative covenants only), to a grace period to be as provided for in the definitive documentation;

(iv) any of the Cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; a Chapter 11 Trustee or an examiner with enlarged powers relating to the operation of the business of any Debtor (powers beyond those expressly set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) is appointed in any of the Cases; or any other superpriority claim (other than the Carve-Out (as

defined below)) or grant of any other lien (including any adequate protection lien) which is *pari passu* with or senior to the DIP Obligations and liens securing the DIP Obligations is granted or allowed in any of the Cases;

(v)  the filing of any pleading by any Debtor seeking, or otherwise consenting to or supporting, any of the matters set forth in clause (iv) above unless otherwise consented to by the DIP Lender;

(vi)  payment of principal or interest on any pre-petition claim, if any, other than pursuant to an order of the Bankruptcy Court;

(vii)  the grant of any adequate protection rights to any holder of a pre-petition claim or interest unless otherwise consented to by the DIP Lender;

(viii)  the Bankruptcy Court enters an order granting relief from the automatic stay to any person asserting a claim or other right against any of the Debtors relating to any alleged pre-petition actions or omissions unless otherwise consented to by the DIP Lender;

(ix)  the Termination Date occurs;

(x)  an "Event of Default" under the DIP Loan Documents occurs which is not otherwise cured as provided for in the Financing Orders, the DIP Loan Documents or waived;

(xi)  the waiver, loss or lapse of the exclusivity period as provided for in section 1122 of the Bankruptcy Code without the prior written consent of DIP Lender;

(xii)  the filing of any plan of reorganization or a plan of liquidation without the prior written consent of the DIP Lender or the Debtors seek or support confirmation of a plan of reorganization or liquidation that is not acceptable to the DIP Lender;

(xiii)  the Debtors or any other party (including, without limitation, any Creditors' Committee (as defined below)) (a) engage in or support any challenge to the validity, perfection, priority, extent or enforceability of the DIP Facility or the Senior Prepetition Indebtedness or the liens on or security interest in the assets of the Debtors securing the DIP Obligations, including the Roll-Up Loans), or (b) commence any actions or proceedings against the DIP Lender or any of their affiliates;

(xiv)  the allowance of any claim or claims under section 506(c) or 552(b) of the Bankruptcy Code against or with respect to

any of the DIP Collateral;

(xv) the statutory committee of unsecured creditors ("**Creditors' Committee**"), if any, commences any actions or proceedings against any of the indemnified persons or any entities listed on Schedule 1 hereto;

(xvi) the filing by any of the Debtors of any motion or proceeding, or the entry by the Bankruptcy Court of any order, which could reasonably be expected to result in material impairment of the DIP Lender's rights under the DIP Loan Documents or Financing Orders;

(xvii) any Debtor moves the Bankruptcy Court to enter, modify or amend a Financing Order without receipt of prior written consent to the form of the proposed order from the DIP Lender;

(xviii) the Debtor fails or is unable to operate in the ordinary course of business or gives notice that it does not believe it can operate in the ordinary course of business at any time prior to the sale of all or substantially all of its assets;

(xix) the entry by the Bankruptcy Court of a debtor-in-possession financing order or amendment thereto, the form and substance of which is not consented to by the DIP Lender;

(xx) the entry by the Bankruptcy Court of a debtor-in-possession financing order or amendment thereto that does not expressly provide for the entirety of the Senior Prepetition Indebtedness being converted to Roll-Up Loans;

(xxi) the Debtors seek or propose to sell all or substantially all of their assets and such sale does not provide for the payment in full in cash of the Debtors' obligation under the DIP Facility and the DIP Lender has not otherwise consented to such sale; or

(xxii) the Debtors abandon the Sale; or the Sale is otherwise terminated or modified without the DIP Lender's prior written consent.

| | |
|---|---|
| **Remedies:** | Upon the occurrence and during the continuation of an Event of Default, the DIP Lender shall have customary remedies, including that upon five (5) business days' written notice (the "**Remedies Notice Period**") to Borrower (with a simultaneous copy to Borrower's counsel) and counsel to any court appointed committees and the office of the U.S. Trustee, it may: (i) reduce the amount of or terminate any outstanding commitments under the DIP Facility; (ii) terminate the DIP Facility; and (iii) declare the entirety of the DIP Facility to be due and payable.  Further, upon expiration of the Remedies Notice Period, the automatic stay under section 362 shall |

be deemed lifted without further order or application to the Court, to permit the DIP Lender to realize on all DIP Collateral and to exercise any and all remedies under the DIP Loan Documents.

In addition, upon the occurrence and during the continuation of an Event of Default, the DIP Lender, without notice, may (i) temporarily cease making advances under the DIP Facility; (ii) charge the Default Rate of interest on the DIP Facility; and (iii) charge the fees and expenses of the DIP Lender incurred with respect to the DIP Facility following the occurrence of an Event of Default to the Debtors and their estates as DIP Obligations.

In addition, (x) in the event any Termination Date occurs, (y) upon the occurrence of a default under the DIP Loan Documents or (z) in the event the DIP Lender (1) receives notice from the Debtors that they are unable to operate in the ordinary course of business or (2) prior to the receipt of any notice from the Debtors, the DIP Lender believes in good faith that the Debtors are unable to operate in the ordinary course of business, then the DIP Lender (or its affiliate) shall, without notice, have the right (but not the obligation) (and the automatic stay under section 362 shall be deemed lifted without further order or application to the Court), (i) to (or cause its affiliates to) communicate to the primary account holders and the customers' wearable phone and locater devices of the Business (as defined in the Supplemental Maintenance Agreement between the Borrower and AT&T Services, Inc. dated September 16, 2016 (the "**Supplemental Maintenance Agreement**")), by text message and/or electronic mail, (a) the impending shutdown of the servicing and operation by the Borrower or any of its subsidiaries of the wearable phone and locater devices, (b) where such account holders and customers may obtain further information with respect to such impending shutdown and (c) if the DIP Lender (or its affiliates) so elects, the offering and solicitation by the DIP Lender (or its affiliates) of an alternative communication service to such customers and (ii) at the DIP Lender's (or its affiliates) written request, to require (or cause its affiliates to require) the Borrower to promptly deliver the message set forth in Exhibit 2 to the Supplemental Maintenance Agreement to the primary account holders and the customers' wearable phone and locater devices of the Business, by text message and/or electronic mail.

Should the Borrower, court appointed committee, or the office of the U.S. Trustee seek an emergency hearing opposing the DIP Lender's exercise of its rights and remedies, the only issue that may be raised by any party in opposition to the actions proposed or available to be taken by the DIP Lender shall be whether, in fact, an Event of Default or default, as applicable, has occurred and is continuing.

| | |
|---|---|
| **Carve-Out:** | The claims and liens of the DIP Lender shall be subject to (i) (a) the payment of reasonable fees, costs and expenses incurred by the professionals retained by the Debtors (the "**Professionals**") on and after the Termination Date and subsequently allowed by order of the Bankruptcy Court under Sections 330 and 331 of the Bankruptcy Code in an aggregate amount not to exceed $20,000 (any such fees and disbursements, the "**Post-Termination Date Professional Fees**"); provided, that, notwithstanding anything to the contrary herein, the Post-Termination Date Professional Fees shall not exceed the aggregate amounts for such professionals expressly set forth in the Authorized Budget, plus, (b) subject to the Authorized Budget, the aggregate amount of any reasonable and unpaid professional fees, costs and expenses that were accrued or incurred prior to the occurrence of the Termination Date by any Professionals (subject to final allowance by the Bankruptcy Court pursuant to Sections 330 and 331 of the Bankruptcy Code) (such allowed fees, costs and expenses, "**Professional Fees**"), which Professional Fees shall be required to be first satisfied by the Debtors out of the proceeds of any amounts remaining under any retainer funded by the DIP Lender prior to the Petition Date (any such retainer, the "**Prepetition Retainer**") and (ii) the payment of fees pursuant to 28 U.S.C. § 1930 (the foregoing clauses (i) and (ii), together, and to the extent not excluded pursuant to the last paragraph of this section, the "**Carve-Out**").  The Carve-Out amount allowed pursuant to clause (i) above shall not exceed $150,000 in the aggregate (the "**Carve-Out Cap**"). |
| | Notwithstanding anything to the contrary herein, following the Termination Date, the fees, costs, and expenses incurred by Professionals shall be applied first to any amounts remaining under the Prepetition Retainer until such Prepetition Retainer is exhausted and any amounts paid to Professionals by any means, including but not limited to a Prepetition Retainer, will reduce the Carve-Out and the Carve-Out Cap on a dollar-for-dollar basis.  For the avoidance of doubt, to the extent a Professional holds a Prepetition Retainer, it must first use the retainer to reduce the amounts owed to it under clauses (i)(a) and (i)(b) above. To the extent the reasonable fees, costs, and expenses incurred by Professionals under clauses (i)(a) and (i)(b) above exceed the amount of the Prepetition Retainer, but are otherwise included in the Authorized Budget, such excess shall be paid pursuant to the Carve-Out described herein but subject to (a) the cap established in clause (i)(a) above, (b) the Carve-Out Cap and (c) the Authorized Budget. |
| | All interested parties shall retain their rights to object to any of the fees, expenses, reimbursement or compensation sought by the professionals retained by the Debtors or any Creditors' Committee |

appointed in the Cases.

Notwithstanding anything to the contrary herein, neither the Carve-Out, proceeds of the DIP Facility, nor any Cash Collateral, nor any DIP Collateral, nor the DIP Facility, nor the Prepetition Retainer may be used by any professional retained pursuant to sections 327, 328, 1102 or 1104 or other party in interest to challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to the DIP Facility or the security interests and liens securing the DIP Obligations, or to fund the investigation, prosecution or assertion of any claims, or to otherwise litigate against any indemnified person or any affiliates thereof except as expressly set forth herein and provided in the Authorized Budget.

**Section 506(c) Waiver:** The Interim Order shall include a ruling that, except to the extent of the Carve-Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from any collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender.

**Expenses:** The Borrower shall pay (a) all documented out-of-pocket fees and expenses of the DIP Lender, on demand, associated with the preparation, execution, delivery and administration of the DIP Loan Documents (including, for the avoidance of doubt, the preparation and negotiation of this summary of terms) and any amendment or waiver with respect thereto (including, without limitation, reasonable fees and disbursements of legal counsel and advisors) and (b) all reasonable and documented out-of-pocket expenses of the DIP Lender, on demand, (including, without limitation, reasonable fees and disbursements of legal counsel and advisors) in connection with the enforcement of the DIP Loan Documents.

**Indemnifications:** The DIP Lender and AT&T Capital Services, Inc., in its capacity as lender under the Senior Prepetition Indebtedness, and each of their respective affiliates, and each of their and their affiliates' respective officers, directors, employees, agents, advisors and other representatives (each, an "**indemnified person**") will be indemnified for and held harmless against (x) any and all losses, claims, damages, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel) incurred in respect of the DIP Facility, the transactions contemplated hereby or the use or the proposed use of proceeds thereof and (y) any and all losses, claims, damages, liabilities and expenses (including, without limitation, reasonable fees and disbursements of counsel)

incurred in connection with any challenges or causes of action in respect of the Senior Prepetition Indebtedness, the Loans extended under and as defined in the Prepetition Senior Secured Promissory Note, any transactions contemplated by the Prepetition Senior Secured Promissory Note or the use of proceeds of any Loans extended under and as defined in the Prepetition Senior Secured Promissory Note, as applicable, except, in each case, to the extent they arise from the gross negligence or willful misconduct of such indemnified person, in each case as determined by a final, non-appealable judgment of a court of competent jurisdiction and not arising out of any act or omission of the Borrower or any of its subsidiaries.  Notwithstanding the foregoing, each indemnified person shall be obligated to refund and return any and all amounts paid by the Borrower to such indemnified person for fees, expenses, damages and expenses to the extent such indemnified person is not entitled to payment of such amounts in accordance with the terms hereof.

**Governing Law:**  The laws of the State of New York (excluding the laws applicable to conflicts or choice of law), except as governed by the Bankruptcy Code.