### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| FILIP TECHNOLOGIES, INC. et al.,[1] | Case No. 16-12192 (KG) |
| Debtors. | Joint Administration Requested |

### DECLARATION OF ROY MESSING IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF

**I, ROY MESSING,** hereby declare, under penalty of perjury, as follows:

1.      I am a Senior Managing Director at Ankura Consulting Group, LLC ("Ankura"). I have more than twenty-five years of experience advising boards of directors and senior management of troubled companies and creditor constituencies in both operational and financial restructurings. I have also assisted in managing and administering companies during the chapter 11 process.

2.      I serve as the Chief Restructuring Officer ("CRO") of the above-captioned debtor and debtor-in-possession Filip Technologies, Inc. ("Filip"), and Filip's four wholly-owned debtor subsidiaries (collectively, the "Debtors"). I served as CRO of Filip since January 15, 2015. As CRO, I am responsible for assisting in the management of Filip's operations, overseeing Filip's liquidity management, and assisting with the restructuring process of Filip and its Debtor subsidiaries. In my capacity as CRO of Filip for nearly twenty-one months, I am familiar with the financial affairs of all of the Debtors, and prior to the Petition Date I was formally appointed as

---

[1] The Debtors in these cases are Filip Technologies, Inc. (Case No. 16-12192 (KG)); Filip Technologies UK Limited (Case No. 16-12193 (KG)); Evado Filip AS (Case No. 16-12194 (KG)); Evado Filip Limited (Case No. 16-12195 (KG)); and Evado Filip US Limited (Case No. 16-12196 (KG)).

CRO of the other Debtors.  I perform my duties out of Filip's headquarters located at 120 East 23rd Street, Floor 5, New York, New York.

3.      I submit this declaration (the "First Day Declaration") in support of the Debtors' chapter 11 petitions and requests for relief contained in certain "first day" applications and motions filed on or shortly after the date hereof (the "First Day Motions").[2]

4.      On October 5, 2016 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently herewith, the Debtors filed a motion seeking joint administration of these chapter 11 cases for procedural purposes pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

5.      Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by other members of the Debtors' management and the Debtors' advisors, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  I am authorized to submit this First Day Declaration on behalf of the Debtors, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

6.      Part I of this First Day Declaration provides a brief overview of the Debtors and a summary of these chapter 11 cases (collectively, the "Cases").  Part II of this First Day Declaration describes in more detail the Debtors' businesses, corporate structure and history, capital and debt

---

[2] All capitalized terms used but not otherwise defined herein have the meanings ascribed in the applicable First Day Motion.

structure, developments which led to the Debtors' chapter 11 filings, and the Debtors' goals during these Cases.  Part III sets forth the relevant details of the various First Day Motions.

## I.    INTRODUCTION

7.    The Debtors are a leading start-up company and the first provider of technology and software solutions that enable parents to connect with their children, wherever located, over wireless networks.  The Debtors' cloud-based software platform provides a service that enables parents, using smartphones, to locate, contact, and communicate with their children wearing compatible watch devices (the "Filip Service").  The Filip Service is presently used by more than 13,000 consumers and their children in the United States through the AT&T wireless network, and approximately 340 consumers and their children in Spain through the Telefónica wireless network. In addition, the Debtors are positioned for further expansion of the Filip Service in numerous countries worldwide.

8.    Despite the Debtors' progress in developing, implementing, and deploying the Filip Service to customers, the Debtors have struggled for nearly two years to attract the capital necessary for sustainable expansion and growth of their platform, infrastructure, and footprint. The Debtors have encountered many difficulties in their effort to grow – including greater than anticipated capital consumption for early-stage product development, increased reliance on short-term funding, and resulting balance sheet pressures.  As a result, approximately six months before the Petition Date in March 2016, the Debtors retained an investment banking firm to lead a marketing process for a potential sale of the Debtors' business.  Although the process was exhaustive – including the marketing to more than two-hundred potential interested parties, extensive diligence by five potential bidders, and advanced discussions and protracted efforts by the Debtors to document and reach a definitive transaction with one bidder – it unfortunately did

not result in a transaction.  During the marketing and sale process, however, the Debtors remained unable to attract additional capital other than limited funding from their existing investors, resulting in an increasingly dire liquidity situation and the near depletion of the Debtors' limited cash by mid-August 2016.

9.      Faced at that time with no other available alternative than a potential chapter 7 filing and the attendant shut-down of the Filip Service – to the detriment of the Debtors' assets and business, stakeholders, employees, and families who use the Filip Service – the Debtors were successful in obtaining funding from their largest wireless network customer and largest unsecured trade creditor (and proposed DIP Lender in these Cases), AT&T.  This prepetition funding enabled the Debtors to continue operations and simultaneous discussions with potential acquirers, focused on the possibility of a competitive auction process within the context of a chapter 11 proceeding. At present, the Debtors are engaged in advanced discussions with a potential stalking horse bidder (the "Potential Stalking Horse") who provided a draft purchase agreement to the Debtors shortly before the Petition Date, and a simultaneous diligence process with eight (8) other potential bidders.  With access to the DIP Financing proposed to be made available by AT&T (which is the only liquidity source available to the Debtors), the Debtors intend to use these Cases to maximize the value of their business and assets for the benefit of all stakeholders through and competitive, open, and expedited auction process under section 363 of the Bankruptcy Code, continue the operation of the Filip Service, and effectuate an orderly and comprehensive wind-down of their estates through chapter 11.

## II.    BACKGROUND

### A.    Business Operations

#### *Overview*

10.    As stated, the Debtors are a leading provider of technology and software solutions that enable parents to connect with their children, wherever located, over wireless networks.  The Filip Service enables parents using smartphones to call, locate, and message their children on a compatible wearable watch device worn by the child.  The Filip Service is provided to customers in the United States and Spain, and Filip is positioned to expand in Spain and other countries.[3]

11.    Filip's primary and direct customers are wireless network operators who offer connected wearable devices to their end users together with a wireless voice and data plan.  Pursuant to contracts between Filip and the respective wireless operator, Filip provides its cloud-based software and services directly to these end users, in exchange for a monthly service fee for each device active on the operator's network.  Presently, nearly one-hundred percent (100%) of Filip's revenue is derived from the provision of the Filip Service to end users.[4]

12.    Filip maintains a website at http://www.myfilip.com.

#### *Filip's Products*

13.    Filip's products consist primarily of a cloud-based software platform, Apple (i.e., iOS) and Android mobile applications (i.e., apps), and a web-based administrative and support tool.

---

[3] As noted in paragraph 7 above, the number of devices active on the Telefónica network is approximately 340.  This represented a limited test launch while Filip worked on the integration of new third-party original equipment manufacturer ("OEM") devices in preparation for a full launch in Spain and other Telefónica countries.

[4] In addition, Filip derives a small amount of revenue from setup fees charged to its wireless network operator partners and fees charged to OEMs, who pay a fee to Filip in exchange for integration of their devices with the Filip software platform.  As of the Petition Date, Filip has completed the integration of two OEM devices with the Filip software platform.

CHAR2\1839502v16

14.    Once a parent has purchased a compatible connected wearable device, installed the Filip mobile application on his or her smartphone and created a Filip account, the parent can securely connect up to five (5) wearable devices to the Filip account.  From the Filip mobile application, the parent can create a short list of approved contact telephone numbers that can call, and be called from, the child's wearable device.  Also from the Filip mobile application, the parent can locate the child on a map and view the child's location history, set 'Safe Zones' to trigger an alert to the parent if the child enters or leaves a Safe Zone, send and receive short messages to and from their child's device, and administer the child's device settings.  Several additional features for the Filip application are also in development.  All such services are delivered using Filip's could-based software platform, which facilitates secure and timely communication between the wearable devices and smartphone application, and processes and stores the data collected.  The Filip software platform also incorporates Filip's proprietary emergency management solution enabling the child to quickly contact a trusted individual in the event of an emergency.

15.    Filip's web-based support portal is designed to provide customer support personnel with the tools necessary to troubleshoot and resolve administrative and technical issues affecting the Filip Service and devices operating on the Filip software platform.

16.    In addition to the Filip Service, Filip also developed its own connected wearable watch device for children, called 'FiLIP,' which it launched in the United States together with AT&T in November 2013.  FiLIP was one of the first FCC-approved wearable devices to incorporate cellular, GPS and Wi-Fi technology to enable parents and children to call each other, and to enable parents to locate their children outdoors and indoors, or in areas where GPS signals are not available.  A second-generation version of this product, FiLIP 2, launched with AT&T in November 2014, and in limited quantities with Spain-based wireless network operator Movistar

6

España (part of the Telefónica group), in September 2015. Following the launch of FiLIP 2, however, Filip became aware of certain third-party OEMs developing devices that Filip believed would be compatible with the Filip software platform, and ultimately determined to pursue partnerships with OEMs instead of continuing its own hardware development program. Accordingly, after significant deliberation, Filip's Board of Directors determined to discontinue Filip's hardware development business and focus on the development, operation, and promotion of the Filip Service and the use of the Filip Service with third-party OEM devices. The manufacturing of the FiLIP 2 device has been discontinued.

### *Operational Footprint*

17.    Filip is headquartered in New York, New York, and presently operates in the United States and Spain.

18.    Filip employs eight (8) individuals, four (4) of whom are based in Filip's New York office and four (4) of whom work remotely from home offices in Pennsylvania. Filip's employees include software developers, engineers, and designers, among others. Filip's CEO and the Chairman of Filip's Board of Directors since 2013 is Mr. Jonathan Peachey.[5]

## B.    Corporate Structure

19.    Filip is a privately-held Delaware corporation formed in 2013. Filip directly owns one-hundred percent (100%) of Filip Technologies UK Limited, an entity formed in 2012 under the laws of England and Wales ("Filip UK"). Filip UK directly owns (i) one-hundred percent (100%) of Evado Filip AS, an entity formed in 2010 under the laws of Norway ("Filip Norway"); and (ii) Evado Filip Limited, a dormant entity formed in 2012 under the laws of England and Wales

---

[5] Prior to Mr. Peachey's joining Filip in 2013, Mr. Peachey held senior positions with Virgin Group for more than ten years, including Chief Executive Officer of Virgin Group in North America, and was involved in the launch and growth of numerous businesses, including as a founding member of the team that developed Virgin Galactic, and a board member at Virgin America.

CHAR2\1839502v16

("Filip UK Dormant").  Filip Norway directly owns one-hundred percent (100%) of Evado Filip

US Limited, a Delaware corporation formed in 2012 ("Filip US Sub" and, together with Filip UK,

Filip Norway, and Filip UK Dormant, the "Debtor Subsidiaries").

20.     Filip's Board of Directors consists of three (3) directors, and the Board of Directors

of each Debtor Subsidiary consists of one (1) director.

21.     Set forth below is a chart depicting the organizational structure of the Debtors as of

the Petition Date:



## C.     Corporate History

22.     The Debtors' corporate structure reflects the evolution of the Debtors' business

since the original inspiration for the Filip concept in Norway, 2010, when the founder of the

Company, Mr. Sten Kirkbak, briefly lost track of his son Filip in a shopping mall.[6]  Subsequently,

Mr. Kirkbak and co-founder Mr. Olav Medhus, established Filip Norway to conduct the initial

research and development that became the basis for Filip's concept and business.  During 2011

---

[6] Mr. Kirkbak is the sole director of Filip Norway.

and 2012, Filip Norway entered into certain contracts with third parties, including a contract for the development of software that would become the first generation of the Filip platform and mobile applications, and a contract for the design, development and testing of the FiLIP wearable device.[7] In addition, during 2012, Filip Norway formed Filip US Sub for the purpose of transferring certain key personnel from Norway to the United States, and to enter into a contract with a U.S.-based counterparty for engineering support, manufacturing, packaging, distribution, and other services for the FiLIP wearable device. Also during 2012, Filip UK was formed for the purpose of attracting investment capital from investors located in the United Kingdom. Shortly after its formation, Filip UK acquired one-hundred percent (100%) ownership of Filip Norway pursuant to a share exchange transaction.

23. By 2013, Filip was in negotiations with AT&T regarding a potential Master Purchase Agreement for the launch of Filip products in the United States, and had determined that the United States would become the headquarters and primary operating location for the Filip business. As a result, Filip Technologies, Inc. was formed under Delaware law in September 2013 to be the primary operating entity for the Filip business. In November 2013, Filip acquired one-hundred percent (100%) ownership of Filip UK pursuant to a stock exchange transaction. As such, since that time, virtually all of Filip's operations have occurred through parent entity Filip Technologies, Inc., and certain intellectual property components of the Filip Service reside in non-dormant Debtor Subsidiaries.

---

[7] Although Evado Norway is the nominal party to a contract for the development of software relating to the Filip platform and mobile applications, Evado Norway has no employees or operations, and all direction and oversight of the software development work performed under this contract has been provided from the United States by employees of Filip for nearly three years.

D.        **Capital and Debt Structure**

24.        As an emerging technology company, since inception Filip has relied on continued cash infusions from investors as it has grown its business.  Filip historically has not been, and is not today, able to finance itself solely from its operational cash flows.  Set forth below is a description of Filip's capital and funded debt structure as of the date hereof.

### *Secured Debt*

25.        As discussed further in paragraph 36 below, prior to the Petition Date, for the purpose of avoiding a shut-down of the Filip Service while enabling the Debtors to continue strategic discussions with potential acquirers and prepare for the orderly commencement of these Cases, AT&T provided $240,000 of unsecured financing (the "Maintenance Amount") to the Debtors pursuant to that certain (i) Maintenance Agreement, dated as of August 24, 2016, by and among Filip Technologies, Inc. and AT&T Services, Inc. (the "Original Maintenance Agreement"); and (ii) Supplemental Maintenance Agreement, dated as of September 16, 2016, by and among Filip Technologies, Inc. and AT&T Services, Inc. (the "Supplemental Maintenance Agreement" and, together with the Original Maintenance Agreement, the "Maintenance Agreements").  Pursuant to the Maintenance Agreements, AT&T deposited the Maintenance Amount with a third-party disbursement agent, Epiq Bankruptcy Solutions, LLC ("Epiq"), for disbursement to the Debtors in accordance with an agreed budget attached to the Maintenance Agreement.

26.        Subsequently, AT&T made a further loan to the Debtors in the amount of $240,000 pursuant to that certain Secured Promissory Note between AT&T Capital Services, Inc. and Filip Technologies Inc., dated September 28, 2016 (the "AT&T Prepetition Promissory Note").  The additional funding provided under the AT&T Prepetition Promissory Note enabled the Debtors to

CHAR2\1839502v16

continue operation of the Filip Service and undertake preparations for the commencement of these Cases.  Pursuant to the AT&T Prepetition Promissory Note, the total prepetition funding provided by AT&T of $480,000 is secured by a first priority and duly perfected lien on substantially all of the Debtors' assets.

### *Unsecured Debt – Senior Notes*

27.     In mid-July 2016, Filip issued senior unsecured promissory notes (the "Prepetition Senior Unsecured Notes") in the aggregate principal amount of $125,000, bearing interest at three percent (3%) per annum and due and payable on March 31, 2017, subject to the terms and conditions thereof.  The Prepetition Senior Unsecured Notes were issued to (i) EF Investigo Holdings AS ($25,000); (ii) KEC Ventures I LP ($25,000); and (iii) Lakestar I LP ($75,000).  The Debtors have not made any payments on the Prepetition Senior Unsecured Notes since issuance.

### *Unsecured Debt – Convertible Notes*

28.     On various dates from July 2015 through August 2016, Filip issued unsecured notes (the "Prepetition Unsecured Convertible Notes") in the aggregate principal amount of $2,775,000, as follows:

| | Amount US$ | Date |
|---|---|---|
| Sibelius International Limited | 75,000.00 | 8/2/16 |
| Lakestar I LP | 75,000.00 | 6/29/16 |
| KEC Ventures I LP | 25,000.00 | 6/29/16 |
| Sibelius International Limited | 75,000.00 | 4/15/16 |
| Lakestar Capital | 75,000.00 | 4/1/16 |
| KEC Ventures I LP | 25,000.00 | 4/7/16 |
| EF Investigo Holdings AS | 25,000.00 | 4/12/16 |
| Sibelius International Limited | 300,000.00 | 1/15/16 |
| Lakestar I LP | 300,000.00 | 1/15/16 |
| KEC Ventures I LP | 100,000.00 | 1/15/16 |
| EF Investigo Holdings AS | 100,000.00 | 1/15/16 |
| Sibelius International Limited | 400,000.00 | 7/31/15 |
| Lakestar I LP | 400,000.00 | 7/31/15 |
| KEC Ventures I LP | 300,000.00 | 7/31/15 |
| EF Investigo Holdings AS | 276,000.00 | 7/31/15 |
| Merit Tech Investment Development Ltd | 100,000.00 | 7/31/15 |
| Whiterose Holdings Ltd | 50,000.00 | 7/31/15 |
| Nick Southgate | 20,000.00 | 7/31/15 |
| Adam Phillips | 20,000.00 | 7/31/15 |
| Torben Cattley | 11,000.00 | 7/31/15 |
| Mark Farrer-Brown | 10,000.00 | 7/31/15 |
| John Angell | 8,000.00 | 7/31/15 |
| Brisbane Consultants Ltd | 5,000.00 | 7/31/15 |
| **Total** | **2,775,000.00** | |

The Prepetition Unsecured Convertible Notes bear interest at three percent (3%) per annum, are due and payable on December 31, 2017, and include a mechanism for the potential conversion of such debt into equity securities of the Company upon the occurrence of certain future events and subject to the terms and conditions thereof. The Debtors have not made any payments on the Prepetition Unsecured Convertible Notes since issuance.

### *Unsecured Debt – Convertible Notes (Former Employees)*

29.    Prior to the Petition Date, due to liquidity constraints preventing Filip from remitting cash payment on account of certain contractual and other termination obligations to departing employees, Filip issued unsecured convertible promissory notes (the "Prepetition Unsecured Employee Notes") to such employees in an amount equal to $345,493 in the aggregate, as follows:  (i) Sten Kirkbak ($150,000); (ii) PJD Holding, LLC ($79,451); (iii) Hilary Tuohy ($72,917); and (iv) Anders Broms ($43,125).  The Prepetition Unsecured Employee Notes bear

interest at three percent (3%) per annum and are due and payable on December 31, 2016 and include certain equity conversion features, subject to the terms and conditions thereof. The Debtors have not made any payments on the Prepetition Unsecured Employee Notes since issuance.

### *Unsecured Debt – Convertible Notes (Trade Vendors)*

30.     Prior to the Petition Date, due to liquidity constraints and in an effort to reach deferred payment arrangements with various trade vendors, Filip issued unsecured convertible promissory notes (the "Prepetition Unsecured Vendor Notes") to certain vendors in the aggregate amount of $93,893.26, as follows:  (i) AltaStream Consulting, LLC ($30,438.00); (ii) Anderssen & Voll AS ($27,899.26); and (iii) eRate AS ($35,556.00).  The Prepetition Unsecured Vendor Notes bear interest at three percent (3%) per annum and are due and payable on December 31, 2017 and include certain equity conversion features, subject to the terms and conditions thereof. The Debtors have not made any payments on the Prepetition Unsecured Vendor Notes since issuance.  In addition to the Prepetition Unsecured Vendor Notes, as of the Petition Date the Debtors also have approximately $2.6 million of unsecured accounts payable owed to approximately seventy (70) trade vendors.

### *Equity Interests*

31.     Parent entity Filip has twenty-one (21) preferred equity holders, and fifty-three (53) common equity holders.  As of the Petition Date, Filip has 564,627,017 shares of preferred stock and 24,113,665 shares of common stock issued and outstanding.  In addition, as of the Petition Date, Filip has issued options to acquire in the aggregate 73,440,033 shares of Filip's common stock.  As noted in paragraph 21 above, Filip owns directly and indirectly one-hundred percent (100%) of the equity of each of the Debtor Subsidiaries.

CHAR2\1839502v16

E.    **Events Leading Up To These Chapter 11 Cases**

32.    Despite Filip's accomplishments and potential for further expansion, various factors have contributed to Filip's (i) inability to obtain investment capital or debt financing to fund operations or further growth whether from its existing investors or otherwise; (ii) liquidity exhaustion; and (iii) determination to pursue a sale of the Filip business and assets and attendant wind-down.

33.    Although Filip successfully launched the FiLIP device in November 2013, the development and certification of the device proved more complex, time consuming, and costly than originally anticipated.  In addition, the final production cost of the FiLIP device was higher than forecast, such that Filip incurred a negative margin on the sale of each device, which was eventually recouped over several months from service fees received by Filip from its customers, i.e., the wireless network operators.  Filip also was unable to sell as many devices as anticipated, and was therefore unable to benefit from anticipated manufacturing discounts in order to improve its gross margins and realized lower than anticipated service revenues.  As a result of these factors, together with the significant advertising and marketing costs and sales rebates necessary to drive FiLIP device sales volume, Filip consumed significantly more capital than anticipated.

34.    In early 2015, Filip determined to exit the hardware business and streamline its operations by focusing on the Filip Service.  Although this operational restructuring effort resulted in certain positive effects, such as improvement to Filip's gross margins, reduction in operating expenditures, reduced cash needs, and positioning Filip on a path to reduce operational complexity, Filip was unable to attract the additional funding necessary to achieve profitability with this new business model.

14

35.     In March 2016, and deliberation and at the direction of Filip's Board of Directors, Filip retained an investment banking firm, Widebridge Group ("Widebridge"), to conduct a marketing and sale process on behalf of Filip.  Through that process and beginning on March 31, 2016, the Debtors, through and with the assistance of Widebridge, (i) contacted approximately two-hundred thirty (230) potentially interested parties; (ii) entered into ten (10) non-disclosure agreements; (iii) facilitated extensive due diligence by five (5) parties; and (iv) reached advanced discussions regarding a potential transaction with one (1) party.  Unfortunately, those advanced discussions did not result in a transaction, and the Debtors formally terminated those discussions on August 18, 2016.

36.     Thereafter, with little remaining liquidity, the Debtors attempted to re-engage in strategic discussions with certain parties that had been contacted during the initial marketing and sale process, and also noted to such parties the Debtors' immediate funding need.  In an effort to avoid the shut-down of the Filip Service, enable introductions by AT&T to the Debtors of additional interested parties, and provide additional time to explore alternatives, on August 24 AT&T and the Debtors entered into the above-described Maintenance Agreement pursuant to which AT&T made the Maintenance Amount available to the Debtors.  The funding provided by AT&T pursuant to the Maintenance Agreements and, thereafter, the AT&T Prepetition Promissory Note, has enabled the Debtors to reach this stage of multiple interested parties conducting due diligence, a Potential Stalking Horse, and the proposed DIP Financing for the purpose of administering a competitive and value-maximizing process and orderly wind-down in chapter 11.

37.     The Debtors presently are in discussions with the Potential Stalking Horse, have received and are reviewing a draft purchase agreement from that party, and are in active discussions with eight (8) other potential bidders as well.  The Potential Stalking Horse and all

15

other potentially interested parties have conditioned their respective willingness to proceed upon a sale process under section 363 of the Bankruptcy Code.  In addition, the DIP Lender has conditioned its willingness to provide any further liquidity to the Debtors upon the approval and implementation of the DIP Facility.  The DIP Lender – as noted, also the Debtors' primary customer and largest unsecured creditor – supports the commencement and framework of these Cases as set forth in the DIP Motion filed contemporaneously herewith.

**F.**     **Debtors' Goals in These Chapter 11 Cases**

38.     The Debtors intend to use these Cases to pursue a competitive auction, sale transaction, and orderly wind-down of their estates – while maintaining the continued operation of the Filip Service throughout – in an effort to maximize the value of the Debtors' business and assets for the benefit of all stakeholders.  Notwithstanding that the Debtors have run an extensive marketing process for approximately six months leading up to the Petition Date, in addition to the interest currently presented, the Debtors will also attempt to reengage with previously interested parties and attract additional interested parties that will participate in a competitive auction process.

## III.     FIRST DAY MOTIONS

**A.**     **Motion of the Debtors for Entry of an Order Authorizing and Directing the Joint Administration of Debtors' Chapter 11 Cases for Procedural Purposes Only**

39.     The Debtors request the joint administration of the Cases for procedural purposes only.  Specifically, the Debtors request that the Court maintain one file and one docket for the Cases under the Filip Technologies, Inc. case and also request that the caption of each of the Cases be modified to reflect the joint administration of the Cases.  Additionally, the Debtors request that the Court authorize the Debtors to use a combined service list for the jointly administered Cases for purposes of noticing creditors of the Debtors' estates.

40.     The Debtors are direct and indirect affiliates of each other and constitute "affiliates" within the meaning of section 101(2) of the Bankruptcy Code.  Joint administration of the Cases will avoid the unnecessary administrative burden on the Court and parties-in-interest in these Cases.  Joint administration will also permit the Clerk to use a single general docket for the Cases and to combine notices to creditors and other parties-in-interest of the Debtors' respective estates. Joint administration will protect parties-in-interest by ensuring that such parties-in-interest in each of the Debtors' respective Cases will be apprised of the various matters before the Court in each of the Cases.

41.     I understand that if the Court approves joint administration of the Cases, the Debtors will be able to reduce fees and costs resulting from the administration of the Cases and ease the onerous administrative burden of having to file multiple documents.  I have also been advised that joint administration will ease the administrative burden for the Court and all parties to the Cases and obviate the need for duplicative notices, motions, applications and orders, thereby saving time and expense for the Debtors and their estate.  Based on the foregoing, the Debtors believe that joint administration of the Cases is in the best interests of the Debtors, their estates and all parties-in-interest, and should be granted.

**B.    Motion of the Debtors for Entry of an Interim Order and Final Order (A) Authorizing the Maintenance of Bank Accounts and Continued Use of Existing Business Forms and Checks, (B) Authorizing the Continued Use of Existing Cash Management Systems, and (C) Granting Limited Relief from the Requirements of Bankruptcy Code Section 345(B) (the "Cash Management Motion")**

42.     By the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing the maintenance of their Bank Accounts and continued use of existing Business Forms; (ii) authorizing but not directing the continued use of their existing Cash Management System; and (iii) providing any additional relief required in order to effectuate the foregoing.  The

CHAR2\1839502v16

Debtors also request the right, in their discretion, to (i) pay any Bank Account related fees; and (ii) close or otherwise modify the terms of certain of the Bank Accounts and open new debtor-in-possession accounts as may be necessary to facilitate the Cases and their operations, or as may otherwise be necessary to comply with the requirements of any debtor-in-possession financing and/or cash collateral order entered in these Cases.

43.    Further, the Debtors request that the Court waive the requirements of Bankruptcy Code section 345(b) on an interim basis and permit the Debtors to maintain their deposits in the Bank Accounts in accordance with existing deposit practices until such time as the Debtors obtain this Court's approval to deviate from the guidelines imposed under Bankruptcy Code section 345(b) on a final basis.  The Debtors' existing deposit practices are significantly less burdensome and more appropriately tailored to their business needs than the practices otherwise required under the Bankruptcy Code and by the U.S. Trustee Guidelines.

44.    The continued use of the Cash Management System and the Bank Accounts during the pendency of these Cases is essential to the Debtors' business operations.  The Debtors believe that the Bank Accounts and related Cash Management System mechanisms are well-suited to the Debtors' business needs and operations.  To require the Debtors to close the Bank Accounts and reestablish new accounts would not result in greater administrative controls and would require considerable time and expense to the Debtors' estates.  Moreover, permitting the Debtors to continue using their existing Bank Accounts is essential to a smooth and orderly transition of the Debtors into chapter 11 and to avoid disruption of their businesses and operations, including the disruption that could result if checks written but not negotiated or cashed prior to the Petition Date were dishonored.

CHAR2\1839502v16

45.     The Cash Management System is a practical mechanism that allows the Debtors to transfer their revenues to the payment of their obligations that decreases the burdens on the Debtors, and that provides several important benefits, including the ability to:  (i) control and monitor corporate funds; (ii) ensure cash availability; (iii) accept certain foreign currencies; and (iv) reduce administrative expenses by facilitating the movement of funds and the development of timely and accurate balance and presentment information.  Moreover, continued operation of the Cash Management System is crucial to the Debtors' ongoing business operations.

46.     Without the relief requested, I believe the Debtors would be unable to effectively and efficiently maintain their financial operations.  Such a result would cause significant harm to the Debtors' businesses and the value of their estates.  Accordingly, I believe that the relief requested is in the best interest of the Debtors, their estates and creditors, and all parties in interest.

**C.     Motion of the Debtors for Entry of an Interim Order and Final Order Authorizing the Debtors to Pay Prepetition Wages, Compensation, Employee Benefits and Other Associated Obligations (the "Employee Wages and Benefits Motion")**

47.     By the Employee Wages and Benefits Motion, the Debtors seek entry of entry of interim and final orders (i) authorizing, but not directing, the Debtors to (a) pay and/or perform, as applicable, prepetition obligations to current employees including accrued prepetition wages, salaries, and other cash and non-cash compensation claims (collectively, the "Employee Wage Obligations"); (b) maintain and continue to honor their practices, programs, and policies for their employees that were in effect as of the Petition Date, as such may be modified, amended or supplemented from time to time in the ordinary course, including without limitation, the continuation and maintenance of the Debtors' various employee benefit plans and programs (and to pay all fees and costs in connection therewith, including those that arose prepetition) (collectively, the "Employee Benefit Obligations"); (c) reimburse Employees for prepetition

expenses incurred on behalf of the Debtors in the ordinary course of business (the "Employee Expense Obligations"); (d) continue to pay and/or contest in good faith all amounts related to workers' compensation claims that arose prepetition (the "Workers' Compensation Obligations"); (e) pay all related prepetition withholdings and payroll-related taxes and deductions (the "Employer Taxes and Deductions" and collectively with the Employee Wage Obligations, Employee Benefit Obligations, Employee Expense Obligations and Workers' Compensation Obligations, the "Employee Obligations") associated with the Employee Wage Obligations and Employee Benefit Obligations; and (ii) authorizing and directing financial institutions to receive, process, honor, and pay all related checks and electronic payment request for payment of any prepetition Employee Obligations.

48.    As of the Petition Date, Filip employs eight (8) individuals, four (4) of whom work in Filip's New York office and four (4) of which work remotely from home offices in Pennsylvania (the "Employees").  These Employees are full-time salaried personnel.

49.    The Debtors' Employees perform a variety of critical functions, including developing and selling the Debtors' products and services, running their business and technical operations, supporting customers, performing general and administrative services, providing financial services, and other related tasks.  The Employees' skills, knowledge, and understanding of the Debtors' operations and business relations are essential to the effective operation of the Debtors' businesses.

50.    In the ordinary course of business, the Debtors incur payroll obligations for salaries, commissions and hourly wages owed to their Employees.  Salaries and hourly wages for the Employees are paid twice a month.  The average total monthly payroll obligations are approximately $83,500.00 for the Employees.  As of the Petition Date, the Debtors estimate that

they owe $9,135.41 to their Employees for prepetition Employee Wage Obligations (collectively, the "Prepetition Wage Obligations"). The Debtors seek the authority to pay and honor Prepetition Wage Obligations in an amount not to exceed $9,200.00 in the aggregate for Employees, and to continue to honor the Employee Wage Obligations on a postpetition basis in the ordinary course of business.

51.    The Employees are essential to the continued operation of the Debtors' businesses, and the Employees' morale directly affects their effectiveness and productivity. Consequently, it is critical that the Debtors continue, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date. A loss of employee morale and goodwill at this critical juncture would undermine the Debtors' stability, and undoubtedly would have an adverse effect on the Debtors, their customers, the value of their assets and businesses, and their ability to achieve their objectives in chapter 11.

52.    I believe that payment of all Prepetition Employee Obligations in accordance with the Debtors' prepetition business practices will enable the Debtors to retain their qualified and highly-skilled employees and is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**D.     Motion of the Debtors for Entry of an Interim Order and Final Order Authorizing the Debtors to Maintain Existing Insurance Policies, Pay All Policy Premiums Arising Thereunder, and Renew or Enter Into New Policies (the "Insurance Motion")**

53.    By the Insurance Motion, the Debtors request entry of interim and final orders (i) authorizing the Debtors to pay unpaid prepetition premiums associated with the prepetition insurance policies (collectively, the "Insurance Policies") to the extent that the Debtors might discover and determine, in their discretion, that such payment is necessary to avoid cancellation, default, alteration, assignment, attachment, lapse, or any form of impairment to the coverage,

benefits, or proceeds provided under the Insurance Policies; and (ii) authorizing and directing financial institutions to receive, process, honor, and pay all related checks and electronic payment requests for payment of the Insurance Policies.  The Debtors are requesting this relief solely to the extent consistent with the terms of any interim and final orders approving entry into debtor in possession financing and authorizing use of cash collateral entered by the Court in these Cases.

54.    The Debtors maintain four (4) Insurance Policies that have been obtained through various third-party insurance carriers (the "Insurance Carriers"), which provide coverage for, among other things, commercial general liability, directors' and officers' liability, property, life, disability, healthcare, dental, and vision.  Continuation of the Insurance Policies is essential to the preservation of the Debtors' businesses.  Moreover, in many cases, coverage provided by the Insurance Policies is required by regulations, laws, and contracts that govern the Debtors' commercial activities.

55.    The Debtors pay certain premiums on a periodic basis and others in an annual lump sum.  The Debtors are generally current on amounts owed to maintain the Insurance Policies. Certain amounts owed in connection with the Insurance Policies, however, are paid in arrears or have otherwise accrued before the Petition Date and have not yet been paid.  As of the Petition Date, the Debtors estimate that a total of approximately $4,500.00 in prepetition amounts is outstanding under the Insurance Policies.

56.    The general liability, property and casualty insurance policy with Marsh and McLennan Agency for the November 15, 2015 through November 15, 2016 term was financed through Premium Assignment Corporation Loan #15045100 for the total financed premium amount of $33,939.57.  As of the Petition Date, this loan was paid in full other than a small contingent fee of $139.32, which is included in the prepetition amount of approximately $4,500.

CHAR2\1839502v16

57.     Additionally, other payments may come due in the future that relate to Insurance Policy obligations incurred prepetition and premiums will need to be paid in the ordinary course postpetition.  Many of the policies are paid on a month to month basis or will expire on a post-petition basis.  The Debtors are in the process of attempting to procure extensions to any policies that come to term during the Cases and will continue such efforts.

58.     The Debtors believe that the Insurance Policies are necessary and essential to the operation of their businesses during these Chapter 11 Cases.  Under the terms of the Insurance Policies, the Insurance Carriers may cancel the Insurance Policies for nonpayment upon the Debtors' failure to pay the premium obligations, and such cancellation will seriously harm the Debtors' ability to continue their operations and business in the ordinary course.  The Debtors' ability to continue their existing Insurance Policies is essential to the maintenance of their business. Accordingly, the Debtors seek authorization to maintain their existing Insurance Policies, including payment of all monthly obligations, whether prepetition or postpetition, and to renew or enter into new policies as may be required as the annual terms of existing Insurance Policies expire, without further order of the Court, in the ordinary course of business.  Accordingly, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**E.     Motion of the Debtors for Entry of an Interim Order and Final Order Authorizing Debtors to Honor and Continue Certain Customer Programs in the Ordinary Course of Business (the "Customer Programs Motion")**

59.     By the Customer Programs Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to continue the Debtors' various customer programs and policies (collectively, the "<u>Customer Programs</u>") and to honor, at the Debtors' sole

discretion and subject to the DIP Facility, their prepetition obligations under the Customer Programs.

60.     Prior to the Petition Date, both in the ordinary course of the Debtors' business and as is customary in the industry, the Debtors offered and engaged in the Customer Programs.  The Customer Programs include, but are not limited to, (i) Warranties; (ii) Gurantees; (iii) Refunds; and (iv) all such other similar policies, programs and practices of the Debtors, including honoring credit balances.

61.     In order to facilitate a smooth transition in chapter 11, the Debtors must maintain customer loyalty and goodwill through the Customer Programs.  Indeed, the Debtors implemented the Customer Programs in the ordinary course of business prior to the Petition Date as a means by which to maintain positive, productive, and profitable relationships with their customers, encourage new purchases of their products, enhance customer satisfaction and ensure that the Debtors remain competitive in their industry.  Although the terms of the Customer Programs may vary among the Debtors' customers, all of the Customer Programs are designed and implemented to encourage the Debtors' customers to increase their purchasing frequency and volume, resulting in larger net revenues for the Debtors and, in return, greater satisfaction for the customers.

62.     Accordingly, the Debtors seek authority, but not direction, to continue the Customer Programs, including authority to honor Customer Obligations arising therefrom, in their sole discretion, as and to the extent provided in the Customer Programs Motion.

**F.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Obtain Post-Petition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Superpriority Claims, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief (the "DIP Financing Motion")**

63.     By the DIP Motion, the Debtors respectfully request that the Court enter interim and final orders (i) authorizing the Debtors to enter into senior secured and superpriority post-

24

petition financing (the "DIP Facility") with AT&T Capital Services, Inc. as lender under the DIP Facility (in such capacity, the "DIP Lender") (ii) authorizing the Debtors to use Cash Collateral; (iv) granting liens and superpriority administrative claims to the DIP Lender pursuant to section 364 of the Bankruptcy Code; and (iv) granting related relief. Specifically, by the DIP Motion, the Debtors request interim and final authorization for Filip to obtain, and each of the other Debtors to unconditionally guaranty, jointly and severally, the Borrower's and each other's obligations in respect of the DIP Facility, which if approved on a final basis would consist of post-petition financing in a total amount of $1,240,000, inclusive of the Roll-Up Loans in an amount equal to $480,000, subject to the terms and conditions of the DIP Facility.

64.     Unsecured financing is not available to the Debtors. The fact that potential buyers, aware of the Debtors' liquidity situation, expressed no interest in funding the Debtors (on any terms) over the course of a six-month marketing and sale process prepetition, demonstrates that the Debtors have no viable alternative to the proposed DIP Facility. Further, during the course of these discussions with interested parties, it became clear to the Debtors that no party was willing to pursue an acquisition of the Debtors' business outside of a chapter 11 process. The Debtors inquired of the potential purchasers whether they would agree to advance debtor-in-possession financing in order to facilitate such a process, but none of the potential purchasers expressed willingness to do so. Additionally, the Debtors explored whether their existing lead investors would provide additional capital to fund the Debtors' chapter 11 process. Despite these efforts, the Debtors were unable to obtain any alternative proposals for DIP financing.

65.     As discussed in detail above, these Cases follow several exhaustive yet unavailing efforts by the Debtors to attract capital and consummate strategic transactions over the past year. Faced with the depletion of remaining liquidity and the inability to obtain further funding outside

of chapter 11, the Debtors' management took the steps they deemed necessary and exercised their best business judgment in negotiating the DIP Facility. The Debtors' management and the Board of Directors ultimately concluded that the DIP Facility will provide immediate access to capital to pay their limited ongoing operating expenses while enabling the Debtors to pursue a sale of substantially all of the Debtors' assets on a competitive basis under the protection of chapter 11, and a wind-down of the Debtors' estates, all on more favorable terms than any other reasonably available alternative.

66.    Without this financing (and the funding provided prepetition under the Maintenance Agreements) the Debtors would have liquidated under chapter 7 with no chance for a recovery to their creditors. The DIP Facility is the Debtors' best and only means of obtaining the liquidity necessary to avoid a shutdown of their business, preserve going concern value, and effectuate a value-maximizing sale transaction for the benefit of all stakeholders.

67.    The DIP Facility provides the Debtors the liquidity they need to maintain their assets during the Cases and allows the Debtors to pursue and effectuate a competitive process and sale of the Debtors' assets. The proceeds of the DIP Facility are sized to preserve and promote the viability of the Debtors' assets and support the Debtors through the anticipated pendency of these chapter 11 cases, but nothing more. Moreover, the financial terms and covenants of the DIP Facility are standard and reasonable for financing of this kind.

68.    Based on the Debtors' negotiations regarding the DIP Facility, the terms of the DIP Loan Documents constitute, on the whole, the most favorable terms the Debtors could achieve upon which the DIP Lender will extend the necessary postpetition financing. Although the Debtors explored whether the DIP Lender would provide the DIP Facility without certain provisions, in the course of negotiations, the DIP Lender indicated it would not be willing to provide the DIP

Facility without such terms.  In particular, the DIP Lender would not provide financing without the provisions requiring, in particular, (i) the achievement of certain sale milestones, including the filing of a sale motion on or shortly after the Petition Date, and the filing of the Motion to Shorten (defined below); (ii) the conversion of the Senior Prepetition Indebtedness into Roll-Up Loans under the DIP Facility; and (iii) securing the DIP Facility with first-priority liens and superpriority claims.  These are key components of consideration for the DIP Lender without which it has indicated it is unwilling to provide the DIP Facility.

69.    Accordingly, the Debtors, in consultation with their advisors – recognizing the absence of any competing financing proposals and the benefits to be provided under the DIP Facility – determined that the terms of the DIP Credit Agreement were superior to any other set of terms reasonably available to the Debtors at this time, and in fact the only available terms. Therefore, the DIP Facility provides the Debtors with the best, most feasible, and value-maximizing financing option available at this time.

70.    Moreover, the Debtors have concluded that the economic terms of the DIP Facility are fair and reasonable and are consistent with what can be expected in a debtor-in-possession financing facility.  In that regard, it is worth noting that the DIP Lender has not imposed any fees on the Debtors for providing the DIP Facility.  After thorough analysis by the Debtors and their advisors, they have concluded that the terms of the DIP Facility are reasonable and appropriate under the circumstances.  The non-economic terms of the DIP Facility, including the sale milestones, are also within the range of what can be expected for a debtor-in-possession financing facility, particularly considering the facts and circumstances of these Cases, the nature of the Debtors' assets, and the extensive marketing and sale process that preceded these Cases.

71.    For these reasons, in the Debtors' prudent business judgment, the terms of the DIP

Facility are fair and reasonable in the circumstances of the Cases and the Debtors could not obtain

postpetition financing from any other lending source.    Accordingly, I believe that the relief

requested in the DIP Motion is in the best interests of the Debtors, their estates and creditors, and

all parties in interest.

**G.    Motion to Shorten Notice with Respect to Debtors' Motion for Orders (I)(A) Approving Bidding Procedures and Auction and (B) Scheduling Sale Hearing and Approving Notice Thereof; (II) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts; and (IV) Granting Related Relief (the "Motion to Shorten")**

72.    By the Motion to Shorten, the Debtors request entry of an order shortening the

notice period for the Debtors' separate Motion, filed on the Petition Date, seeking entry of orders

(i)(a) authorizing bidding procedures and a related auction and (b) scheduling a sale hearing and

approving notice thereof; (ii) authorizing the sale of substantially all of the Debtors' assets free

and clear of all liens, claims, encumbrances, and other interests; (iii) authorizing the assumption

and assignment of certain contracts and establishing procedures to determine cure amounts and

establishing deadlines for objections for certain contracts to be assumed and assigned by the

Debtors; and (iv) granting related relief (the "Bid Procedures Motion").    Specifically, by the

Motion to Shorten, the Debtors request entry of an order shortening the notice period on the Bid

Procedures Motion so as to (i) schedule a hearing on the Bid Procedures for October 20, 2016; and

(ii) shorten the period for notice of the Bid Procedures Hearing with objections, if any, to be filed

on or before October 18, 2016 at 4:00 p.m.

73.    As and for the reasons stated, the Debtors filed these chapter 11 cases in an effort

to avoid a liquidation of their business and any interruption to the Filip Service that would almost

certainly result in no recovery to their estates.    The Debtors concluded that the only available

CHAR2\1839502v16

means of maximizing the value of their assets was to conduct the sale described herein and attempt to increase recoveries through a competitive auction process for the Debtors' business and assets. The DIP Lender – also the Debtors' primary customer – supports the pursuit of the sale and the related relief requested herein, on the timeline required under the DIP Facility.  The relief requested in the Motion to Shorten is necessary for the Debtors to achieve the milestones required under the DIP Facility, and therefore essential to the Debtors' effort to pursue and consummate a value-maximizing sale of their assets expeditiously through these Cases.

74.    Further, as discussed above, these Cases follow an extensive prepetition marketing and sale process for substantially all of the Debtors' assets, over a period of six months.  Although the process did not yield a transaction, the Debtors, through and with the assistance of Widebridge, (i) contacted approximately two-hundred thirty (230) potentially interested parties; (ii) entered into ten (10) non-disclosure agreements; (iii) facilitated extensive due diligence by five (5) parties; and (iv) reached advanced discussions regarding a potential transaction with one (1) party.  As of the Petition Date, the Debtors are actively engaged in strategic discussions with potential acquirers and have received expressions of interest for all and/or certain of their assets.  Further, as of the Petition Date, although the Debtors have not secured a definitive agreement with a prospective purchaser, the Debtors are in advanced discussions with the Potential Stalking Horse, and are in ongoing diligence processes and discussions with eight (8) potential bidders.

75.    Accordingly, in light of the scope and duration of the prepetition marketing process, the Potential Stalking Horse, the ongoing discussions with and diligence by potentially interested parties, and the requisite timeline required as a condition to the DIP Lender's willingness to provide the DIP Facility which is the only financing available to the Debtors, I believe that cause exists for the relief requested in the Motion to Shorten.

## IV.   <u>CONCLUSION</u>

76.   For the reasons described herein and in the First Day Motions, I believe that the prospect for achieving these objectives for the benefit of creditors and other stakeholders will be substantially enhanced if the Court grants the relief requested in each of the First Day Motions and respectfully request the Court to do so.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  October 5, 2016

/s/ Roy Messing
Roy Messing
Chief Restructuring Officer