Ex. A

**Execution Version**

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement"), is made as of October 18, 2016, by and among (i) Filip Technologies, Inc., a Delaware corporation ("Filip"), Filip Technologies UK Ltd, a private limited company organized under the laws of England and Wales, United Kingdom and a wholly-owned direct subsidiary of Filip ("Filip UK"), Evado Filip AS, a private limited company organized under the laws of Norway and a wholly-owned direct subsidiary of Filip UK ("Filip Norway"), Evado Filip Limited, a private limited company organized under the laws of England and Wales, United Kingdom and a wholly-owned direct subsidiary of Filip UK ("Evado UK"), and Evado Filip US Ltd., a Delaware corporation and a wholly-owned direct subsidiary of Filip Norway ("Evado US" and, together with Filip, Filip UK, Filip Norway and Evado UK, the "Sellers" and each of Filip, Filip UK, Filip Norway, Evado UK and Evado US, a "Seller"), each as a debtor and debtor-in-possession in the Bankruptcy Cases (as defined below) and (ii) Aricent Holdings Luxembourg S.à.r.l., an entity formed and organized under the laws of Luxembourg (the "Buyer").  Each of the Sellers and the Buyer are referred to herein individually as a "Party" and collectively as the "Parties."  Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in Article 1 below.

### RECITALS:

WHEREAS, Sellers are engaged in the business of providing certain technology and software solutions that enable parents to connect with their children, wherever located, over wireless networks (the "Business");

WHEREAS, on October 5, 2016, Sellers commenced voluntary cases (collectively, the "Bankruptcy Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which Bankruptcy Cases have been jointly administered for procedural purposes only and are pending before the Bankruptcy Court under Lead Case No. 16-12192 (KG);

WHEREAS, Sellers desire to sell substantially all of the Business (i.e., the Acquired Assets (as defined below)) and the Buyer desires to purchase from Sellers the Acquired Assets, subject to the terms and conditions of this Agreement;

WHEREAS, the Parties intend that the Acquired Assets include all of Sellers' intellectual property, databases and data, proprietary software, related documentation, and certain other assets and Contracts the Buyer requires to operate Sellers' cloud platform and services without interruption, excluding assets relating solely to the manufacture of Sellers' proprietary wearable device; and

WHEREAS, the Acquired Assets will be sold pursuant to the terms of this Agreement and an order of the Bankruptcy Court approving and authorizing such sale pursuant to, inter alia, sections 363 and 365 of the Bankruptcy Code.

## AGREEMENTS:

**NOW, THEREFORE**, in consideration of the foregoing and the mutual covenants and promises contained herein and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1.    **Defined Terms**.  In addition to terms that are used and otherwise defined in this Agreement, the terms below shall have the following meanings:

"**Acquired Assets**" has the meaning set forth in Section 2.1 of this Agreement.

"**Agreement**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Alternative Bid**" shall mean a bid made pursuant to the Bidding Procedures Order by a Person other than the Buyer.

"**Alternative Bidder**" shall mean a Person other than the Buyer that submits an Alternative Bid pursuant to the Bidding Procedures Order.

"**Alternative Transaction**" shall mean any merger, consolidation, business combination, sale or other disposition of any of the Acquired Assets to one or more third parties (including any insiders or affiliates) other than the Buyer.

"**Ancillary Agreements**" shall mean (i) the Assignment and Assumption Agreement; (ii) the Bill of Sale; and (iii) the Intellectual Property Assignment Agreement.

"**Assignment and Assumption Agreement**" shall mean the Assignment and Assumption Agreement to be executed by the Buyer and Sellers on the Closing Date substantially in the form attached hereto as Exhibit A.

"**Assumed Contract**" has the meaning set forth in Section 2.5(a) of this Agreement.

"**Assumed Liabilities**" has the meaning set forth in Section 2.3 of this Agreement.

"**Auction**" shall mean the auction that shall, subject to the terms of this Agreement and pursuant to the Bidding Procedures Order, be scheduled to take place for the purpose of determining the Successful Bidder for the purchase of the Acquired Assets pursuant to the Sale Approval Order.

"**Bankruptcy Cases**" has the meaning set forth in the Recitals of this Agreement.

"**Bankruptcy Code**" has the meaning set forth in the Recitals of this Agreement.

"**Bankruptcy Court**" has the meaning set forth in the Recitals of this Agreement.

#40905041 v19

"**Bidding Procedures**" means the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order, substantially in the form attached hereto as Exhibit B and as an exhibit to the Bidding Procedures Order, and in form and substance acceptable to Sellers, the Buyer, and the DIP Lender.

"**Bidding Procedures Motion**" shall mean Sellers' *Motion for Orders (I)(A) Approving Bidding Procedures and Auction and (B) Scheduling Sale Hearing and Approving Notice Thereof; (II) Authorizing the Sale of Substantially all of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* [Docket No. 11].

"**Bidding Procedures Order**" shall mean an order of the Bankruptcy Court substantially in the form attached hereto as Exhibit C and in form and substance acceptable to Sellers, the Buyer, and the DIP Lender, (i) approving the Bidding Procedures; (ii) approving the Expense Reimbursement; and (iii) establishing, among other things, a date by which Alternative Bids must be submitted by bidders and procedures for the Auction.

"**Bill of Sale**" shall mean the Bill of Sale to be executed by Sellers and the Buyer on the Closing Date substantially in the form attached hereto as Exhibit D.

"**Business**" has the meaning set forth in the Recitals to this Agreement.

"**Business Day**" shall mean any day excluding Saturday, Sunday and any day that is a legal holiday within the meaning of Rule 9006(a) of the Federal Rules of Bankruptcy Procedure.

"**Buyer**" shall mean Aricent Holdings Luxembourg S.à.r.l., an entity formed and organized under the laws of Luxembourg, together with its permitted assigns, as provided in Section 10.2.

"**Buyer Documents**" has the meaning set forth in Section 6.1 of this Agreement.

"**Cash Payment**" has the meaning set forth in Section 3.3 of this Agreement.

"**Cash Purchase Price**" has the meaning set forth in Section 3.1 of this Agreement.

"**Closing**" has the meaning set forth in Section 4.1 of this Agreement.

"**Closing Date**" has the meaning set forth in Section 4.1 of this Agreement.

"**Confirmation Order**" shall mean an order of the Bankruptcy Court, confirming the Plan and approving consummation of the transactions contemplated by the Plan, acceptable to Sellers and the DIP Lender, and reasonably acceptable to the Buyer, entered by the Bankruptcy Court after a hearing conducted on adequate notice given in the Bankruptcy Cases.

"**Contemplated Transactions**" shall mean the transactions contemplated by this Agreement and the Ancillary Agreements.

"**Contract**" shall mean any contract, lease, deed, mortgage, license, instrument, note, commitment, undertaking, indenture, joint venture and any other agreement, commitment and legally binding arrangement, whether written or oral.

"**Copyrights**" shall mean all works of authorship (whether or not published), copyrights, designs and mask works and registrations (and any similar rights) and applications therefor.

"**Cure Amounts**" shall mean all amounts and other consideration that pursuant to section 365 of the Bankruptcy Code, as of the Closing Date, shall be required to cure any defaults on the part of Sellers pursuant to the Assumed Contracts or that will be otherwise due to nondebtor parties pursuant to the Assumed Contracts, as a prerequisite to the assignment and assumption of the Assumed Contracts pursuant to section 365 of the Bankruptcy Code.

"**DIP Facility**" has the meaning ascribed to such term in the Interim DIP Order (or any extension thereof or final order approving the DIP Facility, in form and substance acceptable to the DIP Lender).

"**DIP Lender**" shall mean AT&T Capital Services, Inc., as lender under the DIP Facility.

"**Documentation**" shall mean logic manuals, flow charts, principles of operation, programmer's comments, internal and external specifications and the like, build instructions, software specifications and other documentation Sellers use to deploy, use, distribute, maintain, support, update, upgrade, compile or otherwise exploit the Seller Software, including, without limitation, the materials described by Schedule 1.1(a), which Schedule shall be acceptable to the Buyer.

"**Encumbrance**" shall mean any interest (including ownership interest), pledge, lien (including any lien or liens granted in connection with, or as security for, debtor in possession financing), mortgage, security interest, judgment, demand, tax, successor liability claim, restriction, charge of any kind or nature, claim (as and to the full extent that term is defined in section 101(5) of the Bankruptcy Code), obligation, option, right, or restriction, whether imposed by agreement, understanding, Law, equity or otherwise (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated), in or with respect to any assets of (or used by) Sellers and/or against Sellers.

"**Escrow Deposit**" has the meaning set forth in Section 3.2 of this Agreement.

"**Evado UK**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Evado US**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Excluded Assets**" has the meaning set forth in Section 2.2 of this Agreement.

"**Excluded Liabilities**" has the meaning set forth in Section 2.4 of this Agreement.

-4-

"**Executory Contracts**" shall mean all of the contracts, agreements, joint venture arrangements, leases and/or licenses under which the obligations of both Sellers and the other party to the contract are unperformed such that the failure by either party to perform would excuse further performance by the other party.

"**Expense Reimbursement**" shall mean an amount equal to the reasonable, out-of-pocket documented costs and expenses incurred by the Buyer in connection with its due diligence investigation of the Business and the negotiation and execution of this Agreement and furtherance of the transactions contemplated thereby, up to a maximum amount of costs and expenses equal to the Expense Cap.

"**Expense Cap**" shall mean Fifty Thousand Dollars ($50,000.00).

"**Filip**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Filip Norway**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Filip UK**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Final Order**" shall mean an order of the Bankruptcy Court as to which time for appeal has expired and no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial, request for stay, motion or petition for reconsideration, application for request of review, or other similar motion, application, notice or request (collectively, a "Challenge") has been timely filed or if a Challenge has been timely filed, such Challenge has been denied and no Challenge to such denial has been timely filed.

"**Intellectual Property**" shall mean all intellectual property rights or similar rights arising from or associated with the following, whether protected, created, or arising under the Laws of the United States or any other jurisdiction, including (i) Trademarks, domain names and other Internet addresses or identifiers, trade dress, and similar rights and applications (including intent to use applications) to register any of the foregoing and registrations and renewals therefor; (ii) Patents; (iii) Copyrights; (iv) Trade Secrets; and (v) any other intellectual property rights of any kind or nature.

"**Intellectual Property Assignment Agreement**" shall mean the Intellectual Property Assignment Agreement to be executed by the Buyer and Sellers on the Closing Date substantially in the form attached hereto as Exhibit E.

"**Interim DIP Order**" means the Interim Order (I) Authorizing Debtors to Obtain Post-Petition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Superpriority Claims, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief, entered by the Bankruptcy Court on October 6, 2016 [Docket No. 30].

"**IRS**" has the meaning set forth in Section 3.5 of this Agreement.

-5-

"**Law**" shall mean any constitutional provision, statute or other law (including common law), rule, ordinance, code, requirement, regulation, administrative ruling or executive order in the United States of America, any foreign country or any domestic or foreign national state, provincial, municipal or other local political subdivision thereof issued or promulgated by any governmental authority.

"**Liabilities**" shall mean any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on- or off- balance sheet and otherwise.

"**Licensed Intellectual Property**" shall mean all Intellectual Property that is currently licensed to Sellers.

"**Licensed Software**" shall mean all Software (including software components) that is currently licensed to Sellers.

"**Material Adverse Effect**" shall mean any change, occurrence or development that has a material adverse effect on the assets, Liabilities, operations, property or prospects of the Business, but excludes: (i) any change in general economic conditions in the industries or markets in which Sellers operate (which changes, individually or in the aggregate, do not disproportionately affect Sellers, taken as a whole); (ii) seasonal reductions in revenue and/or earnings of Sellers in the ordinary course of business (which seasonal reductions, individually or in the aggregate, do not disproportionately affect Sellers, taken as a whole); (iii) any adverse change, event or effect on the global wireless and wearable device tracking industry as a whole; (iv) national or international political conditions, including any engagement in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack (which conditions, individually or in the aggregate, do not disproportionately affect Sellers, taken as a whole); and (v) the entry into or announcement of this Agreement, actions contemplated by this Agreement, or the consummation of the Contemplated Transactions.

"**Newly-Hired Employees**" has the meaning set forth in Section 2.6(b) of this Agreement.

"**Patent**" shall mean a patent or application therefor, including any continuation, divisional, continuation-in-part or reissue of a patent application and patents issuing thereon, industrial design registrations and applications, design rights, and inventions.

"**Permitted Encumbrances**" shall mean (i) Encumbrances that will be removed prior to or in connection with the Closing; (ii) the Assumed Liabilities; and (iii) any other Encumbrance expressly assumed in writing by the Buyer.

"**Person**" shall mean any individual, corporation, partnership, limited liability company, trust, association, joint venture or other entity of any kind whatsoever.

-6-

"**Personnel**" shall mean all former and current employees, agents, consultants and independent contractors of Sellers.

"**Petition Date**" shall mean October 5, 2016, i.e., the date of the commencement of the Bankruptcy Cases.

"**Plan**" shall mean a liquidating plan filed by Sellers with the Bankruptcy Court on or before October 28, 2016 as contemplated under the Interim DIP Order, which shall be acceptable in form and substance to the DIP Lender, reasonably acceptable to the Buyer, and which shall not adversely affect the rights of the Buyer under this Agreement or the Business without the prior written consent of the Buyer.

"**Publicly Available Software**" shall mean (i) any Software that contains, or is derived in any manner (in whole or in part) from, any Software that is distributed as "free software" or "open source software" (e.g., Linux), or pursuant to "open source," "copyleft" or similar licensing and distribution models; and (ii) any Software that requires as a condition of use, modification, and/or distribution of such Software that such Software or other Software incorporated into, derived from, or distributed with such Software (a) be disclosed or distributed in Source Code form; (b) be licensed for the purpose of making derivative works; or (c) be redistributable at no or minimal charge. Publicly Available Software includes, without limitation, Software licensed or distributed pursuant to any of the following licenses or distribution models similar to any of the following: (A) GNU General Public License (GPL) or Lesser/Library GPL (LGPL), (B) the Artistic License (e.g., PERL), (C) the Mozilla Public License, (D) BSD licenses, (E) the Netscape Public License, (F) the Sun Community Source License (SCSL), the Sun Industry Source License (SISL), or (G) the Apache Software License.

"**Purchase Price**" has the meaning set forth in Section 3.1 of this Agreement.

"**Sale Approval Motion**" shall mean Sellers' *Motion for Orders (I)(A) Approving Bidding Procedures and Auction and (B) Scheduling Sale Hearing and Approving Notice Thereof; (II) Authorizing the Sale of Substantially all of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* [Docket No. 11].

"**Sale Approval Order**" shall mean an order of the Bankruptcy Court substantially in the form and substance attached hereto as Exhibit F and incorporated by reference herein, and in form and substance acceptable to Sellers, the Buyer, the DIP Lender, and their respective counsel, naming the Buyer as the Successful Bidder at the Auction and approving, without limitation, this Agreement and all of the terms and conditions hereof and approving and authorizing Sellers to consummate the transactions contemplated hereby pursuant to sections 363 and 365 of the Bankruptcy Code, and finding that the Buyer is a good faith purchaser, entered after a hearing conducted on notice given in the Bankruptcy Case and in accordance with the terms specified in Section 9.8, Section 9.9 and Section 9.10.

"**Sale Hearing**" shall mean the Bankruptcy Court hearing to approve the sale of the Acquired Assets to, and the assumption of the Assumed Liabilities by, the Buyer.

"**Sale Motion**" has the meaning set forth in <u>Section 7.4(a)</u> of this Agreement.

"**Seller**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Sellers**" has the meaning set forth in the introductory paragraph of this Agreement.

"**Seller Data**" shall mean all data that is material to the Business and contained in any database used or maintained by Sellers or by a contractor to Sellers, including, without limitation, the data described on <u>Schedule 1.1(a)</u>, which Schedule shall be acceptable to the Buyer.

"**Seller Documents**" has the meaning set forth in <u>Section 5.1</u> of this Agreement.

"**Seller Intellectual Property**" shall mean all Transferred Intellectual Property and Licensed Intellectual Property.

"**Seller Software**" shall mean all Transferred Software and Licensed Software.

"**Sellers' Knowledge**" shall mean (i) the actual knowledge of the individuals listed on <u>Schedule 1.1(b)</u> and (ii) the knowledge that each of the individuals listed on <u>Schedule 1.1(b)</u>, as a prudent business person, would have obtained after making reasonable due inquiry with respect to the particular matter in question.

"**Software**" shall mean computer software programs and software systems, including databases, compilations, tool sets, compilers, higher level or "proprietary" languages and related documentation and materials, whether in Source Code, object code or human readable form, all descriptions, flow-charts and other work product used to design, plan, organize, maintain, support or develop any of the foregoing, the technology supporting, and the contents and audiovisual displays on any web sites, and all documentation, including programmers' notes and Source Code annotations, user manuals and training materials relating to the foregoing, including any translations thereof.

"**Source Code**" shall mean the human-readable version of Software that can be compiled into executable or object code.

"**Stalking Horse**" shall have the meaning ascribed in the Bidding Procedures Order.

"**Stalking Horse Agreement**" shall have the meaning ascribed in the Bidding Procedures Order.

"**Stalking Horse Protections**" shall mean the Expense Reimbursement (as such term is defined in the Bidding Procedures Order).

"**Subsidiary**" shall mean, with respect to Filip, any other Person, whether incorporated or unincorporated, of which (i) more than fifty percent (50%) of the securities or other ownership interests or (ii) securities or other interests having by their terms ordinary voting power to elect more than fifty percent (50%) of the board of directors or others performing similar functions with respect to such corporation or other organization, is directly owned or controlled by Filip.

"**Successful Bidder**" means the bidder that is determined by Sellers, in accordance with the Bidding Procedures and the Bidding Procedures Order, to have submitted the best and highest bid for the purchase of the Acquired Assets.

"**Termination Fee**" has the meaning set forth in Section 7.6(a).

"**Trade Secrets**" shall mean non-public know-how, inventions, discoveries, improvements, concepts, ideas, methods, processes, designs, plans, schematics, drawings, formulae, technical data, customer lists, specifications, research and development information, technology and product roadmaps, databases, and other proprietary or confidential information or trade secrets, in each case protectable under the laws of an applicable jurisdiction, excluding any Copyrights or Patents that may cover or protect any of the foregoing.

"**Trademarks**" shall mean trademarks, service marks, trade names, trade dress, logos, business and product names, slogans, whether or not registered, and registrations and applications for registration thereof.

"**Transferred Intellectual Property**" shall mean all Intellectual Property owned by Sellers, including the Intellectual Property listed on Schedule 1.1(a), which Schedule shall be acceptable to the Buyer.

"**Transferred Software**" shall mean all Software proprietary to Sellers, including the Software listed on Schedule 1.1(a), which Schedule shall be acceptable to the Buyer, (including software components) including Source Code for and the Intellectual Property rights in such Software.

"**WARN**" shall mean the Workers Adjustment Retraining and Notification Act and similar state laws.

"**Work Product**" shall mean, with respect to a Person, all tangible and intangible original work product developed within the scope of their service or employment for Sellers.

## ARTICLE 2
## PURCHASE AND SALE OF ASSETS BY
## THE BUYER AND ASSUMPTION OF LIABILITIES

2.1.    **Purchase and Sale of Assets**.  Upon the terms and subject to the conditions and provisions contained in this Agreement and the Sale Approval Order, at the Closing, Sellers shall sell, convey, transfer, assign and deliver to the Buyer, and the Buyer shall acquire and accept from Sellers, free and clear of any and all Encumbrances (except for Permitted Encumbrances), (x) all Contracts listed on Schedule 2.5(a), as such Schedule may be amended as provided in

-9-

Section 2.5 of this Agreement, to which Sellers are a party, and (y) all other assets of Sellers required to operate and support Sellers' cloud-based software platform that provides a service enabling individuals, using smartphones, to locate, contact and communicate with children wearing compatible watch devices (but excluding assets relating solely to the manufacture of such devices), including, without limitation, the following assets (such Contracts and assets collectively, the "Acquired Assets"):

(a)      those certain specified assets of Sellers as identified in Schedule 2.1(a), which Schedule shall be acceptable to the Buyer; and

(b)      the Transferred Intellectual Property.

2.2.    **Excluded Assets**.  Except as expressly set forth in Section 2.1 of this Agreement, the Buyer shall not acquire and accept from Sellers any assets of Sellers other than the Acquired Assets, including, without limitation, any Contracts that are not Assumed Contracts (collectively, the "Excluded Assets").

2.3.    **Assumption of Liabilities**.  Upon the terms and subject to the conditions and provisions contained in this Agreement, at the Closing the Buyer will execute and deliver to Sellers the Assignment and Assumption Agreement, pursuant to which the Buyer will, effective as of the Closing, assume, satisfy and perform when due the following liabilities and obligations of Sellers (collectively, the "Assumed Liabilities"):

(a)      all liabilities and obligations under the Assumed Contracts arising or to be performed after the Closing; and

(b)      all liabilities and obligations in respect of the Acquired Assets arising after the Closing.

2.4.    **Liabilities Not Assumed**.  Except as expressly set forth in Section 2.3 of this Agreement, the Buyer shall not assume, satisfy, be liable for or perform any Liabilities of Sellers or the Business, including, without limitation, Liabilities under WARN (collectively, the "Excluded Liabilities").  Except as otherwise provided herein, the Acquired Assets shall be sold and conveyed to the Buyer free and clear of all Encumbrances except for Permitted Encumbrances.

2.5.    **Assumed Contracts**.

(a)      Assumed Contracts List.  Sellers shall assume and assign to the Buyer all of the Contracts on Schedule 2.5(a) (the "Assumed Contracts"), as such Schedule may be amended (i) by mutual written agreement of Sellers and the Buyer, or (ii) as set forth in Section 2.5(c), by the Buyer without the consent of Sellers.

(b)      Payment of Cure Amounts.  To the extent required by the Bankruptcy Court under the Bankruptcy Code to permit the assumption and assignment of the Assumed Contracts to the Buyer at Closing pursuant to this Agreement, the Buyer shall pay all related Cure Amounts at

-10-

Closing (which Cure Amount payment by the Buyer shall be additive to the Purchase Price payable by the Buyer pursuant to Section 3.1 of this Agreement).

(c)    Additional Executory Contracts.  From the date of execution of this Agreement through the Closing, the Buyer may remove Contracts designated on Schedule 2.5(a) so that any such Contract is not an Assumed Contract, or the Buyer may designate any Executory Contracts in addition to the Contracts designated on Schedule 2.5(a) (and that Sellers have not rejected pursuant to section 365 of the Bankruptcy Code) as an Assumed Contract, and Sellers shall use commercially reasonable efforts to seek an order authorizing the assumption and assignment to the Buyer of the Executory Contract so designated, and the Buyer shall be obligated to pay any Cure Amounts with respect to any such Assumed Contract (which Cure Amount payment by Buyer shall be additive to the Purchase Price payable by Buyer pursuant to Section 3.1 of this Agreement).  From the date of execution of this Agreement through the Closing, Sellers shall not reject any Executory Contract unless otherwise agreed to in writing by the Buyer.

(d)    Assignment of Contracts.  Attached hereto as Schedule 2.5(d) is a list of all consents which Sellers and the Buyer agree must be obtained with respect to the Assumed Contracts as a condition to the consummation of the Closing.

2.6.    **Employees**.

(a)    Employees.  As of the Closing Date, Sellers shall terminate the employment of those employed in the Business who have accepted employment offers from the Buyer.  The Buyer shall have sole discretion in determining those employees to whom it may extend employment offers.

(b)    Newly-Hired Employees.  With respect to all employees of Sellers who become employees of the Buyer as of the Closing Date (collectively, the "Newly-Hired Employees"), the Buyer shall be responsible for all Liabilities accruing after the Closing and in accordance with the Buyer's employment offers to and employment of the Newly-Hired Employees (and, if appropriate, consistent with applicable law).

## ARTICLE 3
## CONSIDERATION AND RELATED MATTERS

3.1.    **Consideration**.    Subject to the provisions of Section 3.4, the aggregate consideration for the Acquired Assets (the "Purchase Price") shall be equal to (a) $475,000 in cash (the "Cash Purchase Price"), plus (b) the assumption of the Assumed Liabilities.

3.2.    **Escrow Deposit**.  The Buyer will make a "Good Faith Deposit" of $47,500 (the "Escrow Deposit") within one (1) Business Day following the entry of the Bidding Procedures Order naming Buyer as stalking horse and in conformity with Section 7.4 hereof.  The Escrow Deposit shall be governed by the terms of the Bidding Procedures Order and is refundable in accordance therewith.

-11-

3.3.    **Payment of Purchase Price**.  On the Closing Date, Sellers shall be paid the Cash Purchase Price (the "Cash Payment").  The Escrow Deposit shall be applied and credited against the Cash Payment.

3.4.    **Due Diligence**.  If the Buyer in its sole discretion is not satisfied with the results of its due diligence investigations of the Business, it may terminate this Agreement by providing written notice to Sellers by the earlier of (a) the date on which the Buyer notifies Sellers that it has waived its right to terminate pursuant to this Section 3.4, and (b) the date that is five (5) Business Days prior to the date of the Auction as set forth in the Bidding Procedures Order.  At the Buyer's option, it may propose an adjustment to the Purchase Price in lieu of terminating this Agreement; provided, Sellers shall not be under any obligation to accept any such adjusted Purchase Price and may instead proceed with termination of this Agreement; and provided further, if Sellers in their sole discretion accept the Buyer's proposal, the Purchase Price shall be modified as agreed.  Otherwise, the Buyer may proceed with termination of this Agreement.

3.5.    **Allocation.**  Sellers and the Buyer agree to allocate the Purchase Price among the Acquired Assets in accordance with Schedule 3.5, which shall be prepared by the Buyer and provided to Sellers within one month after the Closing Date.  Sellers and the Buyer agree to file all tax reports, returns and claims and other statements in a manner consistent with the allocation set forth on Schedule 3.5 and shall not make any inconsistent written statement or take any inconsistent position on any returns, in any refund claim, during the course of any Internal Revenue Service ("IRS") or other tax audit, for any financial or regulatory purpose, in any litigation or investigation or otherwise, so long as there exists a reasonable basis in law to maintain such position.  Each Party shall notify the other Party if it receives notice that the IRS proposes any allocation different from Schedule 3.5.

3.6.    **Transaction Expenses**.  Except as expressly provided herein, each Party shall bear its own costs and expenses, including attorneys, accountants and other consultants' fees, in connection with the execution and negotiation of this Agreement and the consummation of the Contemplated Transactions.

**ARTICLE 4**
**CLOSING**

4.1.    **Closing**.  The consummation of the Contemplated Transactions (the "Closing") shall occur at the offices of Moore & Van Allen PLLC, 100 North Tryon Street, Suite 4700, Charlotte, North Carolina 28202-4003 or such other location mutually agreed to by the Parties, not later than November 10, 2016, provided that all of the conditions to Closing set forth in Article 8 and Article 9 have been satisfied or waived, unless such date is extended by agreement of the Parties hereto (the "Closing Date").

4.2.    **Conveyances at Closing**.

(a)    At the Closing, and in connection with effecting and consummating the Contemplated Transactions, Sellers shall deliver the following to the Buyer:

-12-

(1)     physical custody of the Acquired Assets;

(2)     up-to-date electronic copies of all Seller Data in a format reasonably acceptable to the Buyer;

(3)     all Ancillary Agreements to which Sellers are a party;

(4)     the Sale Approval Order; and

(5)     such other instruments as may be reasonably requested by the Buyer to vest in the Buyer title in and to the Acquired Assets in accordance with the provisions hereof and the Sale Approval Order.

(b)     At the Closing, and in connection with effectuating and consummating the Contemplated Transactions, the Buyer shall deliver, or cause to be delivered, the following to Sellers:

(1)     the Purchase Price, payable as provided in Section 3.3, and

(2)     all Ancillary Agreements to which the Buyer is a party.

To the extent that a form of any document to be delivered under this Section 4.2 is not attached as an Exhibit hereto, such documents shall be in form and substance, and shall be executed and delivered in a manner, reasonably satisfactory to the Buyer and Sellers.

4.3.    **Other Closing Matters**.    Each of the Parties shall use their commercially reasonable efforts to take such other actions required hereby to be performed by it prior to or on the Closing Date.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF SELLERS

As an inducement to the Buyer to enter into this Agreement, Sellers hereby, as of the date hereof, make the following representations and warranties to the Buyer, but none of which shall survive the Closing of the Contemplated Transactions:

5.1.    **Existence and Authority**.    Each Seller is a validly existing entity under the laws of the jurisdiction of its organization, and has all requisite authority and power to own and, subject to the Sale Approval Order, dispose of the Acquired Assets, to execute and deliver this Agreement and the Ancillary Agreements to which it is a party (collectively, the "Seller Documents"), to perform its obligations thereunder, and to consummate the Contemplated Transactions.

5.2.    **Authorization**.    Except for obtaining the Sale Approval Order, each Seller has taken all necessary action to authorize the execution and delivery of the Seller Documents and the performance of its obligations thereunder and to consummate the Contemplated Transactions.

-13-

5.3.    **Execution and Delivery**.  This Agreement has been executed and delivered by duly authorized officers of each Seller, and, upon issuance of the Bidding Procedures Order and approval of this Agreement as the Stalking Horse Agreement, will constitute the legal, valid and binding obligation of each Seller, and will be enforceable against each Seller in accordance with its terms, subject in all respects to the Bidding Procedures Order.  As of the Closing Date, each of the Seller Documents will be executed and delivered by a duly authorized officer of each Seller, will constitute the legal, valid and binding obligations of each Seller, and will be enforceable against each Seller in accordance with their respective terms, subject in all respects to the Sale Approval Order.

5.4.    **Approval and Consents**.  Except for entry of the Bidding Procedures Order and the Sale Approval Order and except as set forth on Schedule 5.4 to this Agreement, no material approval, authorization, consent, license, certification or other action by, or filing with, any governmental authority, administrative agency, court or other party is necessary for Sellers' execution and delivery of any of the Seller Documents, the performance of its obligations thereunder or the consummation of the Contemplated Transactions.

5.5.    **Non-Contravention**.  Except as set forth in Schedule 5.5 to this Agreement, Sellers are not in breach or violation of or default under, and the execution and delivery by Sellers of any of the Seller Documents and the performance of their obligations and the consummation of the Contemplated Transactions, each in accordance with the terms and conditions thereunder and subject to the terms and conditions of the Sale Approval Order, will not cause a breach or violation of or default or event of default under, any provision of (i) the charter or bylaws or other organizational documents of Sellers, (ii) any Contract to which Sellers are a party or Sellers are bound or any of the Acquired Assets are bound or affected, (iii) any Law of any governmental authority applicable to Sellers or its assets or the Business, or (iv) any decree, order, injunction or other decision of any court, arbitrator, governmental authority or administrative agency with jurisdiction over Sellers or its assets or the Business.

5.6.    **No Encumbrances**.  Sellers will, upon the entry of the Sale Approval Order and the consummation of the Contemplated Transactions, transfer all right, title and interest in and to the Acquired Assets to the Buyer, free and clear of any and all Encumbrances, except for Permitted Encumbrances, pursuant to the applicable provisions of the Bankruptcy Code and the authority granted under the Sale Approval Order.

5.7.    **Subsidiaries**.  Schedule 5.7 to this Agreement sets forth each of the Subsidiaries and each other Person in which Filip holds an equity interest.  For each of such Subsidiaries, Schedule 5.7 sets forth the equity interests owned by Filip or any of its Subsidiaries or such other Persons, the names of the Persons owning such equity interests and the percentage of the outstanding equity interests so owned.

5.8.    **Litigation**.  Except for matters pending before the Bankruptcy Court, and except as set forth on Schedule 5.8, there are no actions, suits, claims or legal, administrative or arbitration proceedings pending or, to Sellers' Knowledge, threatened against, relating to or involving any Seller.

5.9.    **Intellectual Property**.

(a)    For each item of Transferred Intellectual Property, Schedule 5.9(a) sets forth the record owner and (i) for each Patent, the patent number or application serial number for each jurisdiction in which filed, date issued and/or filed and present status thereof; (ii) for each registered Trademark, the application serial number or registration number, by country, province and state, and the class of goods or services covered, the nature of the goods or services, the date issued and/or filed and the present status thereof; (iii) for each domain name, the renewal date and name of registry; (iv) for each Copyright, if applicable, the number and date of each registration or Copyright application by country, province and/or state; (v) for each registered design, the registration number or serial number for each jurisdiction in which filed, date issued and/or filed and present status thereof; (vi) all actual or threatened claims (including reexamination and reissue proceedings) before any court, tribunal or other governmental authority (including the United States Patent and Trademark Office or equivalent authority anywhere in the world) related to any Transferred Intellectual Property; and (vii) any actions that must be taken within ninety (90) days after the date hereof for the purposes of obtaining, maintaining, perfecting, preserving or renewing any Transferred Intellectual Property that is registered or subject to a pending application for registration before any authorized Intellectual Property office, including the payment of any registration, maintenance or renewal fees or the filing of documents, applications or certificates or any responses to office actions.

(b)    All Transferred Intellectual Property has been duly registered in, filed in or issued by the appropriate governmental authority where such registration, filing or issuance is necessary to perfect Sellers' rights therein or for the conduct of the Business as presently conducted. Sellers are the sole and exclusive owner of, and Sellers have the right to use, execute, reproduce, display, perform, modify, enhance, distribute, prepare derivative works of and sublicense, without payment to any other Person, all Transferred Intellectual Property and Transferred Software. Sellers maintain the ownership of Transferred Intellectual Property and Transferred Software, and no ownership rights or rights to use Transferred Intellectual Property or Transferred Software have been assigned or licensed to any third party other than under nonexclusive licenses granted to contractors or service providers for use solely for the benefit of Sellers. Except as set forth on Schedule 5.9(b), Sellers have not received any communication from any Person asserting any ownership interest in any Transferred Intellectual Property or Transferred Software or suggesting that any other Person has any claim of legal or beneficial ownership with respect thereto, nor is there any basis for any claim that Sellers do not so own such Transferred Intellectual Property or Transferred Software. Sellers have a valid license to all Licensed Intellectual Property and Licensed Software.

(c)    Sellers have no unpaid accrued liabilities for Sellers' rights to practice, incorporate or otherwise use Licensed Intellectual Property and Licensed Software in the manner currently used by Sellers.

(d)    Except as set forth on Schedule 5.9(d), the execution and delivery of this Agreement and the consummation of the Contemplated Transactions do not and will not affect, contravene, conflict with, alter or impair the ownership of or rights in the Seller Intellectual Property or the Transferred Software, and the Buyer will not be obligated to pay any royalties or

-15-

other amounts after Closing to any Person in excess of those payable by Sellers in the absence of this Agreement or the consummation of the Contemplated Transactions.

(e)      To the Sellers' Knowledge, the conduct of the Business as presently conducted does not violate, misappropriate, dilute or infringe the Intellectual Property rights of any other Person.  The Transferred Intellectual Property and Intellectual Property rights in Transferred Software are enforceable (to the extent such concepts are applicable and, with respect to U.S. Copyrights, assuming registration when required for enforcement), subsisting, and have not been abandoned or cancelled.  No claims are pending or threatened, against any Seller by any Person with respect to the ownership, validity, enforceability, registration, effectiveness or use in the Business of any Transferred Intellectual Property or the Transferred Software.  No claims are pending or threatened, and Sellers have not received any communication alleging that Sellers violated any rights relating to Intellectual Property or Software of any third party.  No third party, to the Sellers' Knowledge, is misappropriating, infringing, diluting, or violating any Transferred Intellectual Property or Transferred Software or any of Sellers' rights in Licensed Intellectual Property and Licensed Software.

(f)      All Transferred Intellectual Property and Transferred Software comprising Trade Secrets that Sellers have chosen to retain as a trade secret under the laws of the applicable jurisdictions have been maintained in confidence in accordance with commercially reasonable protection procedures.  All Personnel are under obligations restricting such Person's right to disclose proprietary information of Sellers.  Except as set forth on Schedule 5.9(f), all Personnel who have contributed to or participated in the conception and development of Transferred Intellectual Property or Transferred Software either (i) have been party to a written "work-for-hire" or similar Contract with Sellers that, in accordance with all Laws, has accorded Sellers full, effective, exclusive and original ownership of all Work Product and all right, title and interest therein, including Intellectual Property rights or (ii) have executed appropriate instruments of assignment in favor of Sellers as assignee that have conveyed to Sellers full, effective and exclusive ownership of all Work Product.  To the Sellers' Knowledge, no former or current Personnel have any claim against Sellers in connection with such Person's involvement in the conception, maintenance and development of any Transferred Intellectual Property or Transferred Software and no such claim has been asserted or threatened.  To the Sellers' Knowledge, none of the Personnel of Sellers has any patents issued or applications pending for any device, process, design or invention of any kind now used or needed by Sellers in the furtherance of the Business.

(g)      No government funding, nor any facilities of a university, college, other educational institution or research center, was used in the development of any Seller Intellectual Property or Transferred Software.

(h)      Schedule 5.9(h) sets forth a true, complete and correct list of all Publicly Available Software used in the Transferred Software or otherwise by Sellers, including in the development or testing of Transferred Software, and (i) identifies the open source license applicable thereto, (ii) identifies, where available, a URL at which such Publicly Available Software are available and at which such open source license is identified, (iii) describes the manner in which such Publicly Available Software were or are used, (iv) states whether (and, if

-16-

so, how) such Publicly Available Software were modified by or for Sellers, (v) states whether such Publicly Available Software were distributed by or for Sellers, (vi) states whether such Publicly Available Software were used, offered or made available on a hosted or similar basis by or for Sellers and (vii) describes how such Publicly Available Software are integrated with or interact with the Transferred Software.

(i)       Except as disclosed in <u>Schedule 5.9(i)</u>, none of the Transferred Software incorporates or comprises or is distributed with any Publicly Available Software, or is otherwise subject to the provisions of any "open source" or third party license agreement that (i) requires the distribution of Source Code in connection with the distribution of such Transferred Software in object code form; (ii) limits Sellers' freedom to seek full compensation in connection with marketing, licensing, and distributing such applications; or (iii) allows a customer or requires that a customer have the right to decompile, disassemble or otherwise reverse engineer the Transferred Software.  With respect to any Publicly Available Software that is or has been used by Sellers in any way in connection with any Transferred Software, all use and distribution of Transferred Software and Publicly Available Software by or through Sellers is in full compliance with all licenses applicable thereto, including all copyright notice and attribution requirements.  With respect to each item of Transferred Software, Sellers are in actual possession and control of the applicable Source Code, object code, code writes, notes, documentation, programmers' notes, Source Code annotations, user manuals and know-how to the extent required for use, distribution, development, enhancement, maintenance and support of such Transferred Software, subject to any licenses granted to third parties therein.  Except as set forth in <u>Schedule 5.9(i)</u>, Sellers have not disclosed to any third party or escrowed, or agreed to disclose to any third party or escrow, any Source Code of any Transferred Software.

(j)       Except as set forth in <u>Schedule 5.9(j)</u>, all right, title and interest in and to the Seller Data is owned by Sellers, free and clear of all Encumbrances.

5.10.  **Tax Returns**.  Except as disclosed on <u>Schedule 5.10</u>, to the extent that under applicable Law the failure of this representation to be true or correct could result in an Encumbrance upon or claim against the Acquired Assets or in a claim against the Buyer as transferee or owner of the Acquired Assets:  (i) Sellers have caused to be filed (or will file) all tax returns that are or were required to be filed on or prior to the Closing Date with respect to the Acquired Assets and the operation of the Business; (ii) all such tax returns accurately reflect all tax liabilities required to be reflected thereon; and (iii) all taxes due and payable by Sellers with respect to the Acquired Assets and the operation of the Business shown in such tax returns have been paid or will be paid pursuant to the terms of the Plan.

5.11.  **Compliance With Laws**.  Except as disclosed on <u>Schedule 5.11</u>, Sellers are in compliance with all material Laws applicable to the Business.  Except as disclosed on <u>Schedule 5.11</u>, Sellers have not received any written notice within the past twelve (12) months relating to violations or alleged violations or defaults under any applicable Law or order.

5.12.  **Privacy and Data Protection**.

(a)      Sellers have complied in all material respects with applicable Laws and its internal privacy policies relating to the use, collection, storage, disclosure and transfer of any personally identifiable information collected, accessed or obtained by Sellers or by third parties having authorized access to the records of Sellers.  Sellers are in material compliance with all of the terms of all Contracts to which Sellers are a party relating to the use, collection, storage, disclosure and transfer of any personally identifiable information collected, accessed or obtained by Sellers or by third parties having authorized access to the records of Sellers.  Each of the Internet websites owned or operated by Sellers since the date on which Sellers were formed maintained a publicly posted privacy policy that describes Sellers' practices with respect to the collection, use and disclosure of personally identifiable information and that complies in all material respects with all applicable Laws.  The execution, delivery and performance of this Agreement will comply with all applicable Laws relating to privacy, security and data protection and with Sellers' privacy policies.  Since the date on which Sellers were formed, Sellers have not received a written complaint or been involved in any investigation or inquiry regarding Sellers' use, collection, storage, disclosure or transfer of personally identifiable information, other than as disclosed on Schedule 5.12.

(b)      Sellers have implemented and maintain a security plan that is customary and reasonable for its industry that (i) identifies internal and external risks to the security of any personally identifiable information, in Sellers' possession, custody or control, (ii) implements, monitors and improves administrative, electronic and physical safeguards to control those risks, (iii) maintains notification procedures in material compliance with applicable Laws in the case of any breach of security compromising data containing personally identifiable information and (iv) complies in all material respects with the obligations of Sellers in any Contracts to which Sellers are a party regarding the security of personally identifiable information in Sellers' possession, custody or control.  To the Sellers' Knowledge, Sellers have not, since the date on which Sellers were formed, experienced any breach of security or otherwise unauthorized access by third parties to any personally identifiable information in Sellers' possession, custody or control.

(c)      To the Sellers' Knowledge, the execution, delivery and performance of this Agreement and the consummation of the Contemplated Transactions, including any transfer of personally identifiable information, will not violate any applicable Law, the privacy policy of Sellers or any data security requirements imposed on Sellers.  Upon Closing, the Buyer will continue to have the right to use such personally identifiable information on identical terms and conditions as the Business enjoyed immediately prior to the Closing.

5.13.    **Completeness and Condition of Assets**.  Sellers have good and marketable title to and is the lawful owner of, or has a valid license or right to use, all of the Acquired Assets, free and clear of any and all Encumbrances (except for Permitted Encumbrances).  All items of tangible personal property included in the Acquired Assets are structurally sound, in good operating condition, in a state of good maintenance and repair and are adequate for the uses to which they are being put, and none of such items of tangible personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost.

5.14.  **Brokerage Fee**.  No brokerage, finder's or similar fee, commission or other payment is or shall become payable by the Buyer in connection with the Contemplated Transactions pursuant to any agreement, contract or other arrangement entered into by Sellers. Sellers have disclosed and are responsible for payment of the fees and expenses of Widebridge Group, as and to the extent such fees and expenses are allowed pursuant to an order of the Bankruptcy Court.

**ARTICLE 6**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

As an inducement to Sellers to enter into this Agreement, the Buyer hereby makes the following representations and warranties as of the date hereof to Sellers, but none of which shall survive the Closing of the Contemplated Transactions for any reason whatsoever:

6.1.  **Existence and Authority.**  The Buyer is a validly existing entity under the laws of the jurisdiction of its organization and has all requisite authority and power to execute and deliver this Agreement and the Ancillary Agreements to which it is a party (collectively, the "Buyer Documents"), to perform its obligations thereunder, and to consummate the Contemplated Transactions.

6.2.  **Authority**.  The Buyer has taken all necessary or appropriate actions to authorize the execution and delivery of each of the Buyer Documents and the performance of its obligations thereunder and to consummate the Contemplated Transactions.

6.3.  **Execution and Delivery**.  This Agreement has been executed and delivered by a duly authorized officer of the Buyer, constitutes the legal, valid and binding obligation of the Buyer, and is enforceable against the Buyer in accordance with its terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (whether applied in a proceeding at law or in equity).  As of the Closing Date, each of the Buyer Documents will be executed and delivered by a duly authorized officer of the Buyer, will constitute the legal, valid and binding obligations of the Buyer, and will be enforceable against the Buyer in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity (whether applied in a proceeding at law or in equity).

6.4.  **Approval and Consents**.  Except for entry of the Bidding Procedures Order and the Sale Approval Order, no approval, authorization, consent or other action by, or filing with, any governmental authority, administrative agency, court or other party is necessary for the Buyer's execution and delivery of any of the Buyer Documents, the performance of its obligations thereunder or the consummation of the Contemplated Transactions.

6.5.  **Financial Resources**.  The Buyer has the financial resources necessary to consummate the Contemplated Transactions upon the terms and conditions set forth in this Agreement and the Ancillary Agreements, and such financial resources are not subject to any

-19-

constraints, conditions or contingencies that could in any way affect the Buyer's ability to consummate the Contemplated Transactions or perform thereunder.

## ARTICLE 7
## COVENANTS

Sellers and the Buyer covenant and agree as follows:

7.1.    **Conduct Pending the Closing**.    During the period from the date of this Agreement through the earlier to occur of (x) the Closing Date, and (y) the date on which this Agreement is terminated in accordance with the provisions of this Agreement or pursuant to an order of the Bankruptcy Court, except (i) as consented to in writing by the Buyer, (ii) as contemplated by this Agreement, (iii) as set forth in a Schedule to this Agreement, or (iv) as required by, arising out of, relating to, or resulting from Sellers' obligations and duties under the Bankruptcy Code or orders entered by the Bankruptcy Court, Sellers will use commercially reasonable efforts to operate the Business only in the ordinary course consistent with reasonable business practices of a similarly situated debtor.  For so long as the Parties are pursuing the Closing in accordance with the terms and conditions of this Agreement, without the prior written consent of the Buyer, Sellers shall not:

(a)     sell or dispose of any of the Acquired Assets; or

(b)     assume or reject any Executory Contracts.

7.2.    **Access to Information Before Closing**.    Sellers agree that during the period from the date of this Agreement through the earlier to occur of (x) the Closing Date, and (y) the date on which this Agreement is terminated in accordance with the provisions of this Agreement or pursuant to an order of the Bankruptcy Court, the Buyer shall be entitled, through its officers, employees, consultants and representatives, to make such investigation of the Business and such examination of the books and records and financial and operating data of Sellers related to the Business, the Acquired Assets and the Assumed Liabilities, and to have access to the officers, key employees and accountants of Sellers in connection with the Business, as it reasonably requests.

7.3.    **Consents**.    Sellers shall use their commercially reasonable efforts, and the Buyer shall cooperate with Sellers, to obtain the consents set forth on <u>Schedule 5.4</u>, if any; provided, however, that except for Cure Amounts, which are to be paid in accordance with <u>Section 2.5(b)</u>, neither Sellers nor the Buyer shall be obligated to pay any consideration therefore to any third party from whom consent or approval is requested or to initiate any litigation or legal proceedings to obtain any such consent or approval.

7.4.    **Submission for Bankruptcy Court Approval; Buyer to be Stalking Horse**.

(a)     Prior to the date hereof, Sellers filed in the Bankruptcy Cases the Bidding Procedures Motion and the Sale Approval Motion (collectively, the "<u>Sale Motion</u>") seeking, among other things, (i) the entry of the Bidding Procedures Order; (ii) if submitted to the Bankruptcy Court by no later than October 18, 2016, the Bankruptcy Court's approval of the

-20-

Buyer as the Stalking Horse and this Agreement as the Stalking Horse Agreement; and (iii) subject to Sellers' selection of the Stalking Horse Agreement as the Successful Bid in accordance with the Bidding Procedures Order and entry of the Sale Approval Order approving the Stalking Horse Agreement as the Successful Bid, Sellers' performance under this Agreement including, without limitation, assumption and assignment of the Assumed Contracts by Sellers to the Buyer pursuant to section 365 of the Bankruptcy Code. The Parties shall use their respective commercially reasonable efforts to have the Bankruptcy Court enter the Bidding Procedures Order on October 24, 2016, and to enter the Sale Approval Order on or before November 8, 2016. Sellers shall give notice under the Bankruptcy Code of the request for the relief specified in the Sale Motion to all Persons entitled to such notice, including all Persons that have asserted Encumbrances in the Acquired Assets, and all non-debtor parties to the Assumed Contracts and other appropriate notice, including such additional notice as the Bankruptcy Court shall direct or as the Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other proceedings in the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby. Sellers shall be responsible for making all appropriate filings relating thereto with the Bankruptcy Court, which filings shall be submitted, to the extent practicable, to the Buyer prior to their filing with the Bankruptcy Court for the Buyer's prior review.

(b)     A list of the Assumed Contracts shall be filed as an exhibit to the Sale Approval Motion (or, alternatively, a motion to assume and assign the Assumed Contracts may be brought), and shall be described in sufficient detail to provide adequate notice to the non-debtor parties to such Contracts. Upon designation or removal by the Buyer of the Assumed Contracts in accordance with Section 2.5, Sellers shall add any Assumed Contracts, respectively, to such exhibit to the Sale Approval Motion or remove any Assumed Contracts. Such exhibit shall set forth the amounts necessary to cure defaults under each Assumed Contract shown thereon, as reasonably determined in good faith by Sellers. In cases in which Sellers are unable to establish that a default exists, the relevant cure amount shall be set at $0.00.

(c)     Sellers and the Buyer shall consult with one another regarding pleadings which any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of, as applicable, the Bidding Procedures Order or the Sale Approval Order. Sellers shall promptly provide the Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that Sellers have in their possession (or receive) pertaining to the motion for approval of the Bidding Procedures Order or the Sale Approval Order or any other order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to the Buyer and its counsel.

(d)     If the Bidding Procedures Order or the Sale Approval Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bidding Procedures Order or the Sale Approval Order or other such order), subject to rights otherwise arising from this Agreement, Sellers and the Buyer shall use their

-21-

#40905041 v19

commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

7.5. **Overbid Procedures; Adequate Assurance**.

(a)    Sellers and the Buyer acknowledge that this Agreement and the sale of the Acquired Assets are subject to higher and better bids and Bankruptcy Court approval. The Buyer and Sellers acknowledge that Sellers must take reasonable steps to demonstrate that Sellers have sought to obtain the highest or otherwise best price for the Acquired Assets, including giving notice thereof to the creditors of Sellers and other interested parties, providing information about Sellers' business to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets, conducting an Auction.

(b)    The Bidding Procedures to be employed with respect to this Agreement and any Auction shall be those reflected in the Bidding Procedures Order. The Buyer agrees and acknowledges that Sellers may continue soliciting inquiries, proposals or offers for the Acquired Assets in connection with any Alternative Transaction pursuant to the terms of the Bidding Procedures Order. Sellers agree that they shall seek Bankruptcy Court approval of overbid protection in favor of the Buyer in the Bidding Procedures Motion, which provides that any Alternative Bidder must exceed the consideration to be paid by the Buyer hereunder by no less than $25,000 plus the amount of the Stalking Horse Protections. This provision is material to the Buyer's willingness to enter into this Agreement.

(c)    Sellers and the Buyer agree, and the Bidding Procedures Motion shall reflect the fact, that the provisions of this Agreement, including this Section 7.5 and Section 7.6 are reasonable, were a material inducement to the Buyer to enter into this Agreement and are designed to achieve the highest and best price for the Acquired Assets.

7.6. **Termination Fee**.

(a)    If this Agreement is terminated (i) pursuant to any of Sections 10.1(a)(2) or 10.1(a)(5) or (ii) by Sellers pursuant to Section 10.1(a)(8) or (iii) by the Buyer pursuant to Section 10.1(a)(8) if the Closing has not occurred on or before January 7, 2017, Sellers shall pay to the Buyer the Expense Reimbursement (the "Termination Fee") no later than two (2) Business Days following such termination.

(b)    The Termination Fee shall be made by wire transfer of immediately available funds to an account designated by the Buyer.

(c)    Subject to the Bidding Procedures Order, the claim of the Buyer in respect of the Termination Fee shall constitute a super-priority administrative expense claim, senior to all other administrative expense claims of Sellers, as administrative expenses under sections 503 and 507(b) of the Bankruptcy Code in the Bankruptcy Cases and shall constitute a carve out from any and all Encumbrances on Acquired Assets, including, without limitation, the DIP Facility, (which carve out shall transfer to any and all Encumbrances on the proceeds thereof at the

-22-

closing of an Alternative Transaction), and shall not be subject to any secured claim. If not otherwise paid, the Termination Fee will be payable in first order of priority from the closing of an Alternative Transaction. Sellers acknowledge that the Termination Fee shall survive termination of this Agreement.

(d)    Each of the Parties hereto acknowledges that the agreements contained in Sections 7.5 and 7.6 are an integral part of the transactions contemplated by this Agreement and that the Termination Fee is not a penalty, but rather is liquidated damages in a reasonable amount that will compensate the Buyer in the circumstances in which such Termination Fee is payable for the efforts and resources expended and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transactions contemplated hereby, which amount would otherwise be impossible to calculate with precision.

7.7.    **Further Assurances**.  In addition to the provisions of this Agreement, from time to time after the Closing Date, Sellers will use all commercially reasonable efforts to execute and deliver such other instruments of conveyance, transfer or assumption, as the case may be, and take such other actions as may be reasonably requested to implement more effectively the conveyance and transfer of the Acquired Assets and the assumption of the Assumed Liabilities.

7.8.    **Property Taxes**.  All past due *ad valorem* property taxes that constitute an Encumbrance on any Acquired Assets shall be paid and satisfied in full by Sellers at or prior to the Closing, or otherwise paid pursuant to the terms of the Plan.  Any and all current personal property *ad valorem* taxes for 2016 shall be paid at Closing and pro-rated; provided that Sellers shall be solely responsible for payment of any interest and penalties, and any such amounts shall not be pro-rated.

7.9.    **Condition of the Acquired Assets**.    THE BUYER AGREES AND ACKNOWLEDGES THAT AT CLOSING, THE BUYER WILL ACQUIRE THE ACQUIRED ASSETS "AS-IS, WHERE-IS," AND SELLERS DO NOT MAKE (AND SELLERS EXPRESSLY DISCLAIM) ANY REPRESENTATION OR WARRANTY OTHER THAN AS EXPRESSLY SET FORTH IN THIS AGREEMENT, EXPRESS OR IMPLIED, WITH RESPECT TO SUCH ACQUIRED ASSETS, INCLUDING WITHOUT LIMITATION IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

7.10.    **Access to Information After Closing; Maintenance of Records**.

(a)    Following the Closing, for a period of the earlier of (i) two (2) years after the Closing Date and (ii) the date of entry of an order of the Bankruptcy Court closing the Bankruptcy Cases, or if converted to a case under chapter 7 of the Bankruptcy Code, an order of the Bankruptcy Court closing such case, each Party shall accord to the other Party and its representatives reasonable access to all of the books and records turned over to the Buyer by Sellers or retained by Sellers relating to the Acquired Assets and Assumed Liabilities for purposes related to taxes.

-23-

(b)     Such access shall be afforded by the Party in possession of such books and records upon receipt of reasonable advance written notice and during normal business hours; provided, however, that: (i) any such access shall be conducted in such a manner as not to interfere unreasonably with the operation of the business of any Party; (ii) no Party shall be required to take any action which would constitute a waiver of the attorney-client privilege; (iii) no Party shall be required to take any action which would reveal confidential or proprietary information without the execution of an appropriate confidentiality agreement by the other Party; and (iv) no Party shall be required to supply the other Party with any information which such Party is under a legal obligation not to supply.  The applicable Party exercising this right of access shall be solely responsible for any costs or expenses incurred by it hereunder.

7.11.   **Communications with Key Parties**.  Prior to the Closing, the Buyer and its affiliates may, as part of its due diligence and efforts to satisfy applicable conditions to its obligation to close, after consultation with Sellers, have discussions with Sellers' landlords, material suppliers, and others with whom Sellers have material commercial dealings.  Sellers shall not have the right to participate in such discussions, but the Buyer shall inform Sellers of the scope and manner of such discussions.

7.12.   **Schedules**.  The Schedules attached to this Agreement as of the date hereof, if any, are not final.  Sellers and the Buyer agree to use commercially reasonable efforts to finalize the Schedules by the earlier of (i) the deadline for submitting bids as set forth in the Bidding Procedures Order and (ii) three (3) Business Days before the Auction.  Until such time, either Sellers or the Buyer may terminate this Agreement if it does not accept the Schedules.  After such time, Sellers may not amend the Schedules unless the Buyer consents in writing.

7.13.   **Non-Competition; Non-Solicitation**For one (1) year after the Closing, without the consent of the Buyer, Sellers shall not, and Sellers shall not permit any of their current or future affiliates to, directly or indirectly, own any interest in, manage, control, participate in (whether as an owner, operator, manager, consultant, officer, director, employee, investor, agent, representative or otherwise), consult with, render services for or otherwise engage in any business or entity that competes with the Business within the United States; provided, notwithstanding anything herein to the contrary and for the avoidance of doubt, nothing herein is intended to nor shall it be deemed to impair or restrict Sellers, from and after the Closing, from effectuating the wind-down of their estates in the Bankruptcy Cases and performing their obligations under the Plan and the Confirmation Order.  Notwithstanding the foregoing, Sellers and their affiliates may own, directly or indirectly, in the aggregate one percent (1%) or less of the combined voting power of a publicly-traded entity that competes with the Business so long as neither Sellers nor any of their current or future affiliates has any active participation in the business of such entity.

(b)     For one (1) year after the Closing, without the prior written consent of the Buyer, Sellers shall not, and Sellers shall not permit any of their affiliates to, directly or indirectly, hire or solicit any Newly-Hired Employees or other employees of the Buyer or any of its current or future affiliates, or encourage any such employee to leave such employment or hire any such employee who has left such employment, except pursuant to a general solicitation that is not directed specifically to any such employees.

-24-

(c)     Sellers acknowledge that a breach or threatened breach of this <u>Section 7.13</u> would give rise to irreparable harm to the Buyer, for which monetary damages would not be an adequate remedy, and hereby agrees that if it breaches or threatens to breach any such obligations, the Buyer will, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond or other security and without having to demonstrate irreparable harm).

(d)     Sellers acknowledge that the restrictions contained in this <u>Section 7.13</u> are reasonable and necessary to protect the legitimate interests of the Buyer and constitute a material inducement to the Buyer to enter into this Agreement and complete the Contemplated Transactions.  If any covenant contained in this <u>Section 7.13</u> is adjudicated to exceed the time, geographic, product or service or other limitations permitted by applicable Law in any jurisdiction, then any court of competent jurisdiction is expressly empowered to reform such covenant, and such covenant will be deemed reformed, in that jurisdiction to the maximum time, geographic, product or service or other limitations permitted by applicable Law.  Each covenant contained in this <u>Section 7.13</u> and each provision of this <u>Section 7.13</u> is a severable and distinct covenant or provision, as applicable.  The invalidity or unenforceability of any covenant or provision in this <u>Section 7.13</u> as written will not invalidate or render unenforceable the remaining covenants or provisions of this <u>Section 7.13</u>, and any such invalidity or unenforceability in any jurisdiction will not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

## ARTICLE 8
## CONDITIONS TO SELLERS' OBLIGATIONS

The obligation of Sellers to consummate the Contemplated Transactions is subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions; provided, the conditions set forth in <u>Section 8.1</u>, <u>Section 8.2</u> and <u>Section 8.5</u> may be waived (in whole or in part) by Sellers in accordance with <u>Section 10.5</u> hereof:

8.1.    **Representation and Warranties of Buyer**.  The representations and warranties of the Buyer contained in <u>Article 6</u> of this Agreement shall be true and correct at Closing, in all material respects.

8.2.    **Covenants of Buyer**.  The covenants of the Buyer contained in <u>Article 7</u> of this Agreement required to be performed or complied with prior to the Closing shall have been performed and complied with prior to the Closing, in all material respects.

8.3.    **Entry of Orders**.  The Bidding Procedures Order and the Sale Approval Order, each in form and substance acceptable to Sellers, shall have been entered by the Bankruptcy Court and no court of competent jurisdiction shall have entered an order staying such order pending appeal.

8.4.   **Payment.**  The Buyer shall deliver the Purchase Price to Sellers in accordance with Section 3.1.

8.5.   **Ancillary Agreements**.  The Buyer shall execute and deliver, or cause to be executed and delivered, to Sellers at the Closing all of the Ancillary Agreements to which the Buyer is a party, and all such Ancillary Agreements shall be in form and substance acceptable to Sellers.

## ARTICLE 9
## CONDITIONS TO THE BUYER'S OBLIGATIONS

The obligations of the Buyer to purchase the Acquired Assets, to assume the Assumed Liabilities and to consummate the Contemplated Transactions are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived (in whole or in part) by the Buyer in accordance with Section 10.5 hereof:

9.1.   **Representation and Warranties**.  The representations and warranties of Sellers contained in Article 5 of this Agreement, individually and in the aggregate, shall be true and correct at Closing, in all material respects, except for those qualified by materiality, which shall be true and correct.

9.2.   **Covenants of Seller**.  The covenants of Sellers contained in this Agreement required to be performed or complied with prior to the Closing shall have been performed and complied with prior to the Closing, in all material respects.

9.3.   **Approvals**.  All required approvals, as set forth on Schedule 5.4 shall have been received.

9.4.   **No Material Adverse Effect.**  Since the date of this Agreement, no event or events shall have occurred which has or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

9.5.   **Key Agreements**.  The Buyer shall have entered into agreements with such key parties (as determined during the due diligence process and as identified on Schedule 9.5, which Schedule shall be acceptable to the Buyer) on terms and conditions acceptable to the Buyer.

9.6.   **Due Diligence Adjustment**.  If the Buyer exercises its right to propose a Purchase Price adjustment as provided in Section 3.4, Sellers and the Buyer shall have agreed to such adjustment.

9.7.   **Bidding Procedures Order**.  No later than October 24, 2016, the Bidding Procedures Order, in form and substance reasonably acceptable to the Buyer, shall have been entered by the Bankruptcy Court.

9.8.   **Entry of Sale Approval Order**.  No later than November 8, 2016, the Sale Approval Order, in form and substance reasonably acceptable to the Buyer, shall have been entered by the Bankruptcy Court.

-26-

#40905041 v19

9.9. **Specific Requirements for Sale Approval Order.**  Notwithstanding any provision of this Agreement, the Sale Approval Order shall have, without limitation, (i) approved the sale of the Acquired Assets to the Buyer on the terms and conditions set forth in this Agreement and authorized Sellers to proceed with the Contemplated Transactions; (ii) contained specific findings that the Buyer is a "good faith purchaser" of the Acquired Assets for purposes of section 363(m) of the Bankruptcy Code and that there have been no agreements between the Buyer and any other Person regarding the Acquired Assets within the ambit of section 363(n) of the Bankruptcy Code; (iii) provided that the sale of the Acquired Assets to the Buyer shall be free and clear of all Encumbrances except for Permitted Encumbrances; (iv) provided that, except for the Assumed Liabilities provided in this Agreement, the Buyer shall not assume any Liabilities of any Seller or relating to the Business; and (v) provided for the assumption by Sellers and assignment to the Buyer of the Assumed Contracts, with the Cure Amounts to be paid in accordance with Section 2.5(b).

9.10. **Final Order/No Stay.**  No court of competent jurisdiction shall have entered an order staying the Sale Approval Order pending appeal and there shall be no Challenge to the finding that the Buyer is a "good faith purchaser" for purposes of section 363(m) of the Bankruptcy Code.

9.11. **Closing**.  The Closing shall have occurred no later than November 10, 2016.

9.12. **Instruments of Conveyance**.  Sellers shall have executed and delivered to the Buyer at the Closing in recordable form (where applicable) all of the documents provided for in Section 4.2(a) hereof.

9.13. **Consent to Assumed Contracts**.  Sellers shall have delivered to the Buyer all necessary consents with respect to the transfer of the Assumed Contracts and the Bankruptcy Court shall have entered an Order permitting the assumption and assignment of such Assumed Contracts.

9.14. **Title to Acquired Assets**.  Pursuant to the Sale Approval Order, Sellers shall have transferred good title to all of the Acquired Assets free and clear of any Encumbrances other than (i) Permitted Encumbrances; and (ii) interests pursuant to Assumed Contracts (including equipment lessor interests, if any).

9.15. **Employment Agreements**.  The Buyer shall have entered into employment agreements with certain of the Newly-Hired Employees on terms and conditions acceptable to the Buyer.

9.16. **Board Approval**.  The Board of Directors of the Buyer shall have approved the purchase of the Acquired Assets by the Buyer pursuant to this Agreement.

## ARTICLE 10
## MISCELLANEOUS

10.1. **Termination**.

-27-

(a)     **Right to Terminate**.  In addition to any other rights of termination expressly provided in this Agreement, this Agreement may be terminated prior to the Closing:

(1)     by the mutual written consent of the Buyer and Sellers;

(2)     by the Buyer, (i) upon written notice to Sellers, of a material breach of any covenant or agreement to be performed or complied with by any Seller if such breach would result in the failure of closing conditions to be satisfied, or (ii) upon dismissal of any of the Bankruptcy Cases or conversion of any of the Bankruptcy Cases to one under chapter 7 of the Bankruptcy Code;

(3)     by Sellers, upon written notice to the Buyer, of a material breach of any covenant or agreement to be performed or complied with by the Buyer if such breach would result in the failure of closing conditions to be satisfied;

(4)     by either the Buyer or Sellers if any foreign, federal, state, local or other governmental, administrative or regulatory authority, body, agency, court, tribunal or similar entity (other than the Bankruptcy Court) having competent jurisdiction issues a final and non-appealable order, decree or ruling prohibiting the transaction;

(5)     by either the Buyer or Sellers upon a determination by Sellers or Filip's board of directors to accept an Alternative Bid and such Alternative Bid is approved by the Bankruptcy Court and a sale is consummated with the party submitting the Alternative Bid;

(6)     by either the Buyer or the Sellers, if the Bankruptcy Court shall not have entered the Bidding Procedures Order in form and substance reasonably acceptable to the Buyer on or before October 24, 2016;

(7)     by either the Buyer or the Sellers, if the Bankruptcy Court shall not have entered the Sale Approval Order on or before November 8, 2016; and

(8)     by either the Buyer or the Sellers, if the Closing Date has not occurred on or before November 10, 2016, provided, however, that the Party seeking to terminate shall not be the cause of the delay or be in default of this Agreement.

(b)     **Effect of Termination**.  In the event of termination of this Agreement pursuant to the terms hereof:

(1)     If such termination is for any reason other than pursuant to Section 10.1(a)(3), the Escrow Deposit shall be returned to the Buyer.  For the avoidance of doubt, a termination of this Agreement by Sellers pursuant to Section 3.4 or Section 7.12 shall not constitute a termination pursuant to Section 10.1(a)(3).

(2)     If this Agreement is terminated (i) pursuant to any of Sections 10.1(a)(2) or 10.1(a)(5) or (ii) by Sellers pursuant to Section 10.1(a)(8) or (iii) by the Buyer

-28-

pursuant to Section 10.1(a)(8) if the Closing has not occurred on or before January 7, 2017, Sellers shall pay to the Buyer the Termination Fee as provided in Section 7.6.

(3)    If Sellers terminate based on a material breach by the Buyer pursuant to Section 10.1(a)(3)10.1(a)(3), the Escrow Deposit shall become non-refundable and shall be retained by Sellers.  The Escrow Deposit retained by Sellers is in the nature of liquidated damages and is in lieu of any other payments or damage, if any, hereunder.

(4)    The rights and obligations of the Parties hereto under this Agreement shall terminate (other than the provisions of this Article 10) and there shall be no liability of any Party hereto to any other Party hereunder and each Party hereto shall bear its own expenses incurred in connection with the negotiation, preparation, execution and performance of this Agreement except as provided herein.

10.2.    **Assignment; Successors**.  Except for an assignment by the Buyer to one or more affiliates prior to Closing, which shall not be subject to the prior written consent of Sellers and not operate to relieve the Buyer from its obligations hereunder, neither this Agreement nor any of the rights or obligations hereunder may be assigned by any Party without the prior written consent of the other Parties to this Agreement.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective representatives, heirs, legatees, successors and permitted assigns, including, without limitation, any chapter 11 trustee, but not any chapter 7 trustee, appointed in Sellers' bankruptcy case, and no other Person shall have any right, benefit or obligation hereunder.

10.3.    **Notices**.  All notices, requests, demands and other communications which are required or may be given under this Agreement shall be in writing and shall be deemed to have been duly given (a) when received if personally delivered; (b) on the date transmitted if transmitted by facsimile or email, if such transmission is completed at or prior to 5:00 p.m., local time of the recipient Party, and on the next Business Day if such transmission is completed after 5:00 p.m., local time of the recipient Party; (c) the next Business Day after it is sent, if sent for next day delivery to a domestic address by a nationally recognized overnight delivery service (including Federal Express); and (d) upon receipt, if sent by certified or registered mail, return receipt requested.  In each case notice shall be sent to:

If to the Buyer:

Aricent Holdings Luxembourg S.à.r.l.
303 Twin Dolphin Dr.
Redwood City, CA 94065
Attention: General Counsel
Telephone No.: (650) 632-4310

with a copy (which shall not constitute notice) to:

Pepper Hamilton LLP
19th Floor, High Street Tower

-29-

125 High Street
Boston, MA 02110-2736
Attention: Todd A. Feinsmith
Telephone No.: (617) 204-5145
Facsimile No.: (800) 507-0866
Email: feinsmit@pepperlaw.com

If to Sellers:

Filip Technologies, Inc.
c/o Ankura Consulting Group, LLC
747 Third Avenue, 35th Floor
New York, NY 10017
Attention: Roy Messing
Telephone No.: (212) 818-1555
Facsimile No.: (212) 818-1551
Email: roy.messing@ankuraconsultinggroup.com

with a copy (which shall not constitute notice) to:

Moore & Van Allen PLLC
100 North Tryon Street
Suite 4700
Charlotte, North Carolina 28202-4003
Attention: Zachary H. Smith
Telephone No.: (704) 331-1046
Facsimile No.: (704) 378-1909
Email: zacharysmith@mvalaw.com

or to such other place and with such other copies as a Party may designate as to itself by written notice to the others.

10.4. **Choice of Law; Jurisdiction**.    This Agreement shall be construed and interpreted, and the rights of the Parties determined in accordance with, the laws of the State of Delaware (without regard to its conflicts of laws principles) and the Bankruptcy Code.  Each Party irrevocably consents to the service of any and all process in any action or proceeding arising out of or relating to this Agreement by the transmitting of copies of such process to each Party at its address specified in Section 10.3 in a manner provided for in Section 10.3.  The Parties hereto irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement and any other agreement or instrument contemplated hereby or entered into in connection herewith, or any of the transactions contemplated hereby or thereby and any such dispute shall be deemed to have arisen in the State of Delaware. Each Party hereby irrevocably agrees that all claims in respect of such dispute or proceeding may be heard and determined in such courts.  The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of

-30-

any such dispute brought in such court or any defense of inconvenient forum in connection therewith.

10.5.  **Entire Agreement; Amendments and Waivers**.  This Agreement, together with the Ancillary Agreements and all Exhibits and Schedules hereto and thereto, constitutes the entire agreement among the Parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties.  No amendment, supplement, modification or waiver of this Agreement shall be binding unless executed in writing by or on behalf of the Party to be bound thereby.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

10.6.  **Construction**.  The headings and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience, are not part of this Agreement, and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Agreement.  All Exhibits and Schedules attached are made a part hereof. All terms defined herein shall have the same meaning in the Exhibits and Schedules, except as otherwise provided therein.  All references in this Agreement to an Article, section or clause is deemed to refer to an Article, section or clause of this Agreement, unless the context clearly indicates otherwise.  The terms "hereby", "hereof", "hereto", "hereunder" and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used.  Whenever in this Agreement provision is made for the payment of attorneys' fees, such provision shall be deemed to mean reasonable attorneys' fees and paralegals' fees.  The term "including" when used herein shall mean "including, without limitation."  Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.  All references in this Agreement to "$", "Dollars" or "US$" refer to currency of the United States of America.

10.7.  **No Third Party Beneficiaries**.  No Person other than the Parties hereto shall have any rights or claims hereunder.

10.8.  **No Waiver**.  The failure of any Party hereto to seek redress for any breach, or to insist upon the strict performance, of any covenant or condition of this Agreement by the other Parties shall not be, or be deemed to be, a waiver of the breach or failure to perform nor prevent a subsequent act or omission in violation of, or not strictly complying with, the terms hereof from constituting a default hereunder.

10.9.  **Multiple Counterparts**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and it may be executed by facsimile.

10.10.  **Invalidity**.  In the event that any one or more of the provisions, or any portion thereof, contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then such provision shall

-31-

remain valid and enforceable to the maximum extent permitted by law.  Such invalidity, illegality or unenforceability shall not affect any other provision, or any portion thereof, of this Agreement or any other such instrument.

10.11.  **Publicity**.  Each Party shall consult with the other Parties prior to issuing any press release or otherwise making any public statements with respect to the Contemplated Transactions, and no Party shall issue any such press release or make any such public statements or comments relating to these transactions without the prior written consent of the other Parties (which consent shall not be unreasonably withheld), except as may be required by applicable law.

10.12.  **Remedies**.  All rights and remedies of any Party hereto are cumulative of each other and of every other right or remedy such Party may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies, including the right to specific performance of the terms hereof.  Sellers and the Buyer hereby acknowledge and agree that money damages may not be an adequate remedy for any breach or threatened breach of any of the provisions of this Agreement and that, in such event, Sellers or their successors or assigns, or the Buyer or its successors or assigns, as the case may be, shall, in addition to any other rights and remedies existing in their favor, be entitled to petition any court of competent jurisdiction for specific performance, injunctive and/or other relief in order to enforce or prevent any violations of this Agreement.

10.13.  **Representation by Counsel; Mutual Negotiation**.  Each Party has been represented by counsel of its choice in negotiating this Agreement and the Ancillary Agreements. This Agreement and the Ancillary Agreements shall therefore be deemed to have been negotiated and prepared at the joint request, direction and construction of the Parties, at arm's length with the advice and participation of counsel, and will be interpreted in accordance with its terms without favor to any Party.

10.14.  **No Survival of Representations and Warranties**.  The Parties hereby acknowledge and agree that the representations and warranties contained in Article 5 and Article 6 shall not survive after the Closing.

10.15.  **Time.**  Time is of the essence of this Agreement.

[Signature Pages Follow]

-32-

#40905041 v19

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be duly executed under seal all as of the day and year first above written.

FILIP TECHNOLOGIES, INC.

By: _____
Name: ROY MESSING
Title: CHIEF RESTRUCTURING OFFICER

FILIP TECHNOLOGIES UK LTD

By: _____
Name: ROY MESSING
Title: CHIEF RESTRUCTURING OFFICER

EVADO FILIP AS

By: _____
Name: ROY MESSING
Title: CHIEF RESTRUCTURING OFFICER

EVADO FILIP LIMITED

By: _____
Name: ROY MESSING
Title: CHIEF RESTRUCTURING OFFICER

EVADO FILIP US LTD.

By: _____
Name: ROY MESSING
Title: CHIEF RESTRUCTURING OFFICER

*[Signature Page to Asset Purchase Agreement]*

#40905041 v19

ARICENT HOLDINGS LUXEMBOURG S.À.R.L.

By: _____
Name: _____Amit Shashank_____
Title: _____manager_____

#40905041 v17