**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

Style Definition: Number_4: Keep with next

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **FILIP TECHNOLOGIES, INC.** *et al.,*[1] | **Case No. 16-12192 (KG)** |
| **Debtors.** | **Jointly Administered** |

**DISCLOSURE STATEMENT WITH RESPECT TO ~~JOINT~~ FIRST AMENDED ~~JOINT~~ ~~PLAN OF LIQUIDATION OF THE DEBTORS PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTORS, AT&T CAPITAL SERVICES, INC.,~~**
**PLAN OF LIQUIDATION OF THE DEBTORS PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY THE DEBTORS, AT&T CAPITAL SERVICES, INC., AND AT&T SERVICES, INC.**

Counsel for Proponents:

**BIELLI & KLAUDER, LLC**
David M. Klauder (No. 5769)
Nella M. Bloom (No. 5430)
1204 N. King Street
Wilmington, DE 19801
Phone: (302) 803-4600
Fax: (302) 397-2557

*~~Proposed~~ Counsel to the Debtors*

**SIDLEY AUSTIN LLP**
Michael G. Burke
Brian J. Lohan
787 Seventh Avenue
New York, NY 10019
Telephone: (212) 839-5300
Facsimile: (212) 839-5599

*Counsel to AT&T Capital Services, Inc. and
AT&T Services, Inc.*

**MOORE & VAN ALLEN PLLC**
Zachary H. Smith *Pro Hac Vice*
Hillary B. Crabtree *Pro Hac Vice*
100 N. Tryon Street, Suite 4700
Charlotte, NC 28202
Telephone: (704) 331-1000
Facsimile: (704) 378-1909

*~~Proposed~~ Counsel to the Debtors*

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Derek C. Abbott (No. 3376)
Daniel B. Butz (No. 4227)
1201 North Market Street, 16th Floor
Wilmington, DE 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel to AT&T Capital Services, Inc.
and AT&T Services, Inc.*

---

[1] The Debtors in these jointly administered cases are Filip Technologies, Inc. (Tax ID: 0660); Filip Technologies~~, (~~UK~~)~~ Limited ~~Ltd~~ (ID: 8339); Evado Filip AS (ID: 6131); Evado Filip Limited (ID: 7233); and Evado Filip US Limited (ID: 3412).

Dated: ~~October 28~~November 18, 2016

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE ~~DEBTORS~~PROPONENTS ARE SUBMITTING THIS DISCLOSURE STATEMENT FOR APPROVAL, BUT THE BANKRUPTCY COURT HAS NOT YET APPROVED THIS DISCLOSURE STATEMENT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.**

**I.**

**INTRODUCTION AND DISCLAIMER**

The above-captioned debtors and debtors in possession (the "Debtors"), AT&T Capital Services, Inc., and AT&T Services, Inc. as co-proponents within the meaning of ~~section~~Section 1129 of ~~title 11 of~~ the ~~United States~~Bankruptcy Code have filed their proposed *First Amended Joint Plan of Liquidation of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code*, dated ~~October 26~~November 18, 2016 (the "Plan"), with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). A copy of the Plan is attached hereto as **Exhibit A**.[2] The Proponents hereby submit this *Disclosure Statement with Respect to the First Amended Joint Plan of Liquidation of the Debtors Pursuant to Chapter 11 of the Bankruptcy Code*, dated ~~October 28~~November 18, 2016 (the "Disclosure Statement"), pursuant to Section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances or rejections of the Plan from certain Holders of Claims against the Debtors.

Following a hearing held on November ~~—~~16, 2016, the Disclosure Statement was approved on an interim basis by the Bankruptcy Court as containing "adequate information" in accordance with Section 1125 of the Bankruptcy Code. Pursuant to Section 1125(a)(1) of the Bankruptcy Code, "adequate information" is defined as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan." A combined hearing to consider final approval of the Disclosure Statement and ~~confirm~~confirmation of the Plan (the "Confirmation Hearing") will be held on ~~December ___, 2016~~January 12, 2017 at ~~—:— .~~2:00 p.m. (ET).

NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT. ALL OTHER STATEMENTS REGARDING THE PLAN AND THE

---

[2] Capitalized terms used herein that are not otherwise defined herein shall have the meanings ascribed to them in the Plan.

TRANSACTIONS CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

APPROVAL OF THE DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT INDICATE THAT THE BANKRUPTCY COURT RECOMMENDS EITHER ACCEPTANCE OR REJECTION OF THE PLAN, NOR DOES SUCH APPROVAL CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES, AND SEEKING CONFIRMATION, OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY OTHER PURPOSE. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS AND SCHEDULES ATTACHED TO THE PLAN, WHICH CONTROL IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY INCOMPLETENESS OF ANY SUMMARY OR STATEMENT MADE IN THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE OF THIS DISCLOSURE STATEMENT, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

ANY STATEMENTS IN THIS DISCLOSURE STATEMENT CONCERNING THE PROVISIONS OF ANY DOCUMENT ARE NOT NECESSARILY COMPLETE, AND IN EACH INSTANCE REFERENCE IS MADE TO SUCH DOCUMENT FOR THE FULL TEXT THEREOF. CERTAIN DOCUMENTS DESCRIBED OR REFERRED TO IN THIS DISCLOSURE STATEMENT HAVE NOT BEEN ATTACHED AS EXHIBITS BECAUSE OF THE IMPRACTICABILITY OF FURNISHING COPIES OF SUCH DOCUMENTS TO ALL RECIPIENTS OF THIS DISCLOSURE STATEMENT.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE (AS DEFINED BELOW) AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW OR THE LAWS OF ANY FOREIGN JURISDICTION.

THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC") OR ANY STATE OR FOREIGN SECURITIES REGULATOR, AND NEITHER THE SEC NOR ANY STATE OR FOREIGN SECURITIES REGULATOR HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

THIS DISCLOSURE STATEMENT AND ANY ACCOMPANYING DOCUMENTS ARE THE ONLY DOCUMENTS TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES ON THE PLAN. NO SOLICITATION OF VOTES MAY BE MADE EXCEPT AFTER DISTRIBUTION OF THIS DISCLOSURE STATEMENT AS AUTHORIZED BY THE BANKRUPTCY COURT PURSUANT TO THE INTERIM APPROVAL AND PROCEDURES ORDER.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY OR AS A WAIVER OF ANY OF THE OPERATING DEBTORS' RIGHTS, REMEDIES, CLAIMS, OR DEFENSES AS TO ANY MATTER OR AS A STIPULATION WITH RESPECT TO ANY DISPUTED MATTERS, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN THE DEBTORS.

THE DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY. AFTER CAREFULLY REVIEWING THESE DOCUMENTS, IF YOU ARE A CLAIM HOLDER ENTITLED TO VOTE, PLEASE INDICATE YOUR VOTE WITH RESPECT TO THE PLAN ON THE ENCLOSED BALLOT AND RETURN IT IN THE ENVELOPE PROVIDED.

A.     Solicitation Package

Each record and beneficial holder of a Claim entitled to vote on the Plan will receive the following materials (collectively, the "Solicitation Package"):

    1.     a cover letter describing the contents of the Solicitation Package;

    2.     this Disclosure Statement, the Plan (Exhibit A to the Disclosure Statement) and all exhibits thereto;

3. the Interim Approval and Procedures Order;

4. a notice providing, among other things, (i) notice of the filing of the Disclosure Statement and Plan, (ii) notice of the interim approval of the Disclosure Statement, (iii) information regarding the Confirmation Hearing, and (iv) directions for submitting objections to the final approval of the Disclosure Statement and Confirmation of the Plan by the Objection Deadline (the "Confirmation Hearing Notice");

5. a ~~ballot~~Ballot for indicating the Holder's acceptance or rejection of the Plan ~~(a "Ballot"),~~ including ~~voting instructions~~Voting Instructions;

6. a pre-addressed stamped return envelope; and

7. such other materials as the Court may direct.

B. Only Impaired Classes Vote

Pursuant to the provisions of the Bankruptcy Code, only Classes of Claims and Equity Interests that are "impaired" under the Plan may vote to accept or reject the Plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are changed under such plan. In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under the plan on account of such claims or interests, such impaired class is deemed to have rejected the plan and shall not be afforded an opportunity to vote to accept or reject the plan.

Under the Plan, Claims and Equity Interests in Classes 2, 3, 4, 5, 6, and ~~6~~7 are ~~impaired~~Impaired. Holders of Intercompany Claims in Class 5, Equity Interests in Filip in Class 6, and Equity Interests in ~~the Debtor Subsidiaries in~~ Class ~~6~~7 will receive no distribution, and, accordingly, such ~~holders~~Holders are deemed to reject the Plan, and their votes are not being solicited. ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASS 2, CLASS 3, AND CLASS 4.

~~ALL~~ **THE PLAN PROVIDES THAT CERTAIN** HOLDERS OF CLAIMS **AGAINST** AND EQUITY INTERESTS IN THE DEBTORS **WILL** ~~GRANT CERTAIN~~ BE GRANTING RELEASES ~~UNLESS THEY CHECK THE OPT OUT BOX ON THE BALLOT OR OPT OUT ELECTION FORM, AS APPLICABLE.~~TO THE PROPONENTS AND CERTAIN OTHER NON-DEBTORS, PLEASE READ THE VOTING INSTRUCTIONS, SECTION VIII.F OF THE PLAN, AND SECTION III.H OF THIS DISCLOSURE STATEMENT CAREFULLY.

C. Combined Disclosure Statement and Confirmation Hearing

The Bankruptcy Court has scheduled the Confirmation Hearing to consider Confirmation of the Plan and approval of the Disclosure Statement on a final basis for ~~December __, 2016~~January 12, 2017, at ~~__:__ __.~~2:00 p.m. (ET) in the Bankruptcy Court, located at 824 N. Market Street, 6th Floor, Courtroom 3, Wilmington, DE 19801. The Bankruptcy Court has directed

that objections, if any, to Confirmation of the Plan be served and filed on or before December ~~—~~,29, 2016, at 4:00 p.m. (ET) in the manner described in the Confirmation Hearing Notice. The date of the Confirmation Hearing may be adjourned from time to time without further notice except for an in-court announcement at the Confirmation Hearing.

D.    Overview of the Plan

THE FOLLOWING IS A BRIEF SUMMARY OF THE TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN. CREDITORS AND OTHER PARTIES IN INTEREST ARE URGED TO REVIEW THE MORE DETAILED DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT AND THE PLAN ITSELF.

The Plan is a plan of liquidation, pursuant to which the net proceeds of the sale ~~or other disposition of the Debtors' assets are being pooled and distributed.~~of substantially all of the Debtors' assets are being pooled in a Liquidating Trust and distributed to Holders of Claims against the Debtors as set forth in Article II and Article III of the Plan. AT&T, in its capacity as DIP Lender and counterparty to the AT&T Contracts, has agreed to compromise certain of its DIP Claims, prepetition secured claims, and cure claims in favor of ensuring that all budgeted Administrative Claims and anticipated Priority Claims will be paid in full and that Unsecured Claims will receive a baseline recovery under the Plan. Accordingly, on the Effective Date of the Plan, the Debtors will fund Distributions first to Holders of Allowed Secured Claims, if any, as their interests may appear, then to the Holders of Allowed Administrative and Priority Claims in accordance with the scheme of priorities set forth in the Bankruptcy Code~~.~~, The DIP Lender has agreed to contribute the GUC Contribution in the amount of $10,000 if Holders of Unsecured Claims vote to accept the Plan. Thereafter, a Distribution will be made to the DIP Lender to repay the Post-Petition DIP Advances and the Roll-Up Claim. Remaining Available Cash will be shared equally by the DIP Lender and the Liquidating Trust until such time as the Other DIP Claims are paid in full. Any remaining Available Cash will thereafter ~~to~~be a Liquidating Trust Asset, to be shared by Holders of Allowed Unsecured Claims and ~~holders~~Holders of Allowed AT&T Unsecured Claims. Holders of Intercompany Claims ~~and~~, Equity Interests in Filip, and Equity Interests in the Debtor Subsidiaries are not receiving any distribution under the Plan.

Under the Plan, Administrative Claims and Priority Tax Claims are unclassified and are to be paid in full, or upon such other terms as the Debtors and the affected Claimants may agree. Class 1 Priority Claims are ~~unimpaired~~Unimpaired and Holders of Allowed Priority Claims are to be paid in full or upon such other terms as the Debtors and the affected Holders may agree. Class 2 Secured Claims, if any, are ~~impaired~~Impaired and at the option of the Debtors, Holders of Allowed Secured Claims will receive payment in full, abandonment of their collateral, or the net proceeds of the sale of their collateral. Class 3 Unsecured Claims are ~~impaired~~Impaired and each Holder of an Allowed Class 3 Claim will receive its Pro Rata distribution of the Class 3 Liquidating Trust Interests and the Class 4 Liquidating Trust Interests following the payment ~~or reserves~~of Reserves provided for in the Plan, including the Administrative and Secured Claims Reserve, the Priority Tax Claims Reserve, the Professional Fee Reserve and the Priority Claims Reserve, each of which shall be funded with the Reserve Estimate. Class 4 AT&T Unsecured Claims, which include any pre-petition Claim by AT&T under the AT&T Contracts, are ~~impaired~~Impaired and will receive a Pro Rata distribution of the Class 4 Liquidating Trust Interests. Class 5 Intercompany

6

Claims and, Class 6 Equity Interests in Filip, and Class 7 Equity Interests in the Debtor Subsidiaries are impairedImpaired and will not receive a distribution.

> **Formatted:** Font color: Auto

### Waterfall Distribution Estimates

As noted above, AT&T has agreed to compromise certain of its DIP Claims, prepetition secured claims, and cure claims in favor of ensuring that all budgeted Administrative Claims and anticipated Priority Claims will be paid in full and that Holders of Unsecured Claims will receive a baseline recovery under the Plan. Attached hereto as Exhibit B is the Debtors' recovery analysis for Creditors as of the date of this Disclosure Statement (the "Recovery Analysis"). The Recovery Analysis is based on the known value of the Estates' assets, budgeted expenses for the Estates through Confirmation, reserves for the Liquidating Trust, and estimated Allowed Claims based upon the amounts and classification of Claims set forth in the Debtors' Schedules. Because the Bar Date for Creditors to file Claims against the Debtors is not until December 12, 2016, the estimated Allowed Claims and corresponding distributions are subject to change based on Claims that are filed and the Claims reconciliation process. At this time, the Debtors estimate a dollar recovery of between $47,000.00 to $62,000.00 for Holders of Unsecured Claims.

### Summary of Classification and Treatment of Claims

Set forth below is a table summarizing the classification and treatment of Claims and Equity Interests under the Plan and the estimated distributions to be received by the Holders of such Claims and Equity Interests thereunder. The actual distributions may differ from those set forth in the table depending on the amount of Claims ultimately allowedAllowed in each category or Class and the extent of Liquidating Trust Assets ultimately available for distribution.

| DESCRIPTION/CLASS | STATUS | VOTING RIGHTS | ESTIMATED DISTRIBUTION (%) |
|---|---|---|---|
| Administrative Claims | Unimpaired | Not Entitled to Vote | 100% |
| Class 1 Priority Claims | Unimpaired | Not Entitled to Vote | 100% |
| Class 2 Secured Claims | Impaired | Entitled to Vote | 100% |
| Class 3 Unsecured Claims | Impaired | Entitled to Vote | 1.0.2% - Unknown% - 1.3% |
| Class 4 AT&T Unsecured Claims | Impaired | Entitled to Vote | 0% - Unknown0.3% |
| Class 5 Intercompany Claims | Impaired | Not Entitled to Vote | 0% |
| Class 6 Equity Interests in Filip | Impaired | Not Entitled to Vote | 0% |
| Class 7 Equity Interests in the Debtor Subsidiaries | Impaired | Not Entitled to Vote | 0% |

> **Formatted Table**

**HOLDERS OF UNSECURED CLAIMS ARE RECEIVING A DISTRIBUTION AS A RESULT OF AN AGREEMENT BETWEEN THE DEBTORS AND THE DIP LENDER. ABSENT SUCH AN AGREEMENT, HOLDERS OF UNSECURED CLAIMS WOULD RECEIVE NO DISTRIBUTION ON ACCOUNT OF THEIR CLAIMS. IF THE PLAN IS NOT CONFIRMED, THE DEBTORS BELIEVE THAT HOLDERS OF UNSECURED CLAIMS WILL RECEIVE NO DISTRIBUTION ON ACCOUNT OF THEIR CLAIMS.**

E.    Claims Reconciliation Process and Estimated Recoveries

To facilitate timely Plan Distributions, the Debtors intend to reconcile Claims as quickly and efficiently as possible with a goal of reconciling all Claims before the Effective Date. To that end, the Debtors ~~have filed and~~ anticipate filing ~~additional~~ objections to ~~claims~~Claims asserted against the Debtors. The Bar Date for ~~claims~~Claims to be filed in these cases ~~has not been set at~~ is 4:00 p.m. prevailing Eastern time on December 12, 2016, for any Claim arising prior to the ~~filing~~Petition Date against the Debtors in these Chapter 11 Cases, and (ii) 5:00 p.m. prevailing Eastern time on April 3, 2017 for any Claim of ~~this Disclosure Statement.~~a Governmental Unit arising prior to the Petition Date against the Debtors in these Chapter 11 Cases. Notice of the Bar Date ~~will be~~has been sent to all ~~creditors~~Creditors.

## II.

## BACKGROUND; CHAPTER 11 CASES

A.    General Background and History

The Debtors are a leading provider of technology and software solutions that enable parents to connect with their children, wherever located, over wireless networks. ~~The Filip Service~~The Debtors' software platform provides a service that enables parents using smartphones to call, locate, and message their children on a compatible wearable watch device worn by the child. (the "Filip Service"). The Filip Service is provided to customers in the United States and Spain, and Filip is positioned to expand in Spain and other countries.

Filip's primary and direct customers are wireless network operators who offer connected wearable devices to their end users together with a wireless voice and data plan. Pursuant to contracts between Filip and the respective wireless operator, Filip provides ~~its cloud-based software and services~~the Filip Service directly to these end users, in exchange for a monthly service fee for each device active on the operator's network. Presently, nearly one-hundred percent (100%) of Filip's revenue is derived from the provision of the Filip Service to end users.

Filip's products consist primarily of a cloud-based software platform, Apple (i.e., iOS) and Android mobile applications (i.e., apps), and a web-based administrative and support tool. Once a parent has purchased a compatible connected wearable device, installed the Filip mobile application on his or her smartphone, and created a Filip account, the parent can securely connect up to five (5) wearable devices to the Filip account. From the Filip mobile application, the parent can create a short list of approved contact telephone numbers that can call, and be called from, the child's wearable device. Also from the Filip mobile application, the parent can locate the child on a map and view the child's location history, set 'Safe Zones' to trigger an alert to the parent if the child enters or leaves a Safe Zone, send and receive short messages to and from their child's device, and administer the child's device settings. Several additional features for the Filip application are also in development. All such services are delivered using Filip's ~~could~~cloud-based software platform, which facilitates secure and timely communication between the wearable devices and smartphone application, and processes and stores the data collected. The Filip software platform also incorporates Filip's proprietary emergency management solution enabling the child to quickly contact a trusted individual in the event of an emergency.

8

Filip's web-based support portal is designed to provide customer support personnel with the tools necessary to troubleshoot and resolve administrative and technical issues affecting the Filip Service and devices operating on the Filip software platform.

In addition to the Filip Service, Filip also developed its own connected wearable watch device for children, called 'FiLIP,' which it launched in the United States ~~together with~~through the AT&T wireless network in November 2013. FiLIP was one of the first FCC-approved wearable devices to incorporate cellular, GPS and Wi-Fi technology to enable parents and children to call each other, and to enable parents to locate their children outdoors and indoors, or in areas where GPS signals are not available. A second-generation version of this product, FiLIP 2, launched ~~with~~through the AT&T wireless network in November 2014, and in limited quantities with Spain-based wireless network operator Movistar España (part of the Telefónica group), in September 2015. Following the launch of FiLIP 2, however, Filip became aware of certain third-party ~~OEMs~~original equipment manufacturers ("OEMs") developing devices that Filip believed would be compatible with the Filip software platform, and ultimately determined to pursue partnerships with OEMs instead of continuing its own hardware development program. Accordingly, after significant deliberation, Filip's Board of Directors determined to discontinue Filip's hardware development business and focus on the development, operation, and promotion of the Filip Service and the use of the Filip Service with third-party OEM devices. The manufacturing of the FiLIP 2 device has been discontinued.

Filip is headquartered in New York, New York, and presently operates in the United States and Spain. Filip is a privately-held Delaware corporation formed in 2013. Filip directly owns one-hundred percent (100%) of Filip Technologies UK ~~Limited~~Ltd, an entity formed in 2012 under the laws of England and Wales ("Filip UK"). Filip UK directly owns (i)~~-~~ one-hundred percent (100%) of Evado Filip AS, an entity formed in 2010 under the laws of Norway ("Filip Norway"); and (ii) Evado Filip Limited, a dormant entity formed in 2012 under the laws of England and Wales ("Filip UK Dormant"). Filip Norway directly owns one-hundred percent (100%) of Evado Filip US Limited, a Delaware corporation formed in 2012 ("Filip US Sub" and, together with Filip UK, Filip Norway, and Filip UK Dormant, the "Debtor Subsidiaries").

The Debtors' corporate structure reflects the evolution of the Debtors' business since the original inspiration for the Filip concept in Norway, 2010, when the founder of the Company, Mr. Sten Kirkbak, briefly lost track of his son Filip in a shopping mall. Subsequently, Mr. Kirkbak and co-founder Mr. Olav Medhus, established Filip Norway to conduct the initial research and development that became the basis for Filip's concept and business. During 2011 and 2012, Filip Norway entered into certain contracts with third parties, including a contract for the development of software that would become the first generation of the Filip platform and mobile applications, and a contract for the design, development and testing of the FiLIP wearable device. In addition, during 2012, Filip Norway formed Filip US Sub for the purpose of transferring certain key personnel from Norway to the United States, and to enter into a contract with a U.S.-based counterparty for engineering support, manufacturing, packaging, distribution, and other services for the FiLIP wearable device. Also during 2012, Filip UK was formed for the purpose of attracting investment capital from investors located in the United Kingdom. Shortly after its formation, Filip UK acquired one-hundred percent (100%) ownership of Filip Norway pursuant to a share exchange transaction.

9

By 2013, Filip was in negotiations with AT&T regarding a potential Master Purchase Agreement for the launch of Filip products in the United States, and had determined that the United States would become the headquarters and primary operating location for the Filip business. As a result, Filip Technologies, Inc. was formed under Delaware law in September 2013 to be the primary operating entity for the Filip business. In November 2013, Filip acquired one-hundred percent (100%) ownership of Filip UK pursuant to a stock exchange transaction. As such, since that time, virtually all of Filip's operations have occurred through parent entity Filip Technologies, Inc., and certain intellectual property components of the Filip Service reside in non-dormant Debtor Subsidiaries.

B.    **Capital and Debt Structure**

As an emerging technology company, since inception Filip has relied on continued cash infusions from investors as it has grown its business. Filip historically has not been, and is not today, able to finance itself solely from its operational cash flows. Set forth below is a description of Filip's capital and funded debt structure as of the date hereof.

*Secured Debt*

Prior to the Petition Date, for the purpose of avoiding a shut-down of the Filip Service while enabling the Debtors to continue strategic discussions with potential acquirers and prepare for the orderly commencement of these Chapter 11 Cases, AT&T Services provided $240,000 of unsecured financing (the "Maintenance Amount") to the Debtors pursuant to that certain (i) Maintenance Agreement, dated as of August 24, 2016, by and among Filip Technologies, Inc. and AT&T Services, Inc. (the "Original Maintenance Agreement"); and (ii) Supplemental Maintenance Agreement, dated as of September 16, 2016, by and among Filip Technologies, Inc. and AT&T Services, Inc. (the "Supplemental Maintenance Agreement" and, together with the Original Maintenance Agreement, the "Maintenance Agreements"). Pursuant to the Maintenance Agreements, AT&T Services deposited the Maintenance Amount with a third-party disbursement agent, Epiq Bankruptcy Solutions, LLC, for disbursement to the Debtors in accordance with an agreed budget attached to the Maintenance AgreementAgreements.

Subsequently, AT&T Capital Services, Inc. made a further loan to the Debtors in the amount of $240,000 pursuant to that certain Secured Promissory Note between AT&T Capital Services, Inc. and Filip Technologies Inc., dated September 28, 2016 (the "AT&T Prepetition Promissory Note"). The additional funding provided under the AT&T Prepetition Promissory Note enabled the Debtors to continue operation of the Filip Service and undertake preparations for the commencement of these Chapter 11 Cases. Pursuant to the AT&T Prepetition Promissory Note, the total prepetition funding provided by AT&T of $480,000 is secured by a first-priority and duly perfected lien on substantially all of the assets of Filip Technologies, Inc. Pursuant to the Final DIP Order, the $240,000 in new borrowings advanced pursuant to the AT&T Prepetition Promissory Note was rolled up into the DIP Facility (the "Roll-Up Claims"). Pursuant to the agreement between the DIP Lender and the Debtors that is embodied in the Plan, if the Plan is confirmed, the DIP Lender has agreed that the Maintenance Amount shall be treated as an AT&T Unsecured Claim.

### *Unsecured Debt – AT&T Claims*

AT&T is the Debtors' largest wireless network customer and largest trade creditor. The Debtors and AT&T were parties to a Master Purchase Agreement for the launch of Filip products in the United States, pursuant to which AT&T was the exclusive wireless network provider for Filip. The Master Purchase Agreement was assumed by the Debtors and assigned to the Purchaser, as amended, pursuant to the Sale Order. Pursuant to the agreement between AT&T and the Debtors that is embodied in the Plan, if the Plan is confirmed, AT&T has agreed that the cure amounts due under the Master Purchase Agreement shall be treated as an AT&T Unsecured Claim.

### *Unsecured Debt – Senior Notes*

In mid-July 2016, Filip issued senior unsecured promissory notes (the "<u>Prepetition Senior Unsecured Notes</u>") in the aggregate principal amount of $125,000, bearing interest at three percent (3%) per annum and due and payable on March 31, 2017, subject to the terms and conditions thereof. The Prepetition Senior Unsecured Notes were issued to (i) EF Investigo Holdings AS ($25,000); (ii) KEC Ventures I LP ($25,000); and (iii) Lakestar I LP ($75,000). The Debtors have not made any payments on the Prepetition Senior Unsecured Notes since issuance.

### *Unsecured Debt – Convertible Notes*

On various dates from July 2015 through August 2016, Filip issued unsecured notes (the "<u>Prepetition Unsecured Convertible Notes</u>") in the aggregate principal amount of $2,775,000, as follows:

The Prepetition Unsecured Convertible Notes bear interest at three percent (3%) per annum, are due and payable on December 31, 2017, and include a mechanism for the potential conversion of such debt into equity securities of ~~the Company~~<u>Filip</u> upon the occurrence of certain future events and subject to the terms and conditions thereof. The Debtors have not made any payments on the Prepetition Unsecured Convertible Notes since issuance.

### *Unsecured Debt – Convertible Notes (Former Employees)*

Prior to the Petition Date, due to liquidity constraints preventing Filip from remitting cash payment on account of certain contractual and other termination obligations to departing employees, Filip issued unsecured convertible promissory notes (the "<u>Prepetition Unsecured Employee Notes</u>") to such employees in an amount equal to $345,493 in the aggregate, as follows:  (i) Sten Kirkbak ($150,000); (ii) PJD Holding, LLC ($79,451); (iii) Hilary Tuohy ($72,917); and (iv) Anders Broms ($43,125). The Prepetition Unsecured Employee Notes bear interest at three percent (3%) per annum and are due and payable on December 31, 2016 and include certain equity conversion features, subject to the terms and conditions thereof. The Debtors have not made any payments on the Prepetition Unsecured Employee Notes since issuance.

### *Unsecured Debt – Convertible Notes (Trade Vendors)*

Prior to the Petition Date, due to liquidity constraints and in an effort to reach deferred payment arrangements with various trade vendors, Filip issued unsecured convertible

promissory notes (the "<u>Prepetition Unsecured Vendor Notes</u>") to certain vendors in the aggregate amount of $93,893.26, as follows:  (i) AltaStream Consulting, LLC ($30,438.00); (ii) Anderssen & Voll AS ($27,899.26); and (iii) eRate AS ($35,556.00). The Prepetition Unsecured Vendor Notes bear interest at three percent (3%) per annum and are due and payable on December 31, 2017 and include certain equity conversion features, subject to the terms and conditions thereof. The Debtors have not made any payments on the Prepetition Unsecured Vendor Notes since issuance. In addition to the Prepetition Unsecured Vendor Notes, as of the Petition Date the Debtors also have approximately $2.6 million of unsecured accounts payable owed to approximately seventy (70) trade vendors.

C.      <u>Events Leading to Bankruptcy</u>

Despite Filip's accomplishments and potential for further expansion, various factors have contributed to Filip's (i) inability to obtain investment capital or debt financing to fund operations or further growth whether from its existing investors or otherwise; (ii) liquidity exhaustion; and (iii) determination to pursue a sale of the Filip business and assets and attendant wind-down.

Although Filip successfully launched the FiLIP device in November 2013, the development and certification of the device proved more complex, time consuming, and costly than originally anticipated. In addition, the final production cost of the FiLIP device was higher than forecast, such that Filip incurred a negative margin on the sale of each device, which was eventually recouped over several months from service fees received by Filip from its customers, i.e., the wireless network operators. Filip also was unable to sell as many devices as anticipated, and was therefore unable to benefit from anticipated manufacturing discounts in order to improve its gross margins and realized lower than anticipated service revenues. As a result of these factors, together with the significant advertising and marketing costs and sales rebates necessary to drive FiLIP device sales volume, Filip consumed significantly more capital than anticipated.

In early 2015, Filip determined to exit the hardware business and streamline its operations by focusing on the Filip Service. Although this operational restructuring effort resulted in certain positive effects, such as improvement to Filip's gross margins, reduction in operating expenditures, reduced cash needs, and positioning Filip on a path to reduce operational complexity, Filip was unable to attract the additional funding necessary to achieve profitability with this new business model.

In March 2016, after deliberation and at the direction of Filip's Board of Directors, Filip retained an investment banking firm, Widebridge Group ("<u>Widebridge</u>"), to conduct a marketing and sale process on behalf of Filip. Through that process and beginning on March 31, 2016, the Debtors, through and with the assistance of Widebridge, (i) contacted approximately two-hundred thirty (230) potentially interested parties; (ii) entered into ten (10) non-disclosure agreements; (iii) facilitated extensive due diligence by five (5) parties; and (iv) reached advanced discussions regarding a potential transaction with one (1) party. Unfortunately, those advanced discussions did not result in a transaction, and the Debtors formally terminated those discussions on August 18, 2016.

D.    Commencement of Chapter 11 Cases

On October 5, 2016 (the "Petition Date"), Debtors Filip Technologies, Inc.; Filip Technologies~~, Limited ( ~~UK)~~;~~ Ltd; Evado Filip AS; Evado Filip Limited and Evado Filip US Limited, Inc. each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtors continued in the management and possession of their businesses and properties as debtors in possession, pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner was appointed.

E.    Retention of Key Professionals

a.    Retention of Bankruptcy Counsel

~~At the time of filing this Disclosure Statement, the Debtors have~~The Debtors filed motions to retain Bielli & Klauder, LLC and Moore & Van Allen PLLC to serve as bankruptcy counsel in the Chapter 11 Cases, and the Bankruptcy Court approved the retention of both firms on November 8, 2016.

b.    Retention of Financial Advisors, Investment Banker, and Claims/Soliciation Agent

~~At the time of filing this Disclosure Statement, the~~The Debtors have filed motions to retain (a) Ankura Consulting Group, LLC as Chief Restructuring Officer, and (b) Kurtzman Carson Consultants LLC~~, was retained by the Debtors~~ to provide various services to the Debtors, including services relating to claims, noticing, solicitation, and balloting. ~~The~~The Bankruptcy Court approved the retention of Ankura Consulting Group, LLC on November 8, 2016, and Kurtzman Carson Consultants, LLC on November 4, 2016. In addition, the Debtors ~~intend to file motions~~filed a motion to retain Widebridge ~~Group~~as their investment banker, which is scheduled to be heard by the Bankruptcy Court on December 7, 2016.

c.    Committee

No committee has been appointed.

F.    First-Day Motions and Related Relief

On the Petition Date, the Debtors filed certain motions seeking emergency relief to allow their efficient and effective continued operations in the Chapter 11 Cases. On October 6, 2016, the Bankruptcy Court, *inter alia*, entered a final order authorizing the joint administration of the Debtors' Chapter 11 Cases for procedural purposes only; and interim orders (ii) permitting the Debtors to pay certain prepetition wages and benefits to their employees, (iii) permitting the Debtors' continued use of their existing cash-management system, (iv) permitting the Debtors to continue to honor certain obligations to customers and to maintain customer programs, including with respect to warranty discounts and returns and (v) permitting the Debtors to perform obligations necessary to maintain insurance coverage. On October 27, 2016 final orders approving these motions ~~was~~were entered.

13

G.    Use of Cash Collateral and DIP Financing

        On October 6, 2016, the Bankruptcy Court entered an order (the "Interim DIP Order") authorizing the Debtors to, on an interim basis, obtain debtor-in-possession financing from AT&T Capital Services, Inc. (in such capacity, the "DIP Lender") to provide liquidity to the Debtors on an exigent basis (the "DIP Facility"). On October 27, 2016, the Bankruptcy Court entered the *Final Order (I) Authorizing Debtors to Obtain Post-Petition Financing, (II) Authorizing The Use Of Cash Collateral, (III) Granting Liens And Superpriority Claims, and (IV) Granting Related Relief* (the "Final DIP Order"). The DIP Facility is a senior secured superpriority multiple draw term loan facility consisting of post-petition financing in a total amount of $1,000,000, inclusive of Roll-Up Loans in an amount equal to $240,000 (representing the new borrowings advanced to the Debtors under the Prepetition Promissory Note), of which an aggregate principal amount of $150,000 was advanced by the DIP Lender to the Debtors pursuant to the Interim DIP Order.

H.    Schedules of Assets and Liabilities and Statements of Financial Affairs

        On October 19, 2016, Filip ~~Technologies, Inc.~~ filed its Schedules of Assets and Liabilities and Statements of Financial Affairs with the Bankruptcy Court, which set forth, *inter alia*, scheduled prepetition claims against the Debtors based on their books and records. The ~~other subsidiaries~~Debtor Subsidiaries filed their schedules shortly thereafter. ~~At the time of filing this Disclosure Statement, the schedules of Evado Filip AS are in process and should be filed shortly.~~

I.    Liquidation Process and Asset Sale

        Both before and after the Petition Date, the Debtors engaged in an intensive effort to identify and attract entities interested in purchasing the Debtors' business or their assets.

        On October 5, 2016, the Debtors filed the *Debtors' Motion for Orders (I)(A) Approving Bidding Procedures and Auction and (B) Scheduling Sale Hearing and Approving Notice Thereof; (II) Authorizing the Sale of Substantially all of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* (the "Bidding Procedures Motion"). In the Bidding Procedures Motion, the Debtors sought authority to conduct one or more auctions (the "Auction") for the sale of the Debtors' business operations and related properties and assets, including the Debtors' intellectual property.

        On October 24, 2016, the Bankruptcy Court entered the *Order (A) Approving Bidding Procedures and Auction and (B) Scheduling Sale Hearing and Approving Notice Thereof; (II) Authorizing the Sale of Substantially all of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* (the "Bidding Procedures Order"). The Bidding Procedures Order fixed certain deadlines, including a bid deadline of November 4, 2016, at 5:00 p.m. (ET), an Auction date of November 7, 2016, at 10:00 a.m. (ET), and a sale hearing date of November 8, 2016 at 2:00 p.m. (ET). Under the Bidding Procedures Order, Aricent Holding Luxembourg S.á.r.l. ("Aricent") was named as the stalking horse, with a proposed purchase price of $475,000, subject to certain adjustments,

**Formatted:** Font color: Auto

Prior to the bid deadline on November 4, 2016, the Debtors received a competing bid from Smartcom Mobility Solutions, Inc. ("Smartcom" or the "Purchaser") in the amount of $550,000.00. In consultation with their DIP Lender, the Debtors determined that the bid submitted by Smartcom was a Qualified Bid (as that term was defined under the Bidding Procedures Order), and therefore the Auction would proceed forward on November 7. No other bids were received.

The Auction was commenced on November 7, 2016, and continued until it was concluded on November 8, 2016. Several rounds of bidding occurred between Aricent and Smartcom. At the end of the Auction, the Debtors, in consultation with their DIP Lender, determined that the highest and best bid was from Smartcom in the amount of $1,025,000.00 (the "Successful Bid"). Aricent was declared the Back-Up Bidder with a bid in the amount of $1,010,000.00. The Debtors then concluded the Auction.

A hearing was held in the Bankruptcy Court on November 8, 2016, at which time the Debtors sought Bankruptcy Court approval for the Successful Bid of Smartcom. At the conclusion of this hearing, the Bankruptcy Court agreed to approve the sale of substantially all of the Debtors' assets to Smartcom in the amount of the Successful Bid. On November 9, 2016, the Bankruptcy Court entered the *Order (I) Approving Asset Purchase Agreement; (II) Authorizing and Approving Sale of Acquired Assets Free and Clear of Liens, Claims and Encumbrances; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts; and (IV) Granting Related Relief* [Docket No. 134].

On November 10, 2016, the sale to Smartcom successfully closed, and the balance of the sale proceeds were paid to the Debtors.

J.    Preservation of Certain Claims and Causes of Action

Under Sections 547, 548, and 550 of the Bankruptcy Code, a debtor may seek to avoid and recover certain pre-petition payments made by the debtor to or for the benefit of a creditor, in the ninety days prior to the petition date, in respect of an antecedent debt if such transfer was made when the debtor was insolvent; transfers made to a creditor that was an "insider" of the debtor are subject to these provisions if the payment was made within one year of the debtor's filing of a petition under Chapter 11 (collectively, the "Avoidance Actions"). As of the date of this Disclosure Statement, the Debtors have not commenced any Avoidance Actions.

AdditionallyAs described below, pursuant to the Plan, certain claimsClaims and causesCauses of action wereAction, including Avoidance Actions, are preserved for the benefit of the Estates. The Debtors are currently investigating the viability of Claims and Causes of Action, which after the Effective Date, would be transferred to the Liquidating Trust to pursue.

K.    Claims Bar Date

At the time of filing this Disclosure Statement, the Debtors have askedOn November 9, 2016, the Bankruptcy Court to setentered an order setting a general claims Bar Date. Once the of December 12, 2016, and a Bar Date has been set, all creditors will receive notice of the Bar Datefor Claims asserted by Governmental Units of April 3, 2017.

15

## III.

## SUMMARY OF THE PLAN

A.    General

The Plan is a plan of liquidation that contemplates the distribution of the remaining net proceeds realized from the ~~earlier~~ sale of substantially all of the assets of the Debtors.

All proceeds from the sale and any available cash on the Effective Date shall be distributed as follows

First, to fund the Reserves, including the Administrative and Secured Claims Reserve, the Priority Tax Claims Reserve, the Professional Fee Reserve, and the Priority Claims Reserve, each of which shall be funded with the Reserve Estimate. The Reserves will be used to pay in full the ~~administrative expenses of the estates, the~~Allowed Administrative Claims, Allowed Professional Fee Claims, Allowed Priority Tax Claims, Allowed Priority Claims (Class 1) and Allowed Secured Claims, ~~Class 1 and~~ (Class 2~~)~~).

Second, to the ~~holders~~Holders of Class 3 Unsecured Claims in an amount not to exceed $10,000 (the "GUC Contribution"); *provided* ~~holders~~*that* Holders of Claims in Class 3 vote to accept the Plan. Otherwise, the GUC Contribution shall be $0.00.

Remaining Available Cash (or, if after the Effective Date, proceeds of Liquidating Trust Assets (other than the Reserves and GUC Contribution)) shall be distributed as follows:

a.    To the DIP Lender to repay Post-Petition DIP Advances.

b.    Next, to the DIP Lender to repay the Roll-Up ~~Claim~~Claims in the amount of $240,000.

c.    The remaining Available Cash shall be distributed as follows:

(i)    Until the DIP Lender is paid in full on account of its Other DIP Claims:

(A)    Fifty percent (50%) to the DIP Lender on account of the Other DIP Claims; and

(B)    Fifty percent (50%) to the Liquidating Trust as a Liquidating Trust Asset

(ii)    Thereafter, remaining Available Cash shall be a Liquidating Trust Asset.

The Liquidating Trust Assets shall be shared by Class 3 and Class 4 as follows. Holders of Class 3 Claims shall share Pro Rata in (i) the GUC Contribution, if any, and (ii) up to the first $50,000 of the Liquidating Trust Assets as Class 3 Liquidating Trust Assets. All remaining

Liquidating Trust Assets over that amount are shared Pro Rata ~~with~~by the Holders of Class 3 Claims and Class 4 Claims as Class 4 Liquidating Trust Interests. For the avoidance of doubt, Class 4 Liquidating Trust Interests shall be junior and subordinated in right of Distribution to Class 3 Liquidating Trust Interests. Distributions made to Class 3 and Class 4 Holders shall be in full and final satisfaction of such Claims.

Class 5 Intercompany Claims ~~and~~, Class 6 Equity Interests in Filip, and Class 7 Equity Interests in the Debtor Subsidiaries shall receive no distribution under the Plan.

For ease of reference, the ~~Debtors will~~Proponents have appended a Recovery Analysis to this Disclosure Statement as Exhibit B and a liquidation analysis to this Disclosure Statement as Exhibit ~~B. The liquidation analysis will be filed as a supplement to the Disclosure Statement and served on notice parties no later than 10 days before~~ C (the ~~Voting Deadline.~~"Liquidation Analysis").

B.    Classification and Treatment of Claims and Equity Interests

1. Unclassified Claims.

Certain types of Claims are not placed into Classes; instead they are unclassified. They are not considered Impaired and they do not vote on the Plan because they are automatically entitled to the specific treatment provided for them in the Bankruptcy Code. As such, the ~~Debtors~~Proponents have not placed the following Claims in a Class:

Administrative Claims. Except to the extent that a Holder of an Allowed Administrative Claim agrees to a less favorable treatment, each Holder of an Allowed Administrative Claim, other than a Professional Fee Claim, shall receive, without interest, Cash equal to the Allowed amount of such Claim: (a) on or as soon as practicable after the later of (i) the Effective Date, or (ii) the date upon which the Bankruptcy Court enters a Final Order determining or approving such Claim; (b) in accordance with the terms and conditions of agreements between the Holder of such Claim and the Debtors or the Liquidating Trustee, as the case may be; (c) with respect to any Administrative Claims representing obligations incurred in the ordinary course of the Debtors' business, upon such regular and customary payment or performance terms as may exist in the ordinary course of the Debtors' business or as otherwise provided in the Plan; or (d) with respect to statutory fees due pursuant to 28 U.S.C. § 1930(a)(6), such fees will be paid as and when due under applicable law.

Holders of Administrative Claims (including, without limitation, Professionals requesting compensation or reimbursement of such expenses pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code) that do not file such requests by the applicable deadline provided for herein may be subject to objection for untimeliness and may be prohibited by order of the Bankruptcy Court from asserting such claims against the Debtors, their Estates, the Liquidating Trust, or their successors or assigns, or their property. Any objection to Professional Fee Claims shall be filed on or before the objection deadline specified in the application for final compensation or order of the Bankruptcy Court.

The Administrative Claims Bar Date for all Administrative Claims (other than Professional Fee Claims) shall be thirty (30) days after service of notice of the occurrence of the

Effective Date. The Debtors shall serve a notice, within five days after the Effective Date, of the Administrative Claims Bar Date on all potential Holders of Administrative Claims. Notwithstanding the foregoing, all fees due and payable under 28 U.S.C. § 1930 that have not been paid shall be paid on or before the Effective Date, and the United States Trustee shall not be required to file a request for payment of such fees.

The Debtors estimate that the total amount of unpaid Allowed Administrative Claims as of the Effective Date will be approximately $0.00, excluding the fees and expenses of Professionals, which the Debtors estimate total approximately $250,000.00 through Confirmation and which have been satisfied in part through interim fee applications and retainers.

Professional Fee Claims. Professionals requesting compensation or reimbursement of expenses pursuant to Sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code or required to file fee applications by order of the Bankruptcy Court for services rendered prior to the Effective Date must file and serve pursuant to the notice provisions of the Interim Fee Order, an application for final allowance of compensation and reimbursement of expenses no later than forty-five (45) days after the Effective Date. All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Bankruptcy Court. For avoidance of doubt, the Liquidating Trustee is not authorized under the Plan to object to applications for final allowance of compensation and reimbursement of expenses.

Priority Tax Claims. Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in exchange for full and final satisfaction, settlement, release and discharge of each Allowed Priority Tax Claim, the Liquidating Trust shall pay each holder of an Allowed Priority Tax Claim the full unpaid amount of such Allowed Priority Tax Claim under one of the following options (at the Liquidating Trust's sole and exclusive election): (i) payment on the Effective Date, (ii) payment on the date such Allowed Priority Tax Claim becomes an Allowed Claim, (iii) payment on the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law, or (iv) payment within the time specified under Bankruptcy Code Section 1129(a)(9).

Priority Tax Claims consist of any Claims for taxes, interest and penalties against the Debtors entitled to priority pursuant to Section 507(a)(8) of the Bankruptcy Code. The Debtors estimate that the total amount of Allowed Priority Tax Claims will be approximately $~~0~~20,000.00.

2. Classified Claims

The ~~Debtors~~Proponents have placed the following categories of Claims and Equity Interests into ~~classes~~Classes for all purposes, including voting, Confirmation, and Distribution (if any) pursuant to the Plan and pursuant to Sections 1122 and 1123(a)(1) of the Bankruptcy Code:

Class 1 - Priority Claims. Class 1 is not an Impaired Class and Holders of Priority Claims are not entitled to vote on the Plan. The Liquidating Trustee shall pay the Allowed amount of each Priority Claim to each Entity holding a Priority Claim as soon as practicable following the later of: (a) the Effective Date and (b) the date such Priority Claim becomes an Allowed Claim (or as otherwise permitted by law). The Liquidating Trustee shall pay each Entity holding a Priority Claim in Cash in full in respect of such Allowed Claim without interest from the Petition Date;

*provided*, *however*, that such Entity may be treated on such less favorable terms as may be agreed to in writing by such Entity. The Debtors anticipate that only approximately $15,000 to $20,000 of Priority Claims will be Allowed Claims.

**Formatted:** Font: Italic

**Formatted:** Font: Italic

       <u>Class 2 - Secured Claims</u>. Class 2 is an Impaired Class and Holders of Secured Claims are entitled to vote on the Plan. Except to the extent previously paid in full, to the ex-tent any Secured Claims exist, at the option of the Debtors or the Liquidating Trustee, as applicable, one of the following treatments shall be provided: (i) the Holder of such Claim shall retain its Lien on its collateral until such collateral is sold, and the proceeds of such sale, less costs and expenses of disposing of such collateral, shall be paid to such Holder in full satisfaction, release, and discharge of such Allowed Secured Claim; (ii) on or as soon as practicable after the later of (a) the Effective Date, or (b) the date upon which the Bankruptcy Court enters a Final Order determining or allowing such Claim, or as otherwise agreed between the Holder of such Claim and the Debtors or the Liquidating Trustee, as applicable, the Holder of such Se-cured Claim will receive a Cash payment equal to the amount of its Allowed Secured Claim in full satisfaction, release, and discharge of such Secured Claim; or (iii) the collateral securing the Creditor's Secured Claim shall be abandoned to such Creditor, in full satisfaction, release, and discharge of such Secured Claim. As AT&T ~~is subordinating~~has agreed to the classification and treatment of its secured claim as an Allowed AT&T Unsecured Claim, the Debtors anticipate that there will be $0.00 in ~~secured claims~~Allowed Secured Claims.

       <u>Class 3 - Unsecured Claims</u>. Class 3 is an Impaired Class and Holders of Claims are entitled to vote to accept or reject the Plan. Each Holder of an Allowed Unsecured Claim in Class 3 shall receive a Pro Rata share of the Class 3 Liquidating Trust Interests following the payment or reserve for Administrative Claims, Priority Tax Claims, Priority Claims, and Se-cured Claims. Unsecured Claims are subject to all statutory, equitable, and contractual subordination claims, rights, and grounds available to the Debtors, the Estates, and pursuant to the Plan, the Liquidating Trustee, which subordination claims, rights, and grounds are fully enforceable prior to, on, and after the Effective Date. The DIP Lender will contribute the GUC Contribution if Holders of Unsecured Claims vote to accept the Plan. If Holders of Unsecured Claims reject the Plan the GUC Contribution shall equal $0. Holders of Unsecured Claims shall also be entitled to receive a Pro Rata share of the Class 4 Liquidating Trust Interests distributed to Holders of Class 4 AT&T Unsecured Claims. For the avoidance of doubt Holders of Class 4 AT&T Unsecured Claims shall not be entitled to receive Class 3 Liquidating Trust Interests.

       Approximately $1.5 million in undisputed ~~claims~~Claims were scheduled by the Debtors with a total inclusive of ~~disputed claims~~Disputed Claims in the approximate amount of $5 million. The Debtors anticipate that Allowed Class 3 Claims will receive a distribution of 1.0~~2~~% to ~~an unknown amount~~1.3% based on the sale and the GUC Contribution (if any) on account of their Allowed Claims, based solely upon the amount of Cash available for payment to Holders of Class 3 Unsecured Claims, and without accounting for any recovery from Causes of Action.

       <u>Class 4 – AT&T Unsecured Claims</u>. Class 4 is an Impaired Class and Holders of <u>Class 4</u> Claims are entitled to vote to accept or reject the Plan. Each Holder of an Allowed AT&T Unsecured Claim in Class 4 shall, along with Holders of Class 3 Unsecured Claims, receive a Pro Rata share of the Class 4 Liquidating Trust Interests.

Approximately $735,000 of AT&T Unsecured Claims have been asserted against the Debtors' estates. The Debtors anticipate that Allowed Class 4 AT&T Unsecured Claims will receive a distribution of 0.00% to unknown amount0.3% based on the sale on account of their Allowed Claims, based solely upon the amount of Cash available for payment to Holders of AT&T Unsecured Claims, and without accounting for any recovery from Causes of Action.

Class 5 – Intercompany Claims. Holders of Intercompany Claims will receive no distribution under the Plan and therefore are deemed to have rejected the Plan. Accordingly, Holders of Intercompany Claims are not entitled to vote. There shall be no Distribution on account of Class 5 Intercompany Claims. Upon the Effective Date, the Intercompany Claims will be discharged.

Class 6 – Equity Interests in Filip. Holders of Equity Interests in Filip will receive no distribution under the Plan and therefore are deemed to have rejected the Plan. Accordingly, Holders of Equity Interests in Filip are not entitled to vote. There shall be no Distribution on account of Class 6 Equity Interests. Upon the Effective Date, the Equity Interests in Filip will be deemed cancelled and will cease to exist.

Class 7 – Equity Interests in the Debtor Subsidiaries. Holders of Equity Interests in the Debtor Subsidiaries will receive no distribution under the Plan and therefore are deemed to have rejected the Plan. Accordingly, Holders of Equity Interests in the Debtor Subsidiaries are not entitled to vote. There shall be no Distribution on account of Class 7 Equity Interests. Upon or as soon as practicable after the Effective Date, the Equity Interests in the Debtor Subsidiaries will be deemed cancelled and will cease to exist.

C.    Means for Implementation of the Plan; Distributions

1. Appointment of the Liquidating Trustee

The Proponents are appointing Roy Messing, Senior Managing Director of Ankura Consulting Group, LLC as the Liquidating Trustee. The form of the Liquidating Trust Agreement will be disclosed in the Plan Supplement, as described in Article V of the Plan.

2. The Liquidating Trust

The Liquidating Trust shall administer the Liquidating Trust Assets, prosecute and resolve all Disputed Claims, investigate and pursue Causes of Action, and make Distributions to the Beneficiaries of the Liquidating Trust. The Distributions will be made as provided in Article V of the Plan. The Liquidating Trustee shall have the powers and rights described in Article V of the Plan and the Liquidating Trust Agreement. The Debtors have budgeted approximately $50,000.00 as a reserve for the Liquidating Trust operating expenses.

D.    Unexpired Leases and Executory Contracts

Except as otherwise provided in the Plan, any and all pre-petition leases or executory contracts not previously rejected by the Debtors, unless specifically assumed pursuant to order(s) of the Bankruptcy Court prior to the Confirmation Date or the subject of a motion to

assume or assume and assign pending on the Confirmation Date, shall be deemed rejected by the Debtors on the Confirmation Date.

Proofs of claim for rejection damages for any lease or executory contract rejected pursuant to the Plan must be filed within thirty (30) days after the earlier of (a) service of a notice of the occurrence of the Effective Date, which shall include the filing deadline and identify known contracts and leases being rejected pursuant to Confirmation, or (b) service of an order of the Bankruptcy Court approving such rejection.

E.    Retention of Jurisdiction

Following the Confirmation Date and until such time as all payments and distributions required to be made and all other obligations required to be performed under the Plan have been made and performed by the Liquidating Trustee, the Bankruptcy Court shall retain jurisdiction as is legally permissible, including, without limitation, for the purposes described in Article IX of the Plan.

F.    Conditions to Effectiveness

The conditions to the confirmation and effectiveness of the Plan are set forth in Article VII of the Plan. In the event that the conditions specified in Section VII.A of the Plan have not occurred or been waived, the each of the Proponents may withdraw the Plan and the Plan will be of no force or effect.

G.    Modification or Revocation of the Plan

The Proponents reserve the right, in accordance with the Bankruptcy Code, to amend or modify the Plan at or any time prior to the Confirmation Date, as provided in Section 1127 of the Bankruptcy Code or as provided in Bankruptcy Rule 3019. If the Plan, as altered, amended or modified, is not consummated on or before the Effective Date or such other date as the Bankruptcy Court fixes, all ~~holders~~Holders of Claims and Equity Interests shall be returned to the status quo ante, as if the Plan had not been filed, and the Confirmation Order shall be deemed vacated ab initio.

The Liquidating Trustee and the Proponents may, with the approval of the Bankruptcy Court and without notice to all ~~holders~~Holders of Claims and Equity Interests, insofar as it does not materially and adversely affect the interest of ~~holders~~Holders of Claims and Equity Interests, correct any defect, omission or inconsistency in the Plan in such manner and to such extent as may be necessary to expedite consummation of the Plan.

H.    **EXCULPATION, RELEASES[3], AND INJUNCTION**

Information regarding the exculpation, release, and injunction provisions contained in Article VIII of the Plan is below. All Holders of Claims against and Equity Interests in the

---

[3] ~~The Exculpated Parties are (a) the Proponents, (b) the Purchaser and (c) their respective current and former members (including ex officio members), officers, directors, employees, partners, attorneys, financial advisors, accountants, managed funds, investment bankers, investment advisors, actuaries, professionals, agents and representatives.~~

Debtors are urged to review the exculpation and release provisions of the Plan in Sections VIII.D, VIII.E, and VIII.F in their entirety prior to voting to accept or reject the Plan (if applicable) or making a determination whether or not to grant the Consensual Third-Party Releases.

1. Limitation of Liability

**The Plan includes provisions exculpating certain participants in the Chapter 11 Cases, including the Proponents, the Purchaser, the Back-Up Bidder, and their respective current and former officers, directors (including ex officio board members), employees, attorneys, financial advisors, accountants, investment bankers, investment advisors, professionals, agents, and representatives (in each case in their respective capacities as such) (collectively, the "Exculpated Parties") from liability** ~~except for Claims or liabilities~~ **in connection with certain matters arising out of or relating to** ~~any act or omission of a Exculpated Party that constitutes fraud, gross negligence, willful misconduct, criminal conduct, malpractice, misuse of confidential information that causes damages, competition with the Debtors in violation of applicable non-competition agreements or ultra vires act as determined by a Final Order. Article VIII.F of the Plan provides that each holder of a Claim or Equity Interest shall grant releases to the Exculpated Parties (the "Consensual Third-Party Releases") unless the Creditor elects to exercise its right to "opt out" of such releases (the "Opt-Out Right") by making such election on its timely submitted Ballot (to the extent that it receives a Ballot) or in a written notice submitted to the Solicitation Agent (the "Opt-Out Election Form") on or before the Voting Deadline. Creditors should review the Ballots and Opt-Out Election Form, as applicable, and instructions carefully.~~

~~**Limitation of Liability.** The Exculpated Parties, will neither have nor incur any liability to any entity for any action in good faith taken or omitted to be taken after the Petition Date in connection with or related to~~ **the Chapter 11 Cases** ~~or the formulation, preparation, dissemination, implementation, Confirmation, or Consummation of the Plan, the Disclosure Statement, or any agreement created or entered into in connection with the Plan;~~ **as more particularly set forth in Section VIII.D of the Plan, except as otherwise provided** ~~*, however,* that this~~ **in Section VIII.D of the Plan. Specifically, the limitation of liability will not affect or modify the obligations created under the Plan, or the rights of any Holder of an Allowed Claim to enforce its rights under the Plan, and shall not release any action (or inaction) constituting fraud, gross negligence, willful misconduct, criminal conduct, malpractice, misuse** ~~of confidential information~~**and/or misappropriation of confidential information and/or intellectual property that causes damages, competition with the Debtors in violation of applicable non-competition agreements or ultra vires act (in each case subject to determination of such by final order of a court of competent jurisdiction). Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections of Section 1125(e) of the Bankruptcy Code.**

2. Debtor Releases

**Section VIII.E of the Plan provides for the Debtors to release certain participants in the Chapter 11 cases, including the Proponents, the Purchaser, the Back-Up Bidder, and their respective current and former officers, directors (including ex officio board members), employees, attorneys, financial advisors, accountants, investment bankers,**

**investment advisors, professionals, agents, and representatives (in each case in their respective capacities as such) (the "Released Parties") from liability in connection with certain matters arising out of or relating to the Chapter 11 Cases as more particularly set forth in Section VIII.E of the Plan, except as otherwise provided in Section VIII.E of the Plan. Specifically, such releases by the Debtors will not affect or modify the obligations created under the Plan, the rights of any Holder of an Allowed Claim to enforce its rights under the Plan, or any Causes of Action that arise under Chapter 5 of the Bankruptcy Code, and shall not release any action (or inaction) constituting fraud, gross negligence, willful misconduct, criminal conduct, malpractice, misuse and/or misappropriation of confidential information and/or intellectual property that causes damages, competition with the Debtors in violation of applicable non-competition agreements or ultra vires act (in each case subject to determination of such by final order of a court of competent jurisdiction).** ~~Without limiting the generality of the foregoing, each Exculpated Party shall be entitled to and granted the protections of Section 1125(e) of the Bankruptcy Code.~~ **Except as specifically set forth in ~~Article~~Section VIII.E of the Plan, no provision of the Plan or this Disclosure Statement shall be deemed to act to or release any claims, Causes of Action, Litigation claims or rights, or liabilities belonging to Liquidating Trust or the Estates,**

3. Consensual Third-Party Releases. ~~Each Person or Entity participating in Distributions under the Plan or pursuant to the Plan who affirmatively~~

**Section VIII.F of the Plan provides that each holder of a Claim or Equity Interest that (a)** votes to accept the Plan and ~~who does~~**has** not ~~elect to "opt~~**opted** out~~"~~ by ~~marking the appropriate box on their respective ballot,~~**from granting such releases, (b) votes to reject the Plan and has not opted out from granting such releases, and (c) otherwise agrees in writing to grant such releases shall** ~~by virtue of Sections 1126(c) and 1141(a)~~ **grant releases to the Released Parties from liability in connection with certain matters arising out of or relating to the Chapter 11 Cases and as more particularly set forth in Section VIII.F of the Plan (the "Consensual Third-Party Releases") except as otherwise provided in Section VIII.F of the Plan. Specifically, the Consensual Third-Party Releases will not affect or modify the obligations created under the Plan, or the rights of any Holder of an Allowed Claim to enforce its rights under the Plan and shall not release any action (or inaction) constituting fraud, gross negligence, willful misconduct, criminal conduct, malpractice, misuse and/or misappropriation of confidential information and/or intellectual property that causes damages, competition with the Debtors in violation of applicable non-competition agreements or ultra vires act (in each case subject to determination of such by final order of a court of competent jurisdiction).**

Holders of Claims that return a Ballot to accept or reject the Plan will be deemed to have granted the Consensual Third-Party Releases unless such Holders elect not to grant such releases by checking the applicable box on the Ballot. Holders of Claims that do not return a Ballot and Holders of Claims in Class 1 and Equity Interests in Class 6 will be deemed not to have granted the Consensual Third-Party Releases unless such Holders otherwise agree in writing to grant such releases. Holders of Claims in Class 1 and Equity Interests in Class 6 will receive a *Notice of Non-Voting Status for the Joint Plan of Liquidation of the Debtors Pursuant to Chapter 11* of the Bankruptcy Code~~, be deemed,~~ *and Right to Elect to Grant Third-Party Releases*, together with a

Release Election Form on ~~behalf of itself and its successors and assigns, to have released any and all Claims and Causes of Action against the Exculpated Parties and their respective property~~which they may indicate their election to grant the Third-Party Releases. Election to grant the Consensual Third-Party Releases is at the option of the Holders and will not affect such Holders' right to receive a distribution under the Plan, if applicable. Creditors should review the Ballots and Release Election Form, as applicable, and instructions carefully.

    4. Injunction.

On the Effective Date, except as otherwise expressly provided in the Confirmation Order or the Plan, and except in connection with the enforcement of the terms of the Plan or any documents provided for or contemplated in the Plan, all entities who have held, hold or may hold Claims against or Equity Interests in the Debtors, the Liquidating Trust, or the Estates that arose prior to the Effective Date will be permanently enjoined from: (a) commencing or continuing in any manner, directly or indirectly, any action or other proceeding of any kind against the Estates, the Liquidating Trust, or any property of the Liquidating Trust or the Estates with respect to any such Claim or Equity Interest; (b) the enforcement, attachment, collection, or recovery by any manner or means, directly or indirectly, of any judgment, award, decree, or order against the Estates, the Liquidating Trust, or any property of the Liquidating Trust or the Estates with respect to any such Claim or Equity Interest; (c) creating, perfecting, or enforcing, directly or indirectly, any Lien or encumbrance of any kind against the Estates, the Liquidating Trust, or any property of the Liquidating Trust or the Estates with respect to any such Claim or Equity Interest; and (d) any act, in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan with respect to such Claim or Equity Interest. Nothing contained in this Section shall prohibit the Holder of a ~~timely~~ filed Proof of Claim from litigating its right to seek to have such Claim declared an Allowed Claim and paid in accordance with the distribution provisions of the Plan, or enjoin or prohibit the interpretation or enforcement by the Claimant of any of the obligations of the Debtors or the Liquidating Trust under the Plan.

## IV.

## VOTING REQUIREMENTS; ACCEPTANCE AND CONFIRMATION OF THE PLAN

The Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Proponents, including that (i) the Plan has classified Claims and Equity Interests in a permissible manner, (ii) the Plan complies with applicable provisions of the Bankruptcy Code, (iii) the Proponents have complied with applicable provisions of the Bankruptcy Code, (iv) the Proponents have proposed the Plan in good faith and not by any means forbidden by law, (v) the disclosure required by Section 1125 of the Bankruptcy Code has been made, (vi) the Plan has been accepted by the requisite votes of creditors (except to the extent that cramdown is available under Section 1129(b) of the Bankruptcy Code), (vii) the Plan is feasible and confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors, (viii) the Plan is in the "best interests" of all ~~holders~~Holders of Claims or Equity Interests in an ~~impaired~~Impaired Class by providing to such

~~holders~~Holders on account of their Claims or Equity Interests property of a value, as of the Effective Date, that is not less than the amount that such ~~holder~~Holder would receive or retain in a ~~chapter~~Chapter 7 liquidation, unless the Holder has accepted the Plan, and (ix) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on Confirmation, have been paid or the Plan provides for the payment of such fees on the Effective Date.

A.    Parties in Interest Entitled to Vote

Pursuant to the Bankruptcy Code, only classes of claims and interests that are "impaired" (as defined in Section 1124 of the Bankruptcy Code) under the plan are entitled to vote to accept or reject the Plan. A class is impaired if the legal, equitable, or contractual rights to which the claims or equity interests of that class entitled the holders of such claims or equity interests are modified, other than by curing defaults and reinstating the debt. Classes of claims and interests that are not impaired are not entitled to vote on the plan and are conclusively presumed to have accepted the plan. In addition, classes of claims and interests that receive no distributions under the plan are not entitled to vote on the plan and are deemed to have rejected the plan.

B.    Classes Impaired Under the Plan

The following Classes of Claims and Equity Interests are ~~impaired~~Impaired under the Plan:

Class 2: Secured Claims
Class 3: Unsecured Claims
Class 4: AT&T Unsecured Claims
Class 5: Intercompany Claims
Class 6: Equity Interests in Filip
Class 7: Equity Interests in the Debtor Subsidiaries

Acceptances of the Plan are being solicited only from those Holders of Claims in Impaired Classes that will or may receive a distribution under the Plan. Accordingly, the ~~Debtors~~Proponents are soliciting acceptances from members of Class 2, Class 3 and Class 4. Class 5 (Intercompany Claims ~~and~~), Class 6 (Equity Interests in Filip), and Class 7 (Equity Interests in the Debtor Subsidiaries) are receiving no distribution under the Plan and are therefore deemed to reject the Plan.

C.    Voting Procedures and Requirements

In voting for or against the Plan, please use only the Ballot or Ballots sent to you with this Disclosure Statement. In addition, if you vote to accept or reject the Plan, you may elect to opt out of the Consensual Third-Party Releases provided under the Plan to the ~~Exculpated~~Released Parties on the Ballot.

If you are a member of Class 2, Class 3, or Class 4 and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please call the Debtors' ~~solicitation agent~~Solicitation Agent, Kurtzman Carson Consultants, LLC, at 866-

381-9100 or email filipinfo@kccllc.com. PLEASE FOLLOW THE DIRECTIONS CONTAINED ON THE ENCLOSED BALLOT CAREFULLY.

YOU SHOULD COMPLETE AND SIGN YOUR BALLOT AND RETURN IT IN THE ENCLOSED ENVELOPE TO:

**Filip Technologies, Inc. Ballot Processing Center**
**2335 Alaska Avenue**
**El Segundo, CA 90245**

VOTES CANNOT BE TRANSMITTED ORALLY. FACSIMILE AND EMAILED BALLOTS WILL NOT BE ACCEPTED. TO BE COUNTED, ORIGINAL SIGNED BALLOTS MUST BE RECEIVED ON OR BEFORE DECEMBER ——29, 2016, AT 4:00 P.M., PREVAILING PACIFIC TIME. IT IS OF THE UTMOST IMPORTANCE TO THE DEBTORS THAT YOU VOTE PROMPTLY TO ACCEPT THE PLAN.

THE DIP LENDER HAS AGREED TO FUND THE GUC CONTRIBUTION FROM AMOUNTS OTHERWISE RECOVERABLE BY THE DIP LENDER ONLY IF HOLDERS OF CLAIMS IN CLASS 3 VOTE TO ACCEPT THE PLAN.

D.     Confirmation Without Acceptance of All Impaired Classes

The Bankruptcy Code contains provisions for confirmation of a plan even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. These so-called "cramdown" provisions are set forth in Section 1129(b) of the Bankruptcy Code.

A plan may be confirmed under the cramdown provisions if, in addition to satisfying all other requirements of Section 1129(a) of the Bankruptcy Code, it (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each class of claims or interests that is impaired under, and has not accepted, the plan. As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have specific meanings unique to bankruptcy law.

AS CLASS 5 INTERCOMPANY CLAIMS—AND, CLASS 6 EQUITY INTERESTS IN FILIP, AND CLASS 7 EQUITY INTERESTS IN THE DEBTOR SUBSIDIARIES ARE DEEMED TO REJECT THE PLAN, THE PROPONENTS INTEND TO SEEK CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF SECTION 1129(b) OF THE BANKRUPTCY CODE WITH RESPECT TO SUCH CLASSCLASSES.

E.     Best Interests Test

In order to confirm the Plan, the Bankruptcy Court must independently determine that the Plan is in the best interests of each Holder of a Claim or Equity Interest in any such impaired Class who has not voted to accept the Plan. Accordingly, if an Impaired Class does not unanimously accept the Plan, the best interests test requires the Bankruptcy Court to find that the Plan provides to each member of such impairedImpaired Class a recovery on account of the Class

member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such member would receive if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on such date.

F.      Liquidation Analysis

In this case, the Debtors ~~intend to sell~~have sold substantially all of their assets. Based upon the Debtors' ~~current projections and the stalking horse sale provisions~~Sale process, Holders of Allowed Administrative, Priority and Secured Claims will be paid in full under the Plan, while Holders of Allowed Unsecured Claims will receive a projected distribution of 1.0.2% % to 1.3%if they vote to accept the ~~plan. Such amounts may increase if the sale auction results in higher and better bid offers.~~Plan. Holders of AT&T Unsecured Claims are currently estimated to receive 0.00% ~~unless there is a better sale offer.~~to 0.3%.

If the Chapter 11 Cases were converted to Chapter 7 cases, the Debtors' estates would incur the costs of payment of a statutorily allowed commission to the Chapter 7 trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtors believe that such amounts would exceed the amount of expenses that will be incurred in implementing the Plan and winding up the affairs of the Debtors. Additionally, the Debtors' ~~estates~~Estates would suffer substantial additional delays, as a Chapter 7 trustee and his/her counsel took time to develop a necessary learning curve in order to complete the administration of the ~~estates~~Estates. The Debtors' ~~estates~~Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for professionals) which will constitute Allowed Claims in any Chapter 7 cases.

Based upon these reasons, the Proponents believe that creditors will receive at least as much under the Plan and likely more, than they would receive if the Chapter 11 Cases were converted to Chapter 7 cases. Attached hereto as Exhibit C is the Debtors' Liquidation Analysis.

G.      Feasibility

Under Section 1129(a)(11) of the Bankruptcy Code, the Proponents must show that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan). The Plan clearly complies with this requirement because all of the Debtors' remaining assets will be contributed to the Liquidating Trust, and the proceeds will be distributed to creditors. Furthermore, feasibility under Section 1129(a)(11) is supported by the ~~liquidation analysis~~Liquidation Analysis attached as Exhibit ~~B~~C and by the analysis in Article IV, Section F, of this Disclosure Statement, above.

H.      Compliance with the Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. The Proponents have considered each of these issues in the development of the Plan and believes that the Plan complies with all applicable provisions of the Bankruptcy Code.

**V.**

**ALTERNATIVES TO CONFIRMATION**
**AND CONSUMMATION OF THE PLAN**

The Proponents believe the Plan affords Holders of Claims the potential for the maximum distribution on account of their claims and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, the only viable alternatives are dismissal of the Chapter 11 Cases or conversion to Chapter 7 of the Bankruptcy Code. For the reasons described herein, neither of these alternatives is preferable to confirmation and consummation of the Plan.

If the Chapter 11 Cases were dismissed, creditors would revert to a "race to the courthouse," the result being that creditors would not receive a fair and equitable distribution of the Debtors' remaining assets. As set forth above, the Proponents believe the Plan provides a greater recovery to creditors than would be achieved in Chapter 7 cases. Therefore, a Chapter 7 conversion is not an attractive or superior alternative to the Plan. Thus, the Plan represents the best available alternative for maximizing returns to creditors.

**VI.**

**RISK FACTORS**

A.    Allowed Claims May Exceed Estimates

The projected distributions set forth in this Disclosure Statement are based upon the Proponents' good-faith estimate of the amount of expenses that will be incurred and total amount of Claims in each Class that will ultimately be Allowed. The actual amount of such expenses could be greater than expected for a variety of reasons, including greater than anticipated administrative and litigation costs associated with resolving Disputed Claims. Additionally, the actual amount of Allowed Claims in any class could be greater than anticipated, which would impact the distributions to be made to Holders of Claims.

B.    Liquidating Trust Expenses and Recoveries Are Uncertain

The Liquidating Trustee may use available Cash to pursue Causes of Action. The actual expenditures may depend on the Liquidating Trustee's decisions about which Causes of Action to pursue and in what forum, as well as the defendants' efforts to resist any litigation. The amount that may be recovered from the Causes of Action also is uncertain.

C.    Plan May Not Be Accepted or Confirmed

While the Proponents believe the Plan is confirmable under the standards set forth in Section 1129 of the Bankruptcy Code, there can be no guarantee that the Bankruptcy Court will agree.

## VII.

### CERTAIN FEDERAL INCOME
### TAX CONSEQUENCES OF THE PLAN

The following discussion addresses certain United States federal income tax consequences of the consummation of the Plan. This discussion is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), existing and proposed regulations thereunder, current administrative rulings, and judicial decisions as in effect on the date hereof, all of which are subject to change, possibly retroactively. No rulings or determinations by the Internal Revenue Service have been obtained or sought by the Proponents with respect to the Plan. An opinion of counsel has not been obtained with respect to the tax aspects of the Plan. This discussion does not purport to address the federal income tax consequences of the Plan to particular classes of taxpayers (such as foreign persons, S corporations, mutual funds, small business investment companies, regulated investment companies, broker-dealers, insurance companies, tax-exempt organizations and financial institutions) or the state, local, or foreign income and other tax consequences of the Plan. NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR EQUITY INTEREST. EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT A TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

A.     Federal Income Tax Consequences to Holders of Claims and Equity Interests

A Holder of an Allowed Claim or Equity Interest will generally recognize ordinary income to the extent that the amount of Cash or property received (or to be received) under the Plan is attributable to interest that accrued on a Claim but was not previously paid by the Debtors or included in income by the Holder of the Allowed Claim or Equity Interest. A Holder of an Allowed Claim or Equity Interest will generally recognize gain or loss equal to the difference between the Holder's adjusted basis in its Claim and the amount realized by the Holder upon consummation of the Plan that is not attributable to accrued but unpaid interest. The amount realized will equal the sum of Cash and the fair market value of other consideration received (or to be received).

The character of any gain or loss that is recognized will depend upon a number of factors, including the status of the Creditor, the nature of the Claim or Equity Interest in its hands, whether the Claim was purchased at a discount, whether and to what extent the Creditor has previously claimed a bad debt deduction with respect to the Claim, and the Creditor's holding period of the Claim or Equity Interest. If the Claim or Interest in the Creditor's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the Creditor is a non-corporate taxpayer and held such Claim or Equity Interest for longer than one year or short-term capital gain or loss if the Creditor held such Claim or Interest for less than one year.

A holder of an Allowed Claim or Equity Interest who receives, in respect of its Claim, an amount that is less than its tax basis in such Claim or Equity Interest may be entitled to

a bad debt deduction if either: (i) the holder is a corporation; or (ii) the Claim or Equity Interest constituted (a) a debt created or acquired (as the case may be) in connection with a trade or business of the holder or (b) a debt the loss from the worthlessness of which is incurred in the holder's trade or business. A holder that has previously recognized a loss or deduction in respect of its Claim or Equity Interest may be required to include in its gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the holder's adjusted basis in such Claim or Equity Interest.

Holders of Claims or Interests who were not previously required to include any accrued but unpaid interest with respect to in their gross income on a Claim or Equity Interest may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. Holders previously required to include in their gross income any accrued but unpaid interest on a Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

Holders of a Claim constituting any installment obligation for tax purposes may be required to currently recognize any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold or otherwise disposed of within the meaning of section 453B of the Tax Code.

The Holders of Class 3 Unsecured Claims and Class 4 AT&T Unsecured Claims are expected to receive only a partial distribution of their Allowed Claims and Class 5 Intercompany Claims and, Class 6 Equity Interests in Filip, and Class 7 Equity Interests in the Debtor Subsidiaries will not receive any distributions under the Plan on account of their Claims or Equity Interests. Whether the Holder of such Claims or Equity Interests will recognize a loss, a deduction for worthless securities or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the holder and its Claims or Equity Interests. Accordingly, the holders Holders of Class 3, 4, and 5 Claims and Class 6 and 7 Equity Interests should consult their own tax advisors.

B.      Federal Income Tax Consequences to the Debtors

Under the Tax Code, a taxpayer generally must include in gross income the amount of any cancellation of indebtedness income ("COD income") realized during the taxable year. Section 108 of the Tax Code provides an exception to this general rule, however, if the cancellation occurs in a case under the Bankruptcy Code but only if the taxpayer is under the jurisdiction of the bankruptcy court and the cancellation is granted by the court or is pursuant to a plan approved by the court.

Section 108 of the Tax Code requires the amount of COD income so excluded from gross income to be applied to reduce certain tax attributes of the taxpayer. The tax attributes that may be subject to reduction include the taxpayer's net operating losses and net operating loss carryovers (collectively, "NOLs"), certain tax credits and most tax credit carryovers, capital losses and capital loss carryovers, tax bases in assets, and foreign tax credit carryovers. Attribute reduction is calculated only after the tax for the year of the discharge has been determined. Section 108 of the Tax Code further provides that a taxpayer does not realize COD income from

cancellation of indebtedness to the extent that payment of such indebtedness would have given rise to a deduction.

Under the Plan, Holders of certain Claims are expected to receive less than full payment on their Claims. The Debtors' liability to the Holders of Claims in excess of the amount satisfied by distributions under the Plan will be canceled and therefore, will result in COD income to the Debtors. The Debtors should not realize any COD income, however, to the extent that payment of such Claims would have given rise to a deduction to the Debtors had such amounts been paid. In addition, any COD income that the Debtors realize should be excluded from the Debtors' gross income pursuant to the bankruptcy exception to Section 108 of the Tax Code described in the immediately preceding paragraph.

The exclusion of COD income, however, will result in a reduction of certain tax attributes of the Debtors. Because attribute reduction is calculated only after the tax for the year of discharge has been determined, the COD income realized by the Debtors under the Plan should not diminish the NOLs and other tax attributes that may be available to offset any income and gains recognized by the Debtors in the taxable year that includes the Effective Date.

C.      Importance of Obtaining Professional Tax Assistance

The foregoing is intended to be only a summary of certain of the United States federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. Holders of Claims or Equity Interests are strongly urged to consult with their own tax advisors regarding the federal, state, local and foreign income and other tax consequences of the Plan, including, in addition to the issues discussed above, whether a bad debt deduction may be available with respect to their Claims and if so, when such deduction or loss would be available.

THE FOREGOING DISCUSSION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. ACCORDINGLY, HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE TAX CONSEQUENCES OF THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX LAWS.

## VIII.

## RECOMMENDATION

The Proponents strongly recommend that all creditors receiving a Ballot vote in favor of the Plan. The Proponents believe that the Plan is in the best interests of creditors. The Plan as structured, among other things, allows creditors with Allowed Claims to participate in distributions believed to be in excess of those that would otherwise be available were the Chapter 11 Cases dismissed or converted under Chapter 7 of the Bankruptcy Code and minimizes delays in recoveries to creditors.

FOR ALL THE REASONS SET FORTH IN THIS DISCLOSURE STATEMENT, THE PROPONENTS BELIEVE THAT THE CONFIRMATION AND CONSUMMATION OF

THE PLAN IS PREFERABLE TO ALL OTHER ALTERNATIVES. THE ~~DEBTORS~~PROPONENTS URGE ALL CREDITORS ENTITLED TO VOTE TO ACCEPT THE PLAN AND TO EVIDENCE SUCH ACCEPTANCE BY RETURNING THEIR BALLOTS SO THAT THEY WILL BE RECEIVED BY 4:00 P.M. PACIFIC TIME ON DECEMBER ~~—~~29, 2016.

Dated: ~~October 28~~ November 18, 2016          Respectfully submitted,

Debtors:                              FILIP TECHNOLOGIES, INC.

                                      /s/  Roy Messing
                                      By:  Roy Messing
                                      Title:  Chief Restructuring Officer

LTD                                   FILIP TECHNOLOGIES, ~~LIMITED (~~ UK ~~)~~

                                      /s/  Roy Messing
                                      By:  Roy Messing
                                      Title:  Chief Restructuring Officer

                                      EVADO FILIP AS

                                      /s/  Roy Messing
                                      By:  Roy Messing
                                      Title:  Chief Restructuring Officer

                                      EVADO FILIP LIMITED

                                      /s/  Roy Messing
                                      By:  Roy Messing
                                      Title:  Chief Restructuring Officer

                                      EVADO FILIP US LIMITED

                                      /s/  Roy Messing
                                      By:  Roy Messing
                                      Title:  Chief Restructuring Officer

AT&T:                                 AT&T CAPITAL SERVICES, INC.

                                      /s/  James W. Grudus
                                      By:  James W. Grudus
                                      Title:  Authorized Signatory

                                      AT&T SERVICES, INC.

                                      /s/  James W. Grudus
                                      By:  James W. Grudus
                                      Title:  Authorized Signatory